**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

3M COMPANY,

                Plaintiff,

        -against-

PERFORMANCE SUPPLY, LLC,

                Defendant.

Case No.: 1:20-cv-02949 (LAP)(KNF)

**Jury Trial Demanded**

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF 3M COMPANY'S APPLICATION**
**FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.     PRELIMINARY STATEMENT ................................................................... 1

II.    STATEMENT OF FACTS ............................................................................. 3

       A.     COVID-19 and the Current National Emergency ................................ 3

       B.     The Parties and the Products ............................................................... 4

              1.     3M, and its Famous Brand and Trademarks ............................ 4

              2.     3M's Production and Sale of N95 Respirators During COVID-19 .......... 5

              3.     Defendant and its Purported Business ...................................... 6

              4.     Defendant's False and Deceptive Formal Quote to New York City ........ 6

III.   LEGAL STANDARD ..................................................................................... 8

IV.   LEGAL ANALYSIS ....................................................................................... 9

       A.     3M Will Suffer Immediate, Irreparable Harm Absent a TRO and PI ................... 9

       B.     3M is Likely to Succeed on the Merits of its Claims ........................... 10

               1.     3M is Likely to Establish the Validity of its 3M Marks and 3M Slogan .......... 11

              2.     3M is Likely to Establish that Defendant's Use of the 3M Marks and Slogan is Likely to Cause Confusion as to Source and/or Quality ................................. 11

       C.     The Balance of Hardships Tips Decidedly in 3M's Favor .................... 17

              1.     Defendant Would Not Suffer any Hardship if this Court Grants 3M's Application for a TRO and PI ........................................ 18

              2.     3M Would Suffer Substantial Hardship in the Absence of a TRO and PI .......... 18

       D.     Issuing a TRO and PI Would Serve the Public Interest of Avoiding Confusion ................................ 19

       E.     3M Should Not Be Required To Post A Bond .................................... 20

V.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M Co. v. Christian Investments LLC*,
  No. 1:11CV0627 TSE/JFA, 2012 WL 6561732 (E.D. Va. July 12, 2012)............................13

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019).....................................................................................10

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976)........................................................................................................12

*Avela, Inc. v. Estate of Marilyn Monroe, LLC*,
  131 F. Supp. 3d 196 (S.D.N.Y. 2015).....................................................................................11

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
  784 F.3d 887 (2d Cir. 2015)......................................................................................................8

*Cache, Inc.* v. *M.Z. Berger & Co.*,
  No. 99CV12320(JGK), 2001 WL 38283 (S.D.N.Y. Jan. 16, 2001)........................................17

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996)................................................................................................. 13-4

*Christian Louboutin, S.A. v. Yves Saint Laurent America Holdings, Inc.*,
  696 F.3d 206 (2d Cir. 2012).....................................................................................................12

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017).....................................................................................17

*Doctor's Associates, Inc. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996).......................................................................................................20

*Gucci America, Inc. v. Guess?, Inc.*,
  868 F. Supp. 2d 207 (S.D.N.Y. 2012).....................................................................................14

*Guthrie Healthcare System v ContextMedia, Inc.*,
  826 F.3d 27 (2d Cir. 2016)...........................................................................................11, 14, 17

*Henegan Const. Co., Inc.* v. *Heneghan Contracting Corp.*,
  No. 00 CIV.9077 JGK, 2002 WL 1300252 (S.D.N.Y. June 12, 2002) ............................. 16-7

*Heritage of Pride, Inc. v. Matinee of NYC*,
  2014 WL 12783866 (S.D.N.Y. June 20, 2014) .......................................................................15

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997)......................................................................................12

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt, Inc.*,
192 F.3d 337 (2d Cir. 1999)......................................................................................12

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
10 F. Supp. 2d 271 (S.D.N.Y. 1998)........................................................................11

*Long Island R.Co. v. Int'l Ass'n of Machinists*,
874 F.2d 901 (2d Cir. 1989)....................................................................................8, 9

*Louis Vuitton Malletier v. Sunny Merchandise*,
97 F. Supp. 3d 485 (S.D.N.Y. 2015).................................................................15, 16

*Mahmood v. Nielsen*,
312 F. Supp. 3d 417 (S.D.N.Y. 2018).........................................................................8

*Marks Org., Inc. v. Joles*,
784 F. Supp. 2d 322 (S.D.N.Y. 2011) ........................................................................9

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
818 F.2d 254 (2d Cir. 1987)......................................................................................15

*Mister Softee, Inc. Tsirkos,*
2014 WL 2535114 (S.D.N.Y. June 5, 2014) ...........................................................14

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F. Supp. 2d 305 (S.D.N.Y. 2010)..........................................................10, 18, 19

*NYP Holdings v. New York Post Pub. Inc.*,
63 F. Supp. 3d 328 (S.D.N.Y. 2014)........................................................................20

*Paddington Corp. v. Attiki Importers & Distrib.*,
996 F.2d 577 (2d Cir. 1993)......................................................................................16

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir.)....................................................................................... *passim*

*Streetwise Maps, Inc. v. VanDam, Inc.*,
159 F.3d 739 (2d Cir. 1998)......................................................................................12

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
294 F.3d 383 (2d Cir. 2002)......................................................................................13

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*US Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   800 F. Supp. 2d 515 (S.D.N.Y. 2011)........................................................................16

*Virgin Enterprises Ltd. v. Nawab*,
   335 F.3d 141 (2d Cir. 2005)...................................................................................14

*WpIX, Inc. v. lvl, Inc.*,
   691 F.3d 275 (2d Cir. 2012)...................................................................................18

**STATUTES**

15 U.S.C. § 1065...............................................................................................5, 6, 11

15 U.S.C. § 1072...............................................................................................16

15 U.S.C. § 1115(a)...........................................................................................11

15 U.S.C. § 1115(b)...........................................................................................11

**OTHER AUTHORITIES**

42 C.F.R. Part 84..............................................................................................3, 4, 5

FED. R. CIV. P. 65..............................................................................................20, 21

Local Civil Rule 7.1(a)(1)..................................................................................1

Plaintiff 3M Company ("3M"), by and through its undersigned counsel, respectfully submits this Memorandum of Law, and the concurrently filed Declarations of David A. Crist (the "Crist Decl."), Charles Stobbie (the "Stobbie Decl."), and A. John P. Mancini, Esq. (the "Mancini Decl."), in support of 3M's Application for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") (the "Application") against Defendant Performance Supply, LLC ("Defendant").  Pursuant to Local Civil Rule 7.1(a)(1), 3M also submits concurrently herewith a Proposed Order to Show Cause.

## I.   PRELIMINARY STATEMENT

The world currently faces the largest public health crisis in modern history, and sadly New York City has now become the epicenter of the crisis.  The exponential growth in the number of COVID-19 cases in the United States has placed increased pressure on healthcare personnel to treat patients, regardless of access to proper personal protective equipment ("PPE").  3M's PPE products, including N95 respirators, are in immediate need to protect medical professionals, first responders, and others who are working on the front lines of the crisis.  As a leading provider of PPE, 3M is committed to getting its PPE in the hands of those who need it most in these unprecedented times.  To meet the growing demand, 3M has ramped up respirator production, but the demand still exceeds the supply, especially in virus hotspots like New York City.

Unscrupulous parties, such as Defendant, are using this time of desperation to fabricate false associations with 3M and trade off of 3M's famous brand and goodwill for self-gain—all at the immeasurable expense of 3M, but more importantly at the expense of healthcare workers, first responders, and the public at-large.  In this instance, Defendant is falsely portraying an affiliation with and authorization by 3M to sell 3M-branded products, and in doing so is offering N95 respirators to New York City's Office of Citywide Procurement at grossly inflated prices.  However, Defendant is not an authorized distributor, agent, broker, or vendor of 3M products, has

no right to use 3M's famous 3M marks, and has no authority to make offers or solicit orders on 3M's behalf.  Defendant's exploitation of a global health disaster to confuse and deceive government officials into believing that Defendant is an authorized representative of 3M's products—and offering those products for sale at inflated prices—threatens immediate and irreparable harm to 3M's brand and to those desperately in need of PPE, including healthcare workers working on the front lines of COVID-19.

The damage to the famous 3M brand and its associated goodwill as a result of Defendant's unlawful conduct is immediate, immeasurable and irreparable, and has the potential to define the 3M brand in the eyes of consumers for years to come.  Indeed, Defendant's offer to sell 3M-brand N95 respirators supposedly subject to "acceptance…at the full discretion of 3M" at a price that is 400-600% higher than 3M's list price gives the false impression that 3M is inflating its prices and condoning price-gouging in the midst of a national emergency.  This is not the case, and is antithetical to 3M's organizational mission and values.  In fact, 3M has not increased its prices for PPE in response to the pandemic, despite costly measures to increase worldwide production.

Based on the foregoing, a TRO and PI are fully warranted.  Absent injunctive relief, 3M is likely to suffer reputational damage and loss of goodwill that would be impossible to quantify.  In this case and in other cases, public procurement agencies strapped for resources and operating in a crisis mode are confused and misled by the false association tactics employed here. Absent a TRO and PI preventing Defendant from infringing and diluting 3M's trademarks, unfairly competing, falsely claiming association with 3M, and engaging in false advertising and otherwise deceptive practices, 3M will suffer immediate injury to the goodwill and business reputation that it has worked for decades to build.  3M is also likely to succeed on the merits of its claims, including, in particular, its federal and state claims for trademark infringement,  unfair competition,

false endorsement, false association, and false designation of origin, because Defendant is using 3M's name and goodwill without authorization or endorsement from 3M, and for nefarious purposes that is causing immediate harm 3M's name and reputation. Accordingly, this Court should grant 3M's Application for a TRO and PI that prohibits Defendant from such unlawful conduct, for which 3M has no adequate remedy at law.

## II.   STATEMENT OF FACTS

### A.   COVID-19 and the Current National Emergency

Over the last four months, the world has seen an outbreak of a highly contagious virus, known as COVID-19, creating an international state of emergency. The virus is believed to pass from person-to-person via airborne particles and liquids. *See* Mancini Decl. at ¶ 5, Ex. 1.

Current guidelines recommend that healthcare personnel wear respiratory protection, like 3M's N95 respirator, when interacting with infected patients in order to minimize the workers' risk of exposure to the virus. *See* Mancini Decl. at ¶ 6, Ex. 2. According to the Center for Disease Control and Prevention, reported illnesses resulting from exposure "range[] from very mild (including some with no reported symptoms) to severe, including illness resulting in death." *See id*. at Ex. 1, p. 3. The number of cases of COVID-19 increases every day in the United States, with New York accounting for nearly 35% of all domestic cases. *See id*. at ¶ 7, Ex. 3.

N95 respirators can prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose. *See* Stobbie Decl. at ¶ 5. The 3M-branded N95 respirators are one of three respirator levels that meet the National Institute of Occupational Safety and Health standards for minimum filtration efficiency levels as prescribed by regulation 42 C.F.R. Part 84. *Id*.

### B.     The Parties and the Products

#### 1.     3M, and its Famous Brand and Trademarks

For decades, 3M has been a leading provider of personal protective equipment for healthcare professionals, industry workers and the public.  *See* Stobbie Decl. at ¶ 4.  Indeed, 3M is a leading manufacturer of N95 respirators (*id.*), and has sold N95 respirators in the United States under the 3M brand name for decades.  *See* Crist Decl. at ¶ 10.  Since the outbreak began, the public has become familiar with 3M as a manufacturer of the N95 respirators and other equipment essential to protecting healthcare personnel and workers from exposure to airborne particles, including viruses like COVID-19.  *See id.* at ¶ 17; Stobbie Decl. at ¶ 13.

Over the past century, 3M has invested hundreds of millions of dollars in advertising, promoting, offering for sale, and selling its vast array of goods and services under its standard-character mark "3M" and 3M design mark **3M** (together, the "3M Marks").  *See* Crist Decl. at ¶ 10.  3M also uses its famous "3M Science. Applied to Life" slogan (the "3M Slogan") in connection with the promotion of its goods and services.  *Id.*  During this period, 3M's goods and services offered under its 3M Marks have been the subject of widespread, unsolicited media coverage and critical acclaim.  *Id.* at ¶ 11.  Goods and services offered under 3M Marks also enjoy enormous commercial success, with annual revenues exceeding hundreds of millions of dollars.  *Id.* at ¶ 12.

To protect its rights over the 3M Marks, 3M has obtained numerous federal trademark registrations for these marks, including, but not limited to, U.S. Trademark Reg. Nos.: (i) 3,398,329, covering the standard-character 3M mark for International Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"), (ii) 2,793,534, which covers the 3M design mark in, *inter alia*, International Class 10 for respirators (the "'534 Registration"), and (iii) 5,469,903, which covers the 3M Slogan in a number of Int. Classes, including Int. Class 9 for facial masks

and respirators (the "'903 Registration"). *See* Crist Decl. at ¶¶ 13-6, Exs. 4, 6, 8. The '329, '534, and '903 Registrations are valid, in effect, and on the Principal Trademark Register. *See id*. The '329 and '534 Registrations are "incontestable" within the meaning of 15 U.S.C. § 1065. *See id*. Exs. 5, 7.

### 2.      3M's Production and Sale of N95 Respirators During COVID-19

3M is proudly "on the front lines of COVID-19":



3M is providing the heroic individuals on the front lines of the battle against COVID-19 with 3M-brand N95 respirators, which "are considered the gold standard by medical workers and public-health officials." Mancini Decl. at ¶ 8, Ex. 4. Since the outbreak of COVID-19 in early 2020, 3M has doubled its global output rate of respirators (including N95 respirators) to 1.1 billion per year to ensure that an adequate supply of its respirators is available to governments and healthcare personnel, as well as to workers in other critical industries, including food, energy, and pharmaceuticals. *See* Stobbie Decl. at ¶¶ 8, 9, Exs. 1-3. In the last seven days of March 2020, 3M sent 10 million N95 respirators to healthcare facilities around the United States. *Id*. at ¶ 10, Ex. 1. 3M has also invested the necessary capital and resources to double its current global production of 1.1 billion 3M-brand N95 respirators per year to 2 billion per year. *See id*. at ¶ 11, Exs. 1, 3.

Notwithstanding the surging demand and public need for PPE during COVID-19, 3M has confirmed publicly that it will not increase prices of its 3M-brand N95 respirators in authorized sales and will work to eliminate price-gouging by third parties in the midst of this crisis. *See*

5

Stobbie Decl. at ¶ 12, Ex. 3; *see also id.* at ¶¶ 14-6.  These efforts protect the public from defective and/or inferior products and outrageous and unwarranted price inflation.  *Id.*

### 3.    Defendant and its Purported Business

Defendant purportedly operates out of Englishtown, New Jersey.  *See* Stobbie Decl. at ¶ 19, Ex. 7; *see also* Crist Decl. at ¶ 19, Ex. 9.  Defendant does not appear to have any website or social media.  *See* Mancini Decl. at ¶¶ 14, 15.  Defendant's president, Mr. Ronald Romano, appears to sell vehicles as his primary business.  *Id.* at ¶ 16, Exs. 10-12.

### 4.    Defendant's False and Deceptive Formal Quote to New York City

Defendant is not, and has never been, a licensed or authorized distributor, agent, or representative of 3M-branded N95 respirators.  *See* Stobbie Decl. at ¶¶ 21, 23; Crist Decl. at ¶¶ 21, 23.  Yet, on or about March 30, 2020, Defendant sent Ms. Ebony P. Roberson, a Purchasing Agent at New York City's Office of Citywide Procurement, a detailed Formal Quote, offering to sell seven million 3M N95 respirators.  *See id.* at ¶ 19, Ex. 17; ¶ 19, Ex. 9.  Defendant stated that it would sell the respirators for $6.05 per mask for 2 million 3M 8210 masks and for $6.35 per mask for 5 million 3M 1860 masks.  *See id..*  As shown in the table below, Defendant's mark-up over 3M's listed single-case prices is more than five times as much:

| 3M Model | 3M's Per-Mask Price | Defendant's Per-Mask Price | Markup |
|---|---|---|---|
| 1860 | $1.27 | $6.35 | 500% |
| 8210 | $1.02-$1.31 | $6.05 | 460-590% |

In its one-page Formal Quote, Defendant reproduced 3M's marks *nine times* and referenced 3M's headquarters in St. Paul, Minnesota, seeking to imply a connection that does not exist.  *See* Stobbie Decl. at ¶ 20; Crist Decl. at ¶ 20.  Defendant also attached to the Formal Quote a 3M Technical Specification Sheet for both Models of 3M-brand N95 respirators that Defendant offered

for sale. *See id.* Plaintiff's famous 3M design mark and well-known 3M Slogan prominently appeared in the upper left-hand corner of both Technical Specification Sheets. *Id.* Plaintiff's famous 3M design mark also appeared in the lower left-hand corner of both Technical Specification Sheets. *Id.* Plaintiff's famous standard-character 3M mark also appeared in the Technical Specification Sheets. *Id.*

Based on Defendant's Formal Quote, Ms. Roberson prepared an "Evaluation Request – Bid Document Review" as part of the City's quality-assurance measures. *See* Stobbie Decl. at ¶ 21; Crist Decl. at ¶ 21. In the Evaluation Request, New York City officials twice identified Defendant as a "vendor" of 3M-brand, N95 Model 8210 and 1860 respirators. *See id.* However, the New York City officials were mistaken. Indeed, as stated, *supra*, Defendant is not, and never has been, an authorized distributor, vendor, or representative of Plaintiff's products. Defendant also does not have, and has never had, an association or affiliation with Plaintiff. *See* Stobbie Decl. at ¶¶ 21, 23; Crist Decl. at ¶¶ 21, 23. Defendant's Formal Quote is permeated with false, misleading, and/or deceptive statements. For example, in the Formal Quote, Defendant stated:

> Due to the national emergency, ***acceptance of the purchase order is at the full discretion of 3M*** and supplies are based upon availability. The N95 masks 3M can begin shipping in 2-4 weeks CIF at any of 3M [sic] plants in the USA or 3M Plants Overseas according to their manufacturing schedule. ***3M chooses the plant***. Order may be shipped in whole or in part.

*See* Stobbie Decl. at ¶ 22; Crist Decl. at ¶ 22. (emphasis added).

To be clear, Defendant is not authorized to solicit purchase orders from customers for submission to 3M for approval. Nor is Defendant authorized to state how, where, or in what quantity such orders would be filled. The Formal Quote does not accurately describe how 3M fills N95 orders. *See* Stobbie Decl. at ¶ 22; Crist Decl. at ¶ 23.

The same day that Ms. Roberson received the Formal Quote, she contacted Eileen Simmons, a 3M Business Development Manager for government markets, for verification of

7

Defendant's claim.  *See* Stobbie Decl. at ¶ 24; Crist Decl. at ¶ 24.  Ms. Simmons informed Ms. Roberson that Defendant is not associated with 3M, and so that potential sale was averted.  *Id*. However, there is nothing to prevent Defendant from making similar offers to other government or healthcare entities around the United States, causing irreparable harm to the 3M brand and putting the public at risk.  *Id*.

Based on the foregoing, 3M commenced this action against Defendant on April 10, 2020, asserting claims under federal and New York law for trademark infringement, unfair competition, false endorsement, false association, false designation of origin, false advertising, and deceptive acts and practices.  *See* Crist Decl. at ¶ 24; *see also* Dkt No. 1 (as re-filed at Dkt. No. 9).  The Summons issued from the Court on April 13, and 3M duly served the Defendant with the Summons and Complaint on April 14.

## III.    LEGAL STANDARD

3M seeks a TRO and PI against Defendant's use of the famous 3M brand, Marks, and Slogan in conjunction with bogus offers at grossly inflated prices.  "In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]."  *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018).  To obtain either, 3M must show: "(1) a likelihood of success on the merits […]; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

Of particular significance here and now, harm both to parties within a lawsuit *and to the public* may be considered when determining if failure to issue a preliminary injunction will result in irreparable harm. *Long Island R.Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901 (2d Cir. 1989)

(preliminary injunction prohibiting union from striking was appropriate where the general public would sustain irreparable harm).

For the reasons cited herein, 3M is entitled to a TRO and PI because it will likely succeed on the merits of its claims; it faces immediate, irreparable harm in the absence of swift injunctive relief and the balance of equities favors issuing the requested injunctive relief. Additionally, harm to the public from price-gouging is readily apparent.

## IV.   LEGAL ANALYSIS

### A.   3M Will Suffer Immediate, Irreparable Harm Absent a TRO and PI

To show irreparable harm, the moving party need only show that "remedies available at law, such as monetary damages, are inadequate to compensate the plaintiff." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (granting preliminary-injunction motion).

Here, Defendant's conduct is likely to create immediate *and* continuing irreparable harm to the widespread fame and goodwill of the 3M brand and famous 3M Marks. The 3M brand and Marks are famous and synonymous with superior quality. This is not a coincidence. For more than a century, 3M has invested hundreds of millions of dollars in advertising and marketing products under its 3M Marks and 3M Slogan. *See* Crist Decl. at ¶ 10. 3M also implements rigorous quality-control standards to ensure that all products offered under its famous 3M Marks and 3M Slogan are consistent and of the highest quality. *Id.* at ¶ 9.

3M should not have its carefully curated brand and reputation left to the devices of unsavory characters like the Defendant. Yet, that is precisely what will happen in the absence of an injunction. Indeed, as stated, *supra*, Defendant is not an authorized distributor, agent, or representative of 3M products, including 3M-brand N95 respirators. Nonetheless, Defendant is using the famous 3M Marks to create the false impression that it is authorized to solicit large orders for N95 respirators at grossly inflated prices on 3M's behalf. Significantly, Defendant is not alone

in its price-gouging quest.  Other parties are attempting similar scams and 3M is actively investigating and/or pursuing claims against them.  *See* Mancini Decl. at ¶¶ 11-13, Exs. 7-9.

3M's inability to control Defendant's use of the famous 3M Marks and Defendant's suggested affiliation with 3M imperils 3M's brand and reputation—and irreparably so.  *See* Crist Decl. at ¶¶ 25-30.  To be sure, 3M cannot control whether products offered for sale and/or sold outside of its authorized trade channels adhere to 3M's rigorous standards.  *See id.*  What is more, no amount of money could repair the damage to 3M's brand and reputation if it is associated with deviating from its superior quality standards or the crime of price-gouging at the expense of healthcare workers and other first responders during COVID-19.  *Id.*  This constitutes textbook irreparable harm.  *See*, *e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard").

Based on the foregoing, 3M has established irreparable harm.

**B.      3M is Likely to Succeed on the Merits of its Claims**

To obtain a TRO and preliminary injunction, 3M must establish a likelihood of success on the merits of only one of its claims.  *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019).  Nonetheless, because the same standard governs 3M's claims for trademark infringement, unfair competition, false endorsement, false association, and false designation of origin under Section 32 and 43(a)(1)(a) of the Lanham Act, and New York common law (collectively, the "Claims"), 3M analyzes these Claims together for purposes of the instant Application.

For 3M to prevail on its Claims, it must satisfy two elements, namely: (i) that its 3M Marks and 3M Slogan are valid and entitled to protection, and (ii) Defendant is using the famous 3M

Marks and/or 3M Slogan in a manner that is likely to create consumer confusion.  *See Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998) (This Court applying the same standard to Section 32 and 43(a)(1)(A) claims; granting preliminary injunction); *Avela, Inc. v. Estate of Marilyn Monroe, LLC,* 131 F. Supp. 3d 196, 209 (S.D.N.Y. 2015).

### 1.     3M is Likely to Establish the Validity of its 3M Marks and 3M Slogan

3M's incontestable '329 and '534 Registrations constitute *conclusive* evidence of, *inter alia*, 3M's ownership, and the validity, of the 3M Marks.  *See* 15 U.S.C. § 1115(b); *accord* 15 U.S.C. § 1065, *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 277-78.   3M's '903 Registration constitutes *prima facie* evidence of, *inter alia*, 3M's ownership, and the validity, of the 3M Slogan. *See* 15 U.S.C. § 1115(a).  Accordingly, 3M is likely to establish the first element of its Claims.

### 2.     3M is Likely to Establish that Defendant's Use of the 3M Marks and Slogan is Likely to Cause Confusion as to Source and/or Quality

"The likelihood-of-confusion prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark."  *Guthrie Healthcare System v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016). To determine whether a likelihood of confusion exists, courts in this Circuit use the eight "*Polaroid*" factors, namely: "1) the strength of the plaintiff's mark; 2) the degree of similarity between marks; 3) the proximity of the products or services; 4) the likelihood that the senior user will 'bridge the gap' into the junior user's product or service line; 5) evidence of actual confusion between the marks; 6) whether the defendant adopted the mark in good faith; 7) the quality of defendant's products or services; and 8) the sophistication of the parties' customers."  *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 278 (referencing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.))  As demonstrated, herein, 3M is likely to establish that the balance of relevant *Polaroid* factors weighs overwhelmingly in its favor.

a.      **The First *Polaroid* Factor: the 3M Marks and Slogan are Strong**

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  Courts measure a mark's distinctiveness in two ways, namely: (i) conceptual strength (*i.e.,* "inherent distinctiveness"), and (ii) commercial strength (*i.e.,* "acquired distinctiveness").  *See Streetwise Maps, Inc.,* 159 F.3d at 743-44.

(i)      **The 3M Marks are Conceptually Strong**

To determine a mark's conceptual strength, courts use "Judge Friendly's familiar test for the inherent distinctiveness of trademarks in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir. 1976)."  *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 377 (2d Cir. 1997). "The Abercrombie test classifies verbal marks into four categories which run in a continuum: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Landscape Forms, Inc.,* 113 F.3d at 377.

Here, "3M" is not a word, and has no inherent relationship to the goods or services for which the marks are used, namely, N95 respirators.  Accordingly, the 3M Marks are fanciful and, thus, inherently distinctive when used for respirators.  *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir. 1999) ("[A] fanciful mark is not a real word at all, but is invented for its use as a mark"); *Landscape Forms, Inc.*, 113 F.3d at 377 ("[F]anciful trademarks are inherently distinctive […]").

(ii)      **The 3M Marks are Commercially Strong and Famous**

A mark is commercially strong if it has acquired "secondary meaning," *i.e.*: "in the minds of the public, the primary significance of [the mark] […] is to identify the source of the product rather than the product itself." *Christian Louboutin, S.A. v. Yves Saint Laurent America Holdings, Inc.,* 696 F.3d 206, 216 (2d Cir. 2012).

12

The 3M Marks have acquired secondary meaning as a matter of law because, as discussed above, the 3M Marks are incontestable.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 391 (2d Cir. 2002) ("Because FSLC continually maintained its registration of the mark, FSLC's mark is incontestable and, as a matter of law, it has acquired secondary meaning").

Even in the absence of 3M's incontestable registrations, it is likely to establish that its 3M Marks and 3M Slogan have acquired secondary meaning. Indeed, as discussed above, 3M has spent millions of dollars in advertising, marketing, and promoting goods and services under the 3M Marks and 3M Slogan; goods sold under the 3M Marks and 3M Slogan, including 3M's N95 respirators, generate hundreds of millions of dollars in annual revenue; the 3M Marks and 3M Slogan are recognized and well-known in households around the U.S.; and 3M has been the exclusive source of goods and services offered under the 3M Marks and 3M Slogan for several decades.  Declaration of [●] at ¶ [●].

Several courts throughout the country have held that the foregoing establishes the commercial strength of the 3M Marks.  *See*, *e.g.*, *3M Co. v. Christian Investments LLC*, No. 1:11CV0627 TSE/JFA, 2012 WL 6561732, at *8 (E.D. Va. July 12, 2012) (Holding 3M Marks were distinctive and famous; "Plaintiff has used the 3M mark since 1906, it offers more than 50,000 products and services in a wide variety of fields and markets under the 3M mark, the 3M mark is distinctive and distinguishes the source of plaintiff's products and services […]").

Based on the foregoing, the first *Polaroid* factor favors 3M.

> **b.**    **The Second *Polaroid* Factor: Defendant Reproduced the 3M Marks and Slogan in Their Entirety**

Defendant reproduced the 3M Marks and Slogan in their entirety in the Formal Quote and Technical Specification Sheets.  Accordingly, the second *Polaroid* factor favors 3M.  *See Cadbury*

*Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) ("For the purpose of considering the question of the similarity of the marks, the district court correctly determined that as a matter of law these marks [*i.e.*, "COTT" v. "COTT"] are identical").

### c.    The Third *Polaroid* Factor: Defendant Purported to Sell the Same Products that 3M is Widely Known for Selling

Under the third *Polaroid* factor, courts consider "the subject matter of the commerce in which the two parties engage [...]." *Guthrie Healthcare Sys.,* 826 F.3d at 39 (likelihood of confusion because, among other things, both parties provides healthcare-related goods and services).  Here, as discussed above, Defendant aims to offer the same N95 respirators that 3M already offers under the respective marks.  It has become commonplace knowledge that 3M manufactures N95 respirators.  Defendant's offering of N95 respirators under the 3M Marks heightens the likelihood of consumers confusing the source of products from Defendant as originating from 3M.  *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2005) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."). Accordingly, the third *Polaroid* factor favors 3M.

### d.    The Fourth *Polaroid* Factor: There is No "Gap" to Bridge

The fourth *Polaroid* "factor addresses the question of whether the two companies are likely to compete directly in the same market." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 239-40 (S.D.N.Y. 2012). When, as here, the parties' goods are the same, this *Polaroid* factor is irrelevant because there is no gap to bridge. *See*, *e.g.*, *Mister Softee, Inc. Tsirkos,* 2014 WL 2535114, *5 (S.D.N.Y. June 5, 2014) (issuing preliminary injunction; fourth *Polaroid* factor irrelevant where both parties sold ice cream).

14

   **e.**  **The Fifth *Polaroid* Factor: Defendant Actually Confused New York City Officials into Identifying Him as a 3M "Vendor"**

Here, evidence of actual confusion is demonstrated by Ms. Roberson's March 30 Evaluation Request, wherein New York City officials mistakenly identified Defendant as a "vendor"—*twice*—of 3M-brand N95 respirators.  Accordingly, the fifth *Polaroid* factor favors 3M. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) ("The existence of some evidence of actual confusion, the fifth *Polaroid* factor, further buttresses the finding of a likelihood of confusion").

   **f.**  **The Sixth *Polaroid* Factor: Defendant is Using the 3M Marks in Bad Faith**

"A defendant's good faith—or lack thereof—in adopting its mark is highly consequential among the *Polaroid* factors." *Louis Vuitton Malletier v. Sunny Merchandise*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015).  To be sure, "where the second-comer has adopted its mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement. Courts have found a presumption of likelihood of confusion in such circumstances." *Louis Vuitton Malletier*, 97 F. Supp. 3d at 496.

Moreover, "'actual or constructive knowledge' of the prior user's mark or dress may indicate an absence of good faith or bad faith." *see also Heritage of Pride, Inc. v. Matinee of NYC*, 2014 WL 12783866, *11 (S.D.N.Y. June 20, 2014).  Here, Defendant had both.

Prior to the rise of COVID-19, 3M's federal trademark registrations placed Defendant on constructive notice of 3M's superior rights in and to, among other things, the 3M Marks. *See* 15 U.S.C. § 1072 ("Registration of a mark on the principal register [...] [constitutes] constructive notice of the registrant's claim of ownership thereof").  Subsequent to COVID-19, 3M's manufacture and sale of N95 respirators has become common, household knowledge, with government officials like President Donald Trump and Vice President Mike Pence drawing

extensive attention to 3M and its respirator masks over the last month.  *See* Stobbie Decl. at ¶ 13, Ex. 4.

Accordingly, there is no question that Defendant adopted the 3M Marks with actual knowledge of 3M's rights therein.  Thus, there is likewise no question that Defendant uses the 3M Marks to exploit the Marks' widespread fame and goodwill.  This is textbook bad faith.  *See Louis Vuitton Malletier v. Sunny Merchandise*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015) (explaining that the sixth *Polaroid* factor "is an equitable inquiry which seeks to answer the overarching question of whether defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill"); *US Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 536 (S.D.N.Y. 2011) ("Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products").

Based on the foregoing, the sixth *Polaroid* factor favors 3M.  *See Paddington Corp. v. Attiki Importers & Distrib.*, 996 F.2d 577, 586-87 (2d Cir. 1993) (when actual or constructive knowledge "is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith").

> **g.**    **The Seventh *Polaroid* Factor: Defendant's Use of the 3M Marks Jeopardizes – Irreparably – the Reputation of the 3M Brand and Marks**

The seventh *Polaroid* factor concerns "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Louis Vuitton Malletier*, 97 F. Supp. 3d at 497-98.  As discussed, *supra*, that is precisely what will happen to carefully curated 3M brand if Defendant continues using the 3M Marks to create the false impression that it is an authorized representative of 3M products and/or in connection with unlawful price-gouging.  Accordingly, the seventh *Polaroid* factor favors 3M.  *See Henegan Const.*

*Co., Inc.* v. *Heneghan Contracting Corp.*, No. 00 CIV.9077 JGK, 2002 WL 1300252, at \*8 (S.D.N.Y. June 12, 2002) ("The fact that the plaintiff has maintained high-quality services for so many years makes it more likely that it would be damaged if its reputation were placed beyond its control"); *Cache, Inc.* v. *M.Z. Berger & Co.*, No. 99CV12320(JGK), 2001 WL 38283, at \*12 (S.D.N.Y. Jan. 16, 2001) (explaining that defendants' use of infringing name leaves plaintiff's reputation in the hands of defendant).

### h. The Eighth *Polaroid* Factor: in the Era of COVID-19, Normally Prudent Purchasers Must Make Rash Purchasing Decisions

The eighth and final *Polaroid* factor concerns "the sophistication of the consumers and the degree of care likely to be exercised in purchasing the product." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 456 (S.D.N.Y. 2017). In the current pandemic, purchasers of N95 respirators are government entities and hospitals and healthcare providers. These customers are sophisticated and prone to exercise high degrees of care; however, the current state of emergency has stymied the ability of customers to take the time and conduct the diligence necessary to show extensive care. Accordingly, in this unique environment, the eighth *Polaroid* factor favors 3M.

### i. The Balance of *Polaroid* Factors Strongly Favors 3M

In sum, the balance of relevant *Polaroid* factors strongly favor 3M. This "powerful showing of a likelihood of confusion" (*Guthrie Healthcare Sys.*, 826 F.3d at 46), combined with the overwhelming strength and validity of the 3M Marks, and Defendant's bad faith, establish that 3M is likely to succeed on the merits of its Claims.

### C. The Balance of Hardships Tips Decidedly in 3M's Favor

Defendant would not suffer any hardship if this Court restrains and enjoins it from engaging in unlawful activity with respect to 3M's brand and 3M Marks; 3M, on the other hand,

would suffer substantial hardship if Defendant continues irreparably harming the 3M brand and 3M Marks via its unlawful activity.

### 1.    Defendant Would Not Suffer any Hardship if this Court Grants 3M's Application for a TRO and PI

3M's application concerns Defendant's recent use of the 3M brand, 3M Marks and 3M Slogan during the global COVID-19 pandemic in a manner that creates the false impression that Defendant is an authorized representative of 3M and/or products.  3M's application also concerns Defendant's recent decision to offer to sell purported 3M-brand N95 respirators to resource-strapped government agencies at exorbitant prices.

Put simply, it would not be a "hardship" for Defendant to refrain from engaging in unlawful activities related to 3M's brand (which constitute, *inter alia*, trademark infringement, false association, and price-gouging).  This is especially true given that Defendant sells products unrelated to 3M's brand (*e.g.*, vehicles and automobiles), and could continue doing so even if this Court grants 3M's application.  *See WpIX, Inc. v. lvl, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer […] cannot complain about the loss of ability to offer its infringing products"; "[t]he balance of hardships, therefore, clearly tips in plaintiffs' favor"); *see also New York City Triathlon Club, LLC*, 704 F. Supp. 2d at 344 (Balance of hardships favored plaintiff; entering preliminary injunction that did "not prohibit Defendant from operating a training club [in general].  It only prohib[ited] Defendant from operating a training club using the name that infringes upon Plaintiff's Marks").

### 2.    3M Would Suffer Substantial Hardship Absent a TRO and PI

Unlike Defendant, 3M would suffer substantial hardship in the absence of a TRO and PI. Indeed, as discussed *passim*, Defendant's unlawful conduct is irreparably harming and tarnishing the 3M brand, as well as the widespread fame, goodwill, and reputation enjoyed by famous 3M

Marks and 3M Slogan.  Accordingly, the balance of hardships tips decidedly in 3M's favor.  *See*

*New York City Triathlon Club, LLC*, 704 F. Supp. 2d at 345 ("The balance of hardships in this case

clearly favors Plaintiff.  As explained above, Plaintiff faces the threat of irreparable harm absent

injunctive relief").

> ### D.    Issuing a TRO and PI Would Serve the Public Interest of Avoiding Confusion

During the current COVID-19 pandemic, consumers and government officials, including

those here in New York City, understandably lack the time and resources they would have in

normal purchasing environments to ensure that sellers are who they purport to be (*e.g,* authorized

distributors of 3M-brand products), and that products are what sellers claim they are (*e.g.*, genuine

3M-brand products).  Accordingly, when the public sees purported 3M-brand N95 respirators

available for sale, they are relying on the 3M Marks and 3M Slogan and standards associated with

the 3M brand now, more than ever, to indicate that the respirators offered for sale are, in fact,

genuine and adhere to the 3M brand's rigorous standards.

Sellers, such as Defendant, are seeking to exploit the fact that consumers are making rapid

purchasing decisions during COVID-19 by falsely representing themselves as authorized

distributors of 3M-brand products, as well as offering to sell those products at exorbitantly high

prices.  Not only is this unlawful conduct likely to confuse and deceive the public about the source

and quality of purported 3M-brand products offered under the 3M Marks and 3M Slogan, but also

it creates an overall purchasing environment that is materially different from, and irreparably

harms, the carefully curated 3M brand and customer experience.

Accordingly, unless this Court restrains and enjoins Defendant's unlawful conduct, the

public will continue suffering harm in the form of confusion and deception about the source and

quality of the purported 3M-brand N95 respirators that Defendant is offering to sell for

exorbitantly high prices.  *See New York City Triathlon, LLC*, 704 F. Supp. 2d at 344 (consumers

have an "interest in not being deceived—in being assured that the mark [they] associate [] with a product is not attached to goods of unknown origin and quality"); *see also NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328, 342 (S.D.N.Y. 2014) (consumers have a "protectable interest in being free from confusion, deception and mistake").

> ### E.   3M Should Not Be Required To Post A Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c).  Courts have wide discretion in setting the amount of the bond and may dispense with the posting of a bond entirely where the parties sought to be restrained or enjoined "have not shown that they will likely suffer harm absent the posting of a bond." *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  3M has more than sufficient financial resources to cover any harm resulting from an improvidently granted injunction.  A bond is superfluous in these circumstances.

Furthermore, no one, and especially not Defendant, will suffer any harm if the Court grants the requested TRO and preliminary injunction and stops Defendant's deceptive and infringing activities.

## V.   CONCLUSION

Based on the foregoing, 3M respectfully requests that this Court grant the enclosed [Proposed] Order to Show Cause, which temporarily restrains and preliminarily enjoins Defendant's use of the 3M Marks and Slogan pursuant to FED. R. CIV. P. 65(a)-(b).  3M also respectfully requests any further relief the Court deems just and equitable.

Dated: April 22, 2020
      New York, New York

**MAYER BROWN LLP**

*/s/ A. John P. Mancini*
A. John P. Mancini
Andrew J. Calica
Jordan Sagalowsky
Jonathan W. Thomas
1221 Avenue of the Americas
New York, New York 10020-1001
Tel.: (212) 506-2500
Email: JMancini@mayerbrown.com
Email: ACalica@mayerbrown.com
Email: JSagalowsky@mayerbrown.com
Email: JWThomas@mayerbrown.com

Carmine R. Zarlenga (*pro hac vice*)
1999 K Street, NW
Washington, D.C. 20006
Tel.: (202) 263-3000
Email: CZarlenga@mayerbrown.com

Richard F. Bulger (to apply *pro hac vice*)
Richard M. Assmus (to apply *pro hac vice*)
Kristine M. Young (to apply *pro hac vice*)
71 South Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 782-0600
Email: RBulger@mayerbrown.com
Email: RAssmus@mayerbrown.com
Email: KYoung@mayerbrown.com

*Attorneys for Plaintiff 3M Company*

## <u>CERTIFICATE OF SERVICE</u>

I, A. John P. Mancini, hereby certify that, on April 24, 2020, I filed a true and correct copy of the foregoing document, titled *Memorandum of Law in Support of Plaintiff 3M Company's Application for a Temporary Restraining Order and Preliminary Injunction*, using this Court's ECF Filing System.  I also certify that, on April 22, 2020, before filing the foregoing document, I arranged for service of a true and correct copy of it on Defendant Performance Supply, LLC via personal service and First Class Mail at:

Performance Supply, LLC
c/o Ronald Romano
3 Westbrook Way
Manalapan, New Jersey 07726

*/s/ A. John P. Mancini*
A. John P. Mancini

*Attorney for Plaintiff 3M Company*