# EXHIBIT 7

MAYER BROWN LLP
CARMINE R. ZARLENGA (*pro hac vice*)
*czarlenga@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

DALE GIALI (SBN 150382)
*dgiali@mayerbrown.com*
KERI E. BORDERS (SBN 194015)
*kborders@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

*Attorneys for Plaintiff 3M Company*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3M COMPANY,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>RX2LIVE, LLC and RX2LIVE, INC.,<br><br>　　　　　Defendants. | Case No. 1:20-cv-00523-NONE-SAB<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**JURY TRIAL DEMANDED**<br><br>Original Complaint Filed: April 10, 2020 |

**COMPLAINT**

Plaintiff 3M Company ("3M" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Defendants RX2Live, LLC and RX2Live, Inc. (collectively, "RX2Live" or "Defendant"), hereby alleges as follows based on knowledge of its own actions, and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      This lawsuit concerns Defendant's use of 3M's famous trademarks to perpetrate a false and deceptive price-gouging scheme on unwitting customers and consumers, including Fresno-based healthcare provider Community Medical Centers, Inc. ("CMC"), during the global COVID-19 pandemic.

2.      Throughout its history, 3M has been providing state-of-art, industry-leading scientific and medical products to consumers throughout the world under its famous 3M marks. Based on this longstanding, continuous use, consumers associate the 3M marks uniquely with 3M. Now, more than ever, consumers are also relying on the famous 3M marks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and personal protective equipment ("PPE"), including Plaintiff's 3M-brand N95 respirators.

3.      Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle against COVID-19, 3M is supplying healthcare workers and other first responders with 3M-brand N95 respirators.  For example, in the last week of March 2020, 3M supplied healthcare workers throughout the United States with 10 million of its 3M-brand N95 respirators.  3M also recently announced that it will import 166.5 million of its 3M-brand N95 respirators into the United States in the next three months to supplement its U.S. production, and has invested the capital and resources necessary to double its current annual global production of 1.1 billion respirators.  In response to the COVID-19 outbreak and surge in need for N95 respirators, 3M has doubled its global output rate to nearly 100

- 1 -

million respirators per month, and it expects to produce around 50 million respirators per month in the United States by June 2020.

4.      The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly.  3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to where they are needed most.  Importantly, 3M has **not** increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak.

5.      Unfortunately, any number of wrongdoers seek to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M N95 respirators and other products in high demand.  These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices – all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

6.      In response to fraudulent activity, price-gouging and counterfeiting related to N95 respirators that has spiked in the marketplace in response to the pandemic, 3M is taking an active role to combat these activities.  3M's actions include working with law enforcement authorities around the world, including the U.S. Attorney General, state Attorneys General and local authorities to combat price-gouging.  3M has also created a website where people can report potential price-gouging and the "3M COVID-19 Fraud hotline" for end-users and purchasers of 3M products in the United States and Canada to call for information and to help detect fraud and avoid counterfeit products.  Moreover, 3M is publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website, including disclosure of 3M's list prices for its N95 respirators and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada.  Further information about 3M's efforts are set forth in the 3M press release and publication attached hereto as **Exhibits 1 and 2**.  This Complaint is another part of these efforts.

7.      Despite 3M's extensive efforts during COVID-19, deplorable pandemic profiteers continue their quests to take advantage of healthcare workers, first responders, and others in a time

1   of need and trade off the fame of the 3M brand and marks.  Defendant is a prime example of this

2   behavior.

3       8.      On information and belief, on or before March 26, 2020, RX2Live mobilized its

4   franchise network of 68 franchises located in California and 13 other states to offer 3M model no.

5   8210 N95 respirators supposedly "direct from 3M" to health care customers at grossly inflated

6   prices.  To do so, RX2Live equipped franchisees with a purchase order in blank indicating that N95

7   respirators would be "direct from 3M" and an accompanying price list for N95 respirators likewise

8   indicating that 3M model no. 8210 respirators were available "direct from 3M" in large quantities

9   at the grossly inflated price of $4.95 per respirator (approximately 300-400% above 3M's list price).

10  As RX2Live had no means to secure any respirators "direct from 3M" and no business relationship

11  of any kind with 3M, these representations (and any further representations based on them) were

12  false, deceptive, and harmful to 3M's trademarks, goodwill, and reputation.

13      9.      On March 27, 2020, Virginia Cooper, who is an employee or agent of Defendant

14  RX2Live, contacted CMC via email to advertise PPE products available through RX2Live,

15  including purported 3M-brand N95 respirators.  Over the next several days, Ms. Cooper perpetuated

16  the fraud by providing CMC with additional promotional materials, including a pricing list and a

17  PowerPoint presentation reflecting that both documents were last edited by a management-level

18  employee or agent of Defendant, Alex Myers.  The PowerPoint presentation provided to CMC

19  advertised the availability of "3M N95 1860" surgical respirators and "3M N95 8210" standard

20  respirators, "Direct from 3M."  *See* **Exhibits 3**, **4**.  Moreover, the PowerPoint presentation stated

21  that a minimum order of 10 million masks was required (at grossly inflated purchase prices of $52

22  million for surgical masks and $49.5 million for standard masks in contrast to 3M's list prices of

23  $12.7 million and $10.2-$13.1 million, respectively).   The PowerPoint presentation further

24  indicated that "3M requires payment in full before order can be placed.  Payment is held in escrow

25  until the order is completed."  *See* Exh. 4.  Virtually all of these statements are false, deceptive,

26  and/or unlawful.

27      10.     Defendant is not, and never has been, an authorized distributor of any of 3M's

28  products and has no rights to use 3M's famous marks.  By using 3M's famous marks in RX2Live's

1   promotional materials and product listing, and holding itself out to have a direct supply relationship

2   with 3M and its products, Defendant confused and deceived consumers in the State of California

3   (and elsewhere) by offering for purchase products at unconscionably high prices that were

4   approximately 4-5 times *above* 3M's list prices.  This offer constituted extreme price-gouging by

5   any measure, including under California law (Penal Code § 396).  Not only does such price-gouging

6   further strain the limited resources available to combat COVID-19, but such conduct justifiably has

7   caused public outrage which threatens imminent and irreparable harm to 3M's brand as Defendant

8   and similar pandemic profiteers promote an improper association between 3M's marks and

9   exploitative pricing behavior.

10        11.    To make matters worse, RX2Live has attempted to cover up and conceal all details

11   relating to all sales, marketing, and financial information involving price-gouged 3M products and

12   the use of the 3M brand through a written "Non-Circumvention, Non-Disclosure & Working

13   Agreement" that RX2Live also provided to its franchisees.  The agreement purports to bar the

14   disclosure of the identities of anyone involved in any way in the scheme.  As a consequence, the

15   full scope of RX2Live's wrongdoing is unknown and likely cannot be determined in the absence

16   of discovery.

17        12.    3M does not – and will not – tolerate individuals or entities deceptively trading off

18   the fame and goodwill of the 3M brand and marks for their personal gain.  This is particularly true

19   against those who seek to exploit the surge in demand for 3M-brand products during the COVID-

20   19 global pandemic which already has claimed tens of thousands of lives worldwide and over 1,000

21   lives in the State of California alone.

22        13.    Accordingly, to further protect consumers from confusion and mistake, to reduce

23   the amount of time and energy that healthcare providers and procurement officers are forced to

24   waste interacting with such schemes, as well as to forestall any further diminution to the 3M brand

25   and marks' reputation, fame, and goodwill, Plaintiff brings this lawsuit against Defendant for

26   federal and state trademark infringement, unfair competition, false association, false endorsement,

27   false designation of origin, trademark dilution, false advertising, unlawful, unfair, and fraudulent

28   business acts and practices.  Plaintiff also seeks preliminary and permanent injunctive relief.  As

described below, any damages, costs, or fees recovered by 3M will be donated to charitable COVID-19 relief efforts.

**THE PARTIES**

14.     Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.  3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

15.     On information and belief, Defendant RX2Live, LLC is a Utah limited liability company with its corporate headquarters and principal place of business located at 597 South Pleasant Grove Boulevard, Pleasant Grove, Utah 84062.  RX2Live describes itself as a franchisor in healthcare services, which provides healthcare professionals access to products, education, and services, including workplace and senior wellness programs.  RX2Live supplies a range of PPE products to hospitals and healthcare providers, including the counterfeit 3M-brand N95 respirators at issue in this action, as well as other N95 respirators, surgical masks, nitrile and PVC gloves, hand sanitizer, isolation gowns, and supposed COVID-19 test kits.

16.     On information and belief, Defendant RX2Live, Inc. is a Wyoming corporation with its principal places of business located at 5255 West 11000 North, Suite 225, Highland, Utah 84003 and 1712 Pioneer Avenue, Suite 115, Cheyenne, Wyoming 82001.  On information and belief, Defendant RX2Live, Inc. acquired all of the assets of RX2Live, LLC on January 1, 2019.

**JURISDICTION AND VENUE**

17.     The claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts I – IV, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely, 15 U.S.C. §§ 1051 *et seq.*  Accordingly, this Court has original and subject-matter jurisdiction over Counts I – IV pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C § 1121(a).

18.     The claims for unlawful, unfair, and fraudulent business acts or practices and false advertising in violation of California Business and Professions Code §§ 17200 *et seq.* and 17500 *et seq.*, trademark dilution, unfair competition, and trademark infringement, asserted in

Counts V – VIII, *infra*, arise under California statutory and common law, and are so related to the federal claims asserted in Counts I – IV, *infra*, that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over Counts V – VIII pursuant to 28 U.S.C. §§ 1338(b) and 1367(a). This Court also has subject matter jurisdiction on the separate and independent ground of diversity of citizenship pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Defendant RX2Live has purposefully availed itself of the privilege of transacting business within the State of California, including in this District. RX2Live has also committed and intentionally directed tortious acts towards residents of the State of California, including in this District. For example, RX2Live recently used 3M's famous marks as part of a price-gouging scheme to deceive CMC into believing that RX2Live was authorized by 3M to sell millions of 3M-brand N95 respirators for an aggregate price of nearly $50 million – several multiples of the 3M list price. Plaintiff's claims arise out of and relate to RX2Live's transaction of business and tortious acts committed within the State of California, including in this District. Based on the foregoing, this Court has long-arm jurisdiction over RX2Live pursuant to Cal. Code Civ. Proc. § 410.10 and Fed. R. Civ. P. 4(k).

20. A substantial part of the events giving rise to the claims asserted, *infra*, occurred in this District. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

21. Defendant is subject to personal jurisdiction in this District. Accordingly, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.    Plaintiff 3M

22. 3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world. Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

**A.** **The 3M Brand**

23.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more. Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

24.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and more.  As such 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**B.** **The Famous "3M" Marks**

25.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the inset 3M design mark (together, the "3M Marks"):



26.     For decades, products offered by under the 3M Marks have enjoyed enormous commercial success (including, without limitation, its 3M-brand N95 respirator).  Indeed, in 2019, alone, sales of products offered under the 3M Marks exceeded several hundred million USD.

27.     Over the same period of time, products offered under the 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

28.     Based on the foregoing, consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks.  Based on the foregoing, the 3M Marks have also become famous among consumers in the United States.

29.     To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"), and (ii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"). *See* **Exhibits 5-6**.

30.     The '329 and '534 Registrations are valid, in effect, and on the Principal Trademark Register.

31.     The '329 and '534 Registrations are "incontestable" within the meaning of 15 U.S.C. § 1065. Accordingly, the '329 and '534 Registrations constitute conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

32.     Plaintiff's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder. Indeed, the famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

**C.      3M's Extensive Efforts to Assist With the Battle Against COVID-19**

33.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19. As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":

1

2

3

4

5

6

7

8



9    34.    Among the PPE that 3M is providing to the heroic individuals on the front lines of

10   the battle against COVID-19 are its 3M-brand N95 respirators.

11   35.    Inset, below, is an image of 3M's branded Model 8210 respirator:

12

13

14

15

16

17

18   36.    Authentic N95 respirators reduce exposure to airborne biological particles and

19   liquid contamination when appropriately selected, fitted, and worn.

20   37.    Based on the exponential increase in demand for 3M-branded N95 respirators, 3M

21   has invested in the necessary capital and resources to double its annual production of 1.1 billion

22   N95 respirators.  *See* Exhs. 1, 2.  **What 3M has *not* done in the face of the global COVID-19**

23   **pandemic is increase its prices**.  *See id.*

24   38.    Unfortunately, certain third parties do not share 3M's sense of civic responsibility

25   during this time of crisis.  Indeed, opportunistic third parties are seeking to exploit the increased

26   demand for 3M-branded N95 respirators by offering to sell them for exorbitant prices, selling

27   counterfeit versions of them, and accepting money for 3M-brand N95 respirators despite having no

28   product to sell or never intending to deliver the product in the first place.

39.     Accordingly, to protect both consumers and healthcare workers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand, 3M is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators. For example, in late-March 2020, 3M's Chief Executive Offer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

    a.  3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify price-gouging (*See* **Exhibit 7**);

    b.  3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*See* **Exhibit 8**); and

    c.  3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting.



## II.     Defendant's Unlawful Conduct

40.     Despite 3M's extensive measures to combat price-gouging and counterfeiting of its 3M-brand N95 respirators, illicit activities by bad actors continue.  Defendant is a prime example of this unlawful behavior, which is damaging the 3M brand and public health and safety in a time of unprecedented crisis.

41.     According to promotional materials created and disseminated by Defendant, Defendant purports to have millions, if not billions, of 3M's N95 respirators available for sale to healthcare providers and other customers throughout the United States.

42.     Because Defendant is not an authorized 3M dealer or distributor and has no relationship with 3M, this claim is implausible at best.  But still, Defendant attempted to exploit the feelings of panic and desperation surrounding the COVID-19 public health emergency.

43.     On or before March 26, 2020, Defendant provided a purchase order form and a price list to its franchisees as described in paragraph 8 above.  Defendant instructed its franchisees to submit all orders for products on the price list, including "Face Mask N95 #8210 direct from 3M" to Defendant for handling.  Defendant authorized, instructed, and urged its franchisees to engage in the scheme detailed herein, sought to orchestrate those activities on a system-wide scale, and mandated the concealment of those activities via a written contract.  Defendant implemented the scheme through direct contact with potential customers as well as over social media.

44.     For example, on March 27, 2020, Virginia Cooper contacted CMC, a prominent Fresno-area healthcare provider, to advertise the availability of PPE products at exorbitant prices.  Ms. Cooper provided a spreadsheet listing the availability of "Face Mask N95 #8210 direct from 3M."  *See* Exh. 3 (excerpted below).

| Personal Protective Equipment Product/Price List 3-26-2020 | | | |
|---|---|---|---|
| **ITEM #** | **DESCRIPTION** | **MIN. QTY / unit** | **UNIT PRICE** per each piece unless noted |
| 00A | Face Mask  N95     #8210 direct from 3M | 10,000,000 ea. | $       4.95 |

45.     On March 30, 2020, Ms. Cooper provided CMC with a PowerPoint presentation containing "pictures, catalog codes, pricing and minimum requirements."  *See* Exh. 4.  The metadata on the pricing spreadsheet and the PowerPoint show that both documents were last modified by Alex Myers, the Los Angeles Regional Developer for RX2Live.  *See* **Exhibit 9** (excerpted below).

- 11 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



46.     Defendant's PowerPoint presentation expressly references two models of 3M-brand N95 respirators:  Model 1860 and Model 8210.  The presentation, an excerpt of which is depicted below, prominently displays a photo of a respirator bearing the 3M Mark.  The presentation also represents that the respirators are "Direct from 3M" and that "3M requires payment in full before order can be placed.  Payment is held in escrow until the order is completed."  Exh. 4, at p. 2.  None of these statements are true.

47.     The contents of Defendant's above-referenced PowerPoint presentation are intended to defraud, mislead and/or deceive a reasonable consumer into believing that Defendant is an authorized distributor of 3M's products and/or has an association or affiliation with 3M, which is not the case.  Defendant does not, and never has, represented 3M, and 3M has never authorized Defendant or any other affiliates, agents, employees, or franchisees of Defendant to manufacture, distribute, advertise, market, offer for sale, receive payments on 3M's behalf, escrow funds on 3M's behalf, and/or sell 3M-brand N95 respirators.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
CASE NO. 1:20-CV-00523-NONE-SAB

48.     What is more, in an effort to profit from the public's dire need of PPE during the global COVID-19 pandemic, Defendant's quote of $5.20 per 3M brand, N95 Model 1860 respirator is more than quadruple 3M's posted list price of $1.27 per respirator. *See* Exhs. 4, 7.

49.     Defendant's quote of $4.95 per 3M brand, N95 Model 8210 respirator is approximately 4-5 times 3M's posted list price of $1.02-$1.31 per respirator. *See id.*

50.     Defendant understands that the scheme it undertook was wrong. This is evident from early efforts to conceal the activities via the "Non-Circumvention, Non-Disclosure & Working Agreement" that Defendant provided to its franchisee network for use in conjunction with activities involving 3M N95 respirators and a long list of other products. Furthermore, one business day after this action was filed, Defendant instructed its franchisees "to discontinue all sales activity of 3M masks." There is no way to know if Defendant or its nationwide network of franchisees have actually discontinued their sales and marketing activities involving the 3M brand.

51.     Based on the foregoing, 3M seeks relief against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and unlawful, unfair, and fraudulent business acts and practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Trademark Infringement Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))*

*(Infringement of the Federally Registered 3M Marks)*

52.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 51 of the Complaint as though set forth fully herein

53.     Count I is a claim for trademark infringement under 15 U.S.C. § 1114.

54.     3M is the exclusive owner of each of the federally registered 3M Marks.

55.     3M has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling Plaintiff's 3M-brand N95 respirators.

1    56.    3M's exclusive rights in and to each of the 3M Marks predate any rights that

2    Defendant could establish in and to any mark that consists of "3M" in whole and/or in part.

3    57.    Both of the 3M Marks are fanciful and/or arbitrary when used for respirators and,

4    therefore, are inherently distinctive.

5    58.    Both of the 3M Marks identify 3M as the exclusive source of products offered under

6    the 3M Marks (including, without limitation, 3M-brand N95 respirators) and, therefore, the 3M

7    Marks have acquired distinctiveness.

8    59.    Defendant is using the 3M Marks in commerce to advertise, promote, offer for sale,

9    and sell 3M-branded N95 respirators, including, for example, in communications to healthcare

10   providers listing the products that Defendant purportedly has available for sale.

11   60.    Defendant's use of the 3M Marks in commerce on, for, and/or in connection with

12   the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing,

13   and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether

14   Defendant is 3M, and/or whether Defendant is a licensee, authorized distributor, and/or affiliate of

15   3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand

16   N95 respirators.

17   61.    Defendant's use of the 3M Marks in commerce on, for, and/or in connection with

18   the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing,

19   and is likely to continue cause, consumer confusion, mistake, and/or deception about whether

20   Defendant and/or Defendant's products are affiliated, connected, and/or associated with 3M and/or

21   products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95

22   respirators.

23   62.    Defendant's use of the 3M Marks in commerce on, for, and/or in connection with

24   the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing,

25   and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether

26   Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or

27   offered under a license from, 3M or vice versa.

28   63.    3M has not consented to the use of its famous 3M Marks by Defendant.

64.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendant had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendant began using the 3M Marks as part its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

65.     Upon information and belief, Defendant adopted and used the 3M Marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

66.     Upon information and belief, Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of the 3M Marks, to which Defendant is not entitled at law or in equity.

67.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(a).

68.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

69.     3M has no adequate remedy at law.

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

*(Unfair Competition, False Endorsement, False Association, and False Designation of Origin*

*Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))*

*(Use of the 3M Marks)*

70.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 69 of the Complaint as set forth fully herein.

71.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

72.     Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

73.     Upon information and belief, Defendant's use of Plaintiff's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

74.     Defendant has also falsely held itself out to be an agent of and/or authorized by 3M to sell and/or distribute 3M-branded products, when this is not the case.

75.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

76.     3M has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*

*(Dilution of the Famous 3M Marks)*

77.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 76 of the Complaint as though set forth fully herein.

78.     Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

79.    The 3M Marks were famous before and at the time Defendant began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators).

80.    Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' established selling power and value will be whittled away.

81.    Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' ability to identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M's branded N95 respirators) will be whittled away.

82.    Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically is likely to dilute the reputation of the famous 3M Marks, such that the famous 3M Marks' established ability to indicate the superior quality of Products offered under such Marks (including, without limitation, 3M's branded N95 respirators), will be whittled away.

83.    Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

84.    3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner

1     in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and

2     significant confusion about 3M's role in the marketplace for masks that are essential to

3     safeguarding public health.  Whereas 3M's corporate values and brand image center around the

4     application of science to improve lives, Defendant's conduct imminently and irreparably harms

5     3M's brand.

6          85.     3M has no adequate remedy at law.

7                    **FOURTH CLAIM FOR RELIEF**

8     *(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*

9        *(Defendant's March 26 Instructions to Franchisees, and March 27 and 30 Emails)*

10        86.     3M repeats and incorporates by reference the statements and allegations in

11     paragraphs 1 – 85 of the Complaint as though set forth fully herein.

12        87.     Count IV is a claim for false and deceptive advertising under 15 U.S.C. §

13     1125(a)(1)(B).

14        88.     The statements that Defendant made in its March 26 instructions to franchisees,

15     March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list

16     provided to CMC, constitute commercial advertising and/or commercial promotion.

17        89.     The statements that Defendant made in its March 26 instructions to franchisees,

18     March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list

19     provided to CMC, contained false, misleading, and/or deceptive statements about the nature,

20     characteristics, qualities, and/or geographic origin of Defendant and/or the products that Defendant

21     allegedly had available for sale.

22        90.     The statements that Defendant made in its March 26 instructions to franchisees,

23     March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list

24     provided to CMC, contained false, misleading, and/or deceptive statements about the nature,

25     characteristics, qualities, and/or geographic origin of 3M and the 3M-brand products, including,

26     without limitation, 3M's branded N95 respirators.

27

28

91.     The false, misleading, and/or deceptive statements in Defendant's March 26 instructions to franchisees, March 27 and March 30 emails, PowerPoint presentation, and pricing list were material to CMC's purchasing decisions.

92.     Defendant placed the March 26 instructions to franchisees, March 27 and March 30 emails, PowerPoint presentation, and pricing list into interstate commerce by, *inter alia*, sending them to CMC

93.     Defendant's March 27 and March 30 emails, PowerPoint presentation, and pricing list have directly and/or proximately caused and/or are likely to cause 3M to suffer harm in the form of lost sales (including, without limitation, lost sales of 3M's branded N95 respirators), as well as irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and goodwill.

94.     Upon information and belief, Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

95.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

96.     3M has no adequate remedy at law.

/ / /

/ / /

/ / /

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**

*(Trademark Dilution, Cal. Bus. Prof. Code §§ 14247)*

*(Dilution of the Famous 3M Marks)*

97.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 96 of the Complaint as though set forth fully herein, including, but not limited to the Third Claim for Relief above.

98.     Count V is for trademark dilution under California Business and Professions Code § 14247.

99.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution under California Business and Professions Code § 14247.

100.    3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law..

101.    3M has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**

*(Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq.)*

*(Price-Gouging and False Advertising of 3M-branded Products)*

102.    3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 101 of the Complaint as though set forth fully herein.

103.    Count VI is for unfair competition in violation of California Business and Professions Code § 17200 *et seq.*

104.    On March 4, 2020, California Governor Gavin Newsome declared a state of emergency to exist in California in response to COVID-19.

105.    That same day, California Attorney General Xavier Becerra issued a price-gouging alert reminding all Californians that, under Penal Code § 396, price-gouging is illegal in all California communities during the declared state of emergency.

106.    On March 12, 2020, Governor Newsome issued an executive order further enhancing the ability of the California state and local government's ability to respond to COVID-19.

107. On information and belief, Defendant sold or offered to sell consumer goods, emergency supplies, and medical supplies (including, but not limited to 3M's branded N95 respirators) for a price of more than 10 percent greater than the price charged by Defendant for those goods prior to the proclamation or declaration of emergency, in violation of Penal Code § 396.

108. Defendant's violation of Penal Code § 396 constitutes an unlawful business practice and an act of unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.* It is also a crime under California law.

109. Defendant's unauthorized use in commerce of the 3M Marks is also likely to cause consumer confusion or mistake or to deceive consumers into believing that Defendant's products and/or services are sponsored by, endorsed by, or originate from 3M or are otherwise connected or affiliated with or approved by 3M, thereby causing loss, damage, and injury to 3M and to the purchasing public, constituting unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200 *et seq.*

110. Defendant's marketing and advertisement of products with the 3M Marks and as coming "Direct from 3M" in the United States, as alleged herein, was intended to and did mislead 3M's customers and consumers to believe that such products were manufactured or distributed by, or authorized for manufacture or distribution by, 3M, in violation of California Business & Professions Code § 17500.

111. This conduct, together with Defendant's other acts alleged herein constitute unfair, unlawful, and fraudulent business acts and practices under California Business and Professions Code § 17200, because such acts are forbidden by various state and federal laws and are unscrupulous, unfair, and injurious to 3M. Defendant's acts have irreparably damaged 3M and the consuming public and will continue to do so unless restrained by this Court, and 3M is without an adequate remedy at law.

112. As a result of Defendant's wrongful conduct, 3M is entitled to, among other relief, an order enjoining and restraining Defendant from diverting, distributing, and selling the 3M-branded products and restoring to 3M any funds that were wrongfully collected by Defendant so

1  that those funds may be donated to a COVID-19 charitable organization(s)/cause(s) of 3M's

2  choosing.

3  **SEVENTH CLAIM FOR RELIEF**

4  *(False Advertising, Cal. Bus. Prof. Code §§ 17500 et seq.)*

5  *(False Advertising of 3M-branded Products)*

6  113.    3M repeats and incorporates by reference the statements and allegations in

7  paragraphs 1 – 112 of the Complaint as though set forth fully herein.

8  114.    Count VII is for false advertising in violation of California Business and Professions

9  Code § 17500 *et seq.*

10  115.    As alleged herein, Defendant has engaged in and continue to engage in violations of

11  California Business and Professions Code § 17500 by making or disseminating untrue or

12  misleading statements, with the intent to induce the purchase of 3M-branded N95 respirators, when

13  Defendant knew or by the exercise of reasonable care should have known the statements were

14  untrue, misleading, and likely to deceive the reasonable consumer and the public.  Defendant's

15  untrue or misleading representations include, but are not limited to the following:

16      a.    Representing that Defendant was an agent of and/or authorized by 3M to sell and/or

17            distribute 3M-branded products.

18      b.    Representing that Defendant could supply 3M-branded N95 respirators "Direct from

19            3M."

20      c.    Representing that "3M requires payment in full before order can be placed."

21      d.    Representing that "Payment is held in escrow until the order is completed."

22      e.    Representing that Defendant had available for sale millions, if not billions, of 3M-

23            branded N95 respirators and that the minimum order was 10 million units.

24  116.    Such statements are untrue, false, and misleading because 3M has not authorized

25  the use or direct sale of its 3M-branded products by Defendant.  Likewise, 3M never authorized

26  Defendant to accept deposits or payments on 3M's behalf or to hold any such funds in escrow.

27

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
CASE NO. 1:20-CV-00523-NONE-SAB

1    117.    Defendant knew, or by the exercise of reasonable care should have known at the

2    time of making the statements, or causing the statements to be made, that it was untrue or

3    misleading to hold itself out as an authorized distributor of 3M's branded N95 respirators.

4    118.    Defendant engaged in the false and/or misleading advertising and marketing of the

5    3M-branded N95 respirators, as alleged herein, with the intent to directly or indirectly induce

6    consumers to purchase those respirators.

7    119.    Had Defendant truthfully advertised that it was not authorized to sell 3M-branded

8    products, consumers would not have purchased the products or would have purchased a different

9    product from another manufacturer or distributor.

10   120.    This false and misleading advertising of 3M-branded products by Defendant

11   presents a continuing threat to consumers, as such conduct is ongoing to this day.

12   121.    As a direct and proximate result of the aforementioned acts and omissions by

13   Defendant, Defendant received and continue to hold monies rightfully belonging to 3M.

14   **EIGHTH CLAIM FOR RELIEF**

15   *(Unfair Competition and Trademark Infringement under California Common Law)*

16   *(Use of the 3M Marks)*

17   122.    3M repeats and incorporates by reference the statements and allegations in

18   paragraphs 1 – 121 of the Complaint as though set forth fully herein.

19   123.    Count VIII is for unfair competition and trademark infringement under California

20   common law.

21   124.    Upon information and belief, Defendant's acts and conduct complained of herein

22   constitute unfair competition and trademark infringement in violation of California common law.

23   125.    3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts

24   and conduct complained of herein, unless restrained by law.

25   126.    3M has no adequate remedy at law.

26   / / /

27   / / /

28   / / /

## PRAYER FOR RELIEF

**WHERFORE**, based on Defendant's conduct complained of, herein, Plaintiff asks this Court:

A.      To enter an Order, finding in Plaintiff's favor on each Claim for Relief asserted herein;

B.      Pursuant to 15 U.S.C. § 1116:

1.   To preliminarily and permanently enjoin Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M-brand N95 respirator Marks;

2.   To preliminarily and permanently enjoin Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being distributors, authorized retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirator) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and

3.   To order Defendant to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

C.      Pursuant to 15 U.S.C. § 1117:

1.   To order Defendant to provide 3M with a full accounting of all manufacture, distribution and sale of products under the 3M Marks (including, without limitation, 3M-brand N95 respirators), as well as all profits derived therefrom;

2.   To order Defendant to disgorge and pay to 3M – so as to be donated charitably pursuant to subpart H, *infra* – all of Defendant's profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators);

3.   To award 3M – so as to be donated charitably pursuant to subpart H, *infra* – treble damages in connection with Defendant's infringement of the 3M Marks;

4.   To find that Defendant's acts and conduct complained of herein render this case "exceptional"; and

5.   To award 3M – so as to be donated charitably pursuant to subpart H, *infra* – its costs and reasonable attorneys' fees incurred in this matter;

D.   Pursuant to 15 U.S.C. § 1118, to order the destruction of all unauthorized goods and materials within the possession, custody, and control of Defendant that bear, feature, and/or contain any copy or colorable imitation of 3M's Marks;

E.   To award restitution as authorized by law;

F.   To award Plaintiff pre-judgment and post-judgment interest against Defendant;

G.   To award Plaintiff such other relief that the Court deems just and equitable;

H.   To order that all monetary payments awarded to Plaintiff be donated to a COVID-19 charitable organization(s)/cause(s) of Plaintiff's choosing.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury for all issues so triable pursuant to Fed. R. Civ. P. 38(b) and 38(c).

1     Dated: April 19, 2020             **MAYER BROWN LLP**

2

3                      By: */s/ Carmine R. Zarlenga*

                           Carmine R. Zarlenga (*pro hac vice*)
4                          *czarlenga@mayerbrown.com*

                         1999 K Street, N.W.
5                          Washington, DC  20006-1101

                         Telephone:      (202) 263-3000
6                          Facsimile:       (202) 263-3300

7                          Dale Giali

                         *dgiali@mayerbrown.com*
8                          Keri E. Borders

                         *kborders@mayerbrown.com*
9                          350 South Grand Avenue, 25th Floor

                         Los Angeles, CA  90071-1503
10                         Telephone:      (213) 229-9500

11                         Facsimile:       (213) 625-0248

12

13                          *Attorneys for Plaintiff 3M Company*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
CASE NO. 1:20-CV-00523-NONE-SAB

# EXHIBIT 1

Published on *3M News | United States* (https://news.3m.com) on 4/6/20 5:58 pm CDT

# 3M and the Trump Administration Announce Plan to Import 166.5 Million Additional Respirators into the United States over the Next Three Months

**Release Date:**
Monday, April 6, 2020 5:58 pm CDT

**Terms:**
 Company (English)

**Dateline City:**
ST. PAUL, Minn.

## *Imports to supplement the 35 million N95 respirators 3M currently produces in U.S. per month*

ST. PAUL, Minn.--(BUSINESS WIRE)--Today 3M and the Trump Administration are announcing a plan to import 166.5 million respirators over the next three months to support healthcare workers in the United States. 3M and the Administration worked together to ensure that this plan does not create further humanitarian implications for countries currently fighting the COVID-19 outbreak, and committed to further collaborate to fight price gouging and counterfeiting.

"I want to thank President Trump and the Administration for their leadership and collaboration," said 3M chairman and CEO Mike Roman. "We share the same goals of providing much-needed respirators to Americans across our country and combating criminals who seek to take advantage of the current crisis. These imports will supplement the 35 million N95 respirators we currently produce per month in the United States."

"Given the reality that demand for respirators outpaces supply, we are working around the clock to further expand our capacity, while prioritizing and redirecting our supplies to serve the most critical areas," Roman continued. "We'll continue to do all we can to protect our heroic healthcare workers and first responders, and I want to thank our 96,000 3Mers for your tireless efforts – including those in our plants and distribution centers around the world."

3M will import 166.5 million respirators over the next three months primarily from its manufacturing facility in China, starting in April. The Administration is committed to working to address and remove export and regulatory restrictions to enable this plan. The plan will also enable 3M to continue sending U.S. produced respirators to Canada and Latin America, where 3M is the primary source of supply.

As a global company, 3M has manufacturing operations around the world to serve local and regional markets. As the pandemic unfolds in different stages around the world, 3M will continue to work with governments to direct respirators and other supplies to serve areas most in need.

Beginning in January, 3M ramped up production of N95 respirators and doubled its global output to 1.1 billion per year – including the 35 million a month in the United States. 3M has already put into motion additional investments and actions that will enable it to double its capacity again to 2 billion globally within 12 months, with additional capacity to begin coming online in the next 60 to 90 days. In the United States, for example, 3M expects to be producing N95 respirators at a rate of 50 million per month in June, a 40 percent increase from current levels.

Last week 3M announced additional actions to address price gouging and counterfeit activity related to its respirators. 3M has not changed the prices it charges for respirators, and will take decisive action against those seeking to take illegal and unethical advantage of the COVID-19 outbreak.

**Forward-Looking Statements**
This news release contains forward-looking information about 3M's financial results and estimates and business prospects that involve substantial risks and uncertainties. You can identify these statements by the use of words such as "anticipate," "estimate," "expect," "aim," "project," "intend," "plan," "believe," "will," "should," "could," "target," "forecast" and other words and terms of similar meaning in connection with any discussion of future operating or financial performance or business plans or prospects. Among the factors that could cause actual results to differ materially are the following: (1) worldwide economic, political, regulatory, capital markets and other external conditions and other factors beyond the Company's control, including natural and other disasters or climate change affecting the operations of the Company or its customers and suppliers; (2) risks related to public health crises such as the global pandemic associated with the coronavirus (COVID-19); (3) liabilities related to certain fluorochemicals, including lawsuits concerning various PFAS-related products and chemistries, and claims and governmental regulatory proceedings and inquiries related to PFAS in a variety of jurisdictions; (4) legal proceedings, including significant developments that could occur in the legal and regulatory proceedings described in the Company's Annual Report on Form 10-K for the year ended Dec. 31, 2019, and any subsequent quarterly reports on Form 10-Q (the "Reports"); (5) competitive conditions and customer preferences; (6) foreign currency exchange rates and fluctuations in those rates; (7) the timing and market acceptance of new product offerings; (8) the availability and cost of purchased components, compounds, raw materials and energy (including oil and natural gas and their derivatives) due to shortages, increased demand or supply interruptions (including those caused by natural and other disasters and other

events); (9) changes in tax laws or rulings; or delays with A1B phased implementation of a global enterprise resource planning (ERP) system, or security breaches and other disruptions to the Company's information technology infrastructure; (10) the impact of acquisitions, strategic alliances, divestitures, and other unusual events resulting from portfolio management actions and other evolving business strategies, and possible organizational restructuring; (11) operational execution, including scenarios where the Company generates fewer productivity improvements than estimated; (12) financial market risks that may affect the Company's funding obligations under defined benefit pension and postretirement plans; and (13) the Company's credit ratings and its cost of capital. Changes in such assumptions or factors could produce significantly different results. A further description of these factors is located in the Reports under "Cautionary Note Concerning Factors That May Affect Future Results" and "Risk Factors" in Part I, Items 1 and 1A (Annual Report) and in Part I, Item 2 and Part II, Item 1A (Quarterly Reports), as updated by applicable Current Reports on Form 8-K. The information contained in this news release is as of the date indicated. The Company assumes no obligation to update any forward-looking statements contained in this news release as a result of new information or future events or developments.

About 3M
At 3M, we apply science in collaborative ways to improve lives daily. With $32 billion in sales, our 96,000 employees connect with customers all around the world. Learn more about 3M's creative solutions to the world's problems at www.3M.com or on Twitter @3M or @3MNews.

**Language:**
English

**Contact:**

Jennifer Ehrlich
651-733-8805

**Ticker Slug:**
*Ticker:* MMM
*Exchange:* NYSE

---

**Source URL:** https://news.3m.com/press-release/company-english/3m-and-trump-administration-announce-plan-import-1665-million-addition

# EXHIBIT 2

4/9/2020 2019 Coronavirus (COVID-19) | 3M Product Information

Case 1:20-cv-02949-LAP Document 16-7 Filed 04/24/20 Page 33 of 87
Case 1:20-cv-00523-NONE-SAB Document 8-2 Filed 04/19/20 Page 2 of 10



PRODUCTS FOR ▼        PRODUCTS FOR        ▷        ABOUT US ▷
BUSINESS               CONSUMERS

3M United States > Coronavirus



# Helping the world respond to COVID-19

## 3M is committed to doing everything we can to fight COVID-19 and support healthcare workers globally

The COVID-19 pandemic continues to affect all of us, and 3M is working around-the-clock to help provide critical tools for the fight. Our current focus: supporting healthcare and front-line workers around the world by manufacturing products they need to help protect their lives as they treat others.

4/9/2020 2019 Coronavirus (COVID-19) 3M Proactive Information

Case 1:20-cv-02949-LAP Document 1-7 Filed 04/24/20 Page 34 of 87
Case 1:20-cv-00523-NONE-SAB Document 8-2 Filed 04/19/20 Page 3 of 10

  

## Increasing output of N95 respirators

Doubled our global output rate to nearly 100 million respirators per month; expect to produce about 50 million respirators per month in the U.S. by June 2020.

Anticipate doubling our global capacity to almost 2 billion respirators in the next 12 months.

We have not increased the **prices we charge for 3M respirators** in this crisis.

## Partnering with others to supply more

Working with governments to investigate alternate manufacturing scenarios and exploring coalitions with other companies to increase capacity further.

Partnering with Ford Motor Company to increase production of 3M Powered Air Purifying Respirators.

Secured authorization from the Chinese government to import about 10 million masks to the US from our manufacturing facility in China.

## Getting product to those who need it most

In the last seven days of March 2020, we sent 10 million N95 respirators to healthcare facilities across the U.S.

In the US, 90% of our N95 respirators designated for healthcare workers; remainder for critical industries including: food, energy and pharmaceutical.

Maximizing production of other important products, including hand sanitizers and disinfectants.

## Combatting price-gouging, fraud and counterfeiting

Working with law enforcement, retail partners and others to identify unethical, illegal counterfeiters and price-gougers related to 3M's respirators, remove them from e-commerce partner sites, and refer them to the appropriate law enforcement authorities.

Inviting those with concerns of potentially fraudulent activity, price gouging, or counterfeit 3M products **to report their concerns at 3M's website** so we can take action.

  

## WARNING: Fraud and Counterfeit Activity

We have created a resource for hospitals, government agencies,
end-users and purchasers of 3M products can call for information
on how to identify authentic 3M products and to ensure products
are from 3M authorized distributors.



1 (800) 426-8688
Call the fraud hotline.

Report a concern

STATEMENT: Fraudulent Activity, Price Gouging, and Counterfeit
Products
(PDF, 1.6 MB)

3M recommends purchasing our products from a 3M authorized distributor or dealer
only. This offers the greatest assurance that you will receive authentic 3M product.

If you need help identifying 3M authorized distributors and dealers in your area, please
contact 3M Help Center or 1 (888) 364-3577 in the United States. In Canada, please
contact 3M Canada Customer Service at 1 (800) 364-3577.

# Learn about critical 3M products and access helpful resources

4/9/2020
2019 Coronavirus (COVID-19) | 3M United States

Case 1:20-cv-02949-LAP   Document 16-7   Filed 04/24/20   Page 36 of 87
Case 1:20-cv-00523-NONE-SAB   Document 8-2   Filed 04/19/20   Page 5 of 10



## Personal Protective Equipment (PPE)

Proper selection and use are key to utilizing respirators to help reduce exposure to airborne contaminants. Find Technical Bulletins, How to Videos, Fit Testing Resources and more information to help you protect your employees and yourself.

**Learn more about personal protective equipment**

## Commercial Cleaning Solutions

Get information and application tips on 3M cleaning and disinfectant products for use by facility managers, building service contractors and all who clean public spaces.

**Learn more about commercial cleaning solutions**

## Supporting Health Care Providers

Every day, health care workers on the front lines put themselves at risk to ensure others are cared for. 3M Medical offers resources and information to help protect providers and patients, especially during this challenging time.

**Learn more about health care provider resources**

## Stay up to date with 3M's response to COVID-19

4/9/2020 2019 Coronavirus (COVID-19) | 3M Healthcare Information

Case 1:20-cv-02949-LAP Document 16-7 Filed 04/24/20 Page 37 of 87
Case 1:20-cv-00523-NONE-SAB Document 8-2 Filed 04/19/20 Page 6 of 10





April 01, 2020

## Putting healthcare workers first during the coronavirus outbreak





March 31, 2020

4/9/2020       2019 Coronavirus (COVID-19) 3M Protective Information

Case 1:20-cv-02949-LAK   Document 1-87   Filed 04/24/20   Page 40 of 87
Case 1:20-cv-00523-NONE-SAB   Document 8-2   Filed 04/19/20   Page 9 of 10

READ MORE IN THE 3M NEWS CENTER

## Stay up-to-date on the science of COVID-19

If you have questions about the virus and how to best protect yourself, please consult the sources below for the most current guidelines and recommended precautions.

4/9/2020
2019 Coronavirus (COVID-19) | 3M | Product Information
Case 1:20-cv-02949-LAP   Document 16-7   Filed 04/24/20   Page 41 of 87
Case 1:20-cv-00523-NONE-SAB   Document 8-2   Filed 04/19/20   Page 10 of 10





## Center for Disease Control and Prevention

- **2020 Situation Summary**
- **What You Need to Know**
- **Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings**

## World Health Organization

- **Coronavirus**
- **Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected**

## Contact Media Relations

Media inquiries regarding 3M's response to the coronavirus situation should be referred to 3M Media Relations.

**Contact Us**

# EXHIBIT 3

**From:**                       Virginia Cooper <vcooper.rx2live@gmail.com>
**Sent:**                        Friday, March 27, 2020 1:44 PM
**To:**                             Tiffani Quinto
**Subject:**                    PPE products
**Attachments:**           Copy of COVID PPE Products-Price List.xlsx

Tiffany,
Please see attached the PPE products that are available through RX2LIVE. Please reach out with any additional
questions and I will do my best to answer them or get them answered as swiftly as possible.

**CAUTION: \*\*EXTERNAL EMAIL\*\*** Do NOT click links or open attachments unless you recognize the sender and

1

**RX2Live**

# Personal Protective Equipment Product/Price List  3-26-2020

| ITEM # | DESCRIPTION | | MIN. QTY / unit | UNIT PRICE per each piece unless noted | |
|---|---|---|---|---|---|
| 00A | Face Mask  N95 | #8210 direct from 3M | 10,000,000 ea. | $ | 4.95 |
| 001 | Face Mask  N95 | (CE, FDA) | 100,000 ea. | $ | 3.89 |
| 001A | Face Mask N95 | (CE, FDA) | 20,000 ea. | | TBD |
| 002 | Face Mask KN95 | (CE) | 100,000 ea. | $ | 1.99 |
| 003 | Face Mask Medical - disposable | (CE) | 100,000 ea. | $ | 0.52 |
| 004 | Face Mask-Surgical - disposable | (CE, FDA) | 100,000 ea. | $ | 0.76 |
| 005 | Face Mask Daily - disposable | (CE) | 100,000 ea. | $ | 0.39 |
| 006 | Isolation Gown - Hospital ICU | (CE) | 10,000 ea. | $ | 56.25 |
| 007 | Isolation Gown - Hospital Normal | (CE) | 10,000 ea. | $ | 14.10 |
| 008 | Daily Protective Gown | (CE) | 10,000 ea. | $ | 11.00 |
| 009 | Nitrile Gloves - powder free | (CE, FDA) | 3,000 cartons | $ | 68.00 |
| 010 | PVC Gloves - powder free | (CE, FDA) | 3,000 cartons | $ | 47.00 |
| 011 | Medical Face Shield | (CE, FDA) | 5,000 cartons | $ | 6.00 |
| 012 | Glasses/Goggles 3m Anti-mist | (CE, FDA) | 100,000 cartons | $ | 9.75 |
| 013 | Hand Sanitizer- Antibacterial 75% alcohol / 55ml | (CE) | 100,000 cartons | $ | 2.70 |
| 014 | Hand Sanitizer- Antibacterial 75% alcohol / 100g | (CE) | 100,000 cartons | $ | 2.80 |
| 015 | Hand Sanitizer- Antibacterial 75% alcohol / 100ml | (CE) | 100,000 cartons | $ | 2.80 |
| 016 | Hand Sanitizer- Antibacterial 75% alcohol / 500ml | (CE) | 100,000 cartons | $ | 4.80 |
| 016A | Hand Sanitizer- Antibacterial 75% alcohol / 55ml | (SDS) | 100 cases | $ | 5.80 |
| 017 | COVID-19 IgG/IgM Detection | (CE) | 10,000 cartons | $ | 19.75 |
| 018 | Thermometer-Infrared | (CE) | 10,000 cartons | $ | 49.99 |

price per carton (009)
price per carton (010)

*Information about quantities in each carton or case will be coming.

# EXHIBIT 4

**From:**          Virginia Cooper <vcooper.rx2live@gmail.com>
**Sent:**          Monday, March 30, 2020 4:01 PM
**To:**            Tiffani Quinto
**Subject:**       Here is the latest PPE update that I have been given.
**Attachments:**   PPE Product List - pictures  3-26-20 (1).pptx

Attached are pictures, catalog codes, pricing and minimum requirements.

Virginia Cooper

**CAUTION: **EXTERNAL EMAIL** Do NOT click links or open attachments unless you recognize the sender and



#01860

**3M N95 1860**
*Direct from 3M*

Minimum Order 10 million

*3M requires payment in full before order can be placed.  Payment is held in escrow until the order is completed*

$5.20 ea



#08210

**3M N95 8210**
*Direct from 3M*

Minimum Order 10 million

*3M requires payment in full before order can be placed.  Payment is held in escrow until the order is completed*

$4.95 ea



#001

**N95**
*CE, FDA*

Minimum Order 100,000

$2.99 ea



#002

**KN95**
*CE*

Minimum Order 100,000

$1.99 ea



#003

**Medical Face Masks - Disposable**
*CE*

Minimum Order 100,000

$0.52 ea



#004

**Surgical Masks - Disposable
(Ethylene Oxide Sterile)**
*CE, FDA*

Minimum Order 100,000

$0.76 ea



#005

**Daily Protective Face Mask - Disposable**
*CE, FDA*

Minimum Order 100,000

$0.39 ea





#006

**Isolation Gowns - Hospital ICU Use**
*CE*

Minimum Order 10,000

$56.25 ea



#007

**Isolation Gowns - Hospital Normal Use**
*CE*

Minimum Order 10,000

$14.10 ea



#008

**Daily Protective Gowns**
*CE*

Minimum Order 10,000

$11.00 ea



#009

**Nitrile Gloves – Powder Free**
*CE, FDA*

Minimum Order 3,000 Cartons

$68/carton



#010

**PVC Gloves – Powder Free**
*CE, FDA*

Minimum Order 3,000 Cartons

$47/carton



#011

**Medical Face Shield**
*CE, FDA*

Minimum Order 5,000 Shields

$6.00



#012

**3M Protective Anti-Mist Glasses**
*CE, FDA*

Minimum Order 100,000 Cartons

$9.75



#013

**Antibacterial Instant Hand Sanitizer – 75% Alcohol**
*CE*

Minimum Order 100,000 Cartons

$2.70



100g

#014

**Antibacterial Instant Hand Sanitizer – 75% Alcohol**
*CE*

Minimum Order 100,000 Cartons

$2.80



100ml

#015

**Antibacterial Instant Hand Sanitizer – 75% Alcohol**
*CE*

Minimum Order 100,000 Cartons

$2.80



500ml

#016

**Antibacterial Instant Hand Sanitizer – 75% Alcohol**
*CE*

Minimum Order 100,000 Cartons

$4.80



#016A

**Antibacterial Instant Hand Sanitizer – 75% Alcohol**
*SDS*

Minimum Order 100 Cases

$5.80



#017

**COVID-19 IgG/IgM Detection Kit
(Colloidal Gold)**
*CE*

Minimum Order 10,000 Cartons

$19.75





#018

**Infrared Thermometer**
*CE*

Minimum Order 10,000 Cartons

$49.99



# EXHIBIT 5

Int. Cls.: 9 and 10

Prior U.S. Cls.: 21, 23, 26, 36, 38, 39 and 44

**United States Patent and Trademark Office**

Reg. No. 3,398,329

Registered Mar. 18, 2008

## TRADEMARK
### PRINCIPAL REGISTER

# 3M

3M COMPANY (DELAWARE CORPORATION)
3M CENTER, 220-9E-01
2501 HUDSON ROAD
ST. PAUL, MN 55144

FOR: FULL LINE OF PARTICULATE, OZONE, GAS, VAPOR, CHEMICAL, BIOHAZARD AND OTHER RESPIRATORS, INCLUDING FILTERING FACE-PIECE RESPIRATORS AND ELASTOMERIC FACE-PIECE RESPIRATORS, OTHER THAN FOR ARTIFICIAL RESPIRATION; FULL LINE OF SELF-RESCUE AND PROTECTION APPARATUS, NAMELY, OXYGEN BREATHING UNITS, SUPPLIED-AIR RESPIRATORS, AND POWERED AIR-PURIFYING SYSTEMS (PAPRS) RESPIRATORS; CARTRIDGES, FILTERS, AIR TANKS AND OTHER COMPONENT PARTS FOR RESPIRATORS AND BREATHING UNITS; DUST MASKS; FULL LINE OF PROTEC-TIVE EYEWEAR, NAMELY, SAFETY GOGGLES, EYEGLASSES AND EYE SHIELDS; FACE-PROTEC-TION SHIELDS; EAR PLUGS AND EAR MUFFS TO ATTENUATE SOUND AND PROTECT HEARING; HARD HATS AND OTHER PROTECTIVE HEL-METS; WELDING HELMETS; AIR MONITORING DEVICES AND SENSORS FOR MEASURING GASES AND VAPOR CONCENTRATION LEVELS; GAS DETECTORS FOR DETECTING THE PRESENCE OF CARBON MONOXIDE AND OTHER GASES; THERMAL-IMAGING CAMERAS FOR USE BY FIREFIGHTERS AND FOR SEARCH AND RESCUE; ENVIRONMENTAL SAMPLING AND TESTING IN-STRUMENTS AND EQUIPMENT, NAMELY, ELEC-TRONIC LUMINOMETERS, AND RELATED SOFTWARE, DOCKING STATIONS AND BATTER-IES, FOR DETECTING, MEASURING AND ANA-LYZING CHEMICALS, BIOLOGICAL SUBSTANCES, FOOD RESIDUES AND MICROBES; MICROBIOLOGICAL AND CONTAMINANT-TEST-ING INSTRUMENTS AND EQUIPMENT, AND SOFTWARE RELATED THERETO, FOR DETECT-ING, MEASURING AND ANALYZING BACTERIA, INCLUDING PATHOGENS SUCH SALMONELLA AND LISTERIA, ALLERGENS, TOXINS, VITAMINS,

ANTIBIOTICS, AND OTHER ORGANISMS AND SUBSTANCES; DIAGNOSTIC APPARATUS FOR TESTING FOOD; LABORATORY EQUIPMENT AND SUPPLIES, NAMELY, TEST TUBES, TEST TUBE CAPS, DIP STICKS, RACKS, MICROTITRE PLATES AND TRAYS; SECURITY SCANNERS AND READERS FOR USE IN READING PASSPORTS AND OTHER FORMS OF IDENTIFICATION; ANTI-THEFT AND LIBRARY MATERIAL CHECK-OUT SECURITY SYSTEMS; RADIO FREQUENCY IDENTIFICATION (RFID) TAGS AND READERS; COMPUTER SOFTWARE FOR SUPPLY CHAIN MANAGEMENT FROM SOURCE TO CONSUMP-TION, NAMELY, FOR COLLECTING, STORING AND MANAGING DATA, AND REPORTING, EX-ECUTING AND TRACKING, IN CONNECTION WITH ENTERPRISE RESOURCE PLANNING, SUP-PLIER ENABLEMENT, MANUFACTURING, IN-VENTORY CONTROL AND WAREHOUSING, ORDER FULFILLMENT, SHIPPING, TRANSPOR-TATION AND DELIVERY; COMPUTER SOFT-WARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT AND MEDICAL RECORDS, CODING AND GROUP-ING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND MEDICAL IMAGING SCANNERS AND RE-LATED SOFTWARE FOR CAPTURING IMAGES OF THE MOUTH AND TEETH FOR USE IN DENTIS-TRY, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

FOR: FULL LINE OF SURGICAL AND MEDICAL MASKS, RESPIRATORS AND FACE AND EYE SHIELDS FOR MEDICAL AND HEALTH-CARE RELATED PERSONNEL; FULL LINE OF ORTHO-PEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COM-POSITE FABRICS CONTAINING FIBERGLASS

AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTRO-ENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS; AUTOCLAVES FOR MEDICAL USE;

ORTHODONTIC APPLIANCES; DENTAL APPARATUS, NAMELY, INTRA-ORAL LIGHT SYSTEMS FOR CURING DENTAL MATERIALS, CERAMIC USED IN MAKING DENTAL CROWNS, BRIDGES AND OTHER RESTORATIVES; DENTAL INSTRUMENTS AND KITS COMPRISED OF SUCH INSTRUMENTS, NAMELY, MANDRELS, BURS, DISCS, CUPS, WHEELS, POINTS, BRUSHES AND ABRASIVE STRIPS USED TO GRIND, POLISH OR FINISH DENTAL RESTORATIVES; DENTAL INSTRUMENTS, NAMELY, SCISSORS, CRIMPING PLIERS, CONTOURING PLIERS AND IMPRESSION TRAYS; ELECTRONIC MIXERS FOR DENTAL COMPOUNDS; APPLICATORS AND DISPENSERS FOR DENTAL PRIMERS, CEMENTS, ADHESIVES, IMPRESSION MATERIALS AND RESTORATIVE MATERIALS; GLASS-FIBER POSTS USED IN DENTAL RESTORATIVE PROCEDURES; AND DENTAL PROPHYLAXIS ANGLES AND DENTAL PROPHYLAXIS CUPS FOR USE IN CLEANING TEETH AND DENTAL HYGIENE PROCEDURES, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,237,168, 2,793,534 AND OTHERS.

SER. NO. 77-257,496, FILED 8-16-2007.

TARAH HARDY, EXAMINING ATTORNEY

# EXHIBIT 6

Int. Cls.: 1, 3, 5, 9, 10 and 28

Prior U.S. Cls.: 1, 4, 5, 6, 10, 18, 21, 22, 23, 26, 36, 38, 39, 44, 46, 50, 51 and 52

**Reg. No. 2,793,534**

## United States Patent and Trademark Office

Registered Dec. 16, 2003

# TRADEMARK
## PRINCIPAL REGISTER



3M COMPANY (DELAWARE CORPORATION)
2501 HUDSON ROAD
3M CENTER
ST. PAUL, MN 55144 , BY MERGER, BY CHANGE OF NAME MINNESOTA MINING AND MANU-FACTURING COMPANY (DELAWARE COR-PORATION) ST. PAUL, MN 55144

FOR: ETHYLENE OXIDE FOR USE IN THE STERILIZATION OF MEDICAL, LABORATORY AND FOOD HANDLING INSTRUMENTS AND EQUIPMENT; CHEMICAL AND STEAM INDICA-TOR STRIPS AND TAPE FOR USE WITH AUTO-CLAVES AND FOR TESTING THE STERILITY OF MEDICAL INSTRUMENTS AND EQUIPMENT; IN-DICATOR STRIPS FOR TESTING GLUTARALDE-HYDE, ETHYLENE OXIDE AND OTHER CHEMICAL SOLUTIONS AND GASES; INDICATOR STRIPS FOR TESTING FOR BIOLOGICAL CONDI-TIONS FOR USE IN SAFETY-MONITORING; INDI-CATOR STRIPS FOR INDICATING TEMPERATURES FOR USE IN THE STERILIZA-TION AND SAFETY-MONITORING; ASSAY AND REAGENT TEST KITS AND COUNT PLATES FOR FIELD AND LABORATORY TESTING FOR E COLI, COLIFORM, AND OTHER BACTERIA OR CON-TAMINANTS IN MEAT, DAIRY PRODUCTS AND OTHER TYPES OF FOOD, AND FOR TESTING TO DETECT YEAST AND MOLD; AND STERILIZA-TION MONITOR TESTING KITS CONTAINING INDICATOR STRIPS OR TAPE, REAGENTS AND RECORD KEEPING CARDS OR BINDERS FOR TESTING THE STERILITY OF SURGICAL AND MEDICAL INSTRUMENTS, EQUIPMENT, AND

SUPPLIES , IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FIRST USE 11-0-1990; IN COMMERCE 11-0-1990.

FOR: NON-MEDICATED SKIN CARE PRO-DUCTS, NAMELY, CLEANSERS, CREAMS, LO-TIONS, MOISTURIZERS, BARRIER CREAMS AND EMOLLIENTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-0-1996; IN COMMERCE 1-0-1996.

FOR: FULL LINE OF BANDAGES, DRESSINGS AND MEDICAL TAPES, NAMELY, ADHESIVE BANDAGES, BANDAGES FOR SKIN WOUNDS, SURGICAL BANDAGES, WOUND DRESSINGS, NON-STICK PADS FOR USE AS MEDICAL DRES-SINGS, MEDICATED COMPRESSES, TRANSPAR-ENT MEDICAL DRESSINGS, HYDROCOLLOID DRESSINGS, COLOSTOMY DRESSINGS, ULCER DRESSINGS, MEDICAL ADHESIVE TAPES, SURGI-CAL TAPES, AND WOUND AND SKIN CLOSURE ADHESIVE STRIPS WITH OR WITHOUT ANTIMI-CROBIAL SOLUTIONS; GAUZE; WOUND HEAL-ING FILLERS WITH OR WITHOUT GAUZE; MEDICATED SKIN CARE PREPARATIONS; SUR-GICAL DISINFECTANTS AND PREPPING SOLU-TIONS; MEDICATED ANTISEPTIC HAND WASHES; AND CULTURE MEDIA, BACTERIOLOGICAL MEDIA AND DIAGNOSTIC PREPARATIONS FOR CLINICAL OR MEDICAL LABORATORY USE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 2-0-1991; IN COMMERCE 2-0-1991.

FOR: COMPUTER SOFTWARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT RECORDS, CODING AND GROUPING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND FULL LINE OF RESPIRATORY FACE MASKS FOR FILTERING OUT GERMS, DUST AND POLLEN, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-0-1992; IN COMMERCE 5-0-1992.

FOR: FULL LINE OF ORTHOPEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COMPOSITE FABRICS CONTAINING FIBERGLASS AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTROENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS,

PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; AND FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 6-0-1990; IN COMMERCE 6-0-1990.

FOR: ATHLETIC TAPE AND ATHLETIC SUPPORT AND COMPRESSION WRAPS FOR KNEES, WRISTS, ANKLES, ELBOWS, LEGS AND ARMS, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

FIRST USE 0-0-1993; IN COMMERCE 0-0-1993.

OWNER OF U.S. REG. NOS. 1,181,981, 1,234,260 AND OTHERS.

THE MATTER SHOWN IN BROKEN LINES INDICATES THE RELATIVE PLACEMENT OF THE MARK ON A TYPICAL PACKAGE FOR THE GOODS AND IS NOT CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 76-138,263, FILED 9-29-2000.

ALICIA COLLINS, EXAMINING ATTORNEY

# EXHIBIT 7



**Science.**
**Applied to Life.™**

April 8, 2020
Revision 2

# Fraudulent Activity, Price Gouging, and Counterfeit Products

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. Examples include people fraudulently representing themselves as being affiliated with 3M and having authentic 3M product to sell, selling (or offering to sell) 3M products at grossly inflated prices, selling counterfeit products falsely claimed to be from 3M, and falsely claiming to manufacture 3M products. In many cases, these scammers will try and secure funds in advance and then disappear once the money is received.

3M will not tolerate any such activity by 3M authorized channel partners and we will aggressively pursue third-parties that seek to take advantage of this crisis. We are working with law enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, state Attorneys General, and local authorities.

We have also created a new **3M COVID-19 Fraud hotline** for the U.S. and Canada that end-users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products. **You can reach this hotline by calling: 1 (800) 426-8688.**

In addition to the hotline, you can report a concern in the U.S. at **www.go.3m.com/covidfraud**. You can report a concern in Canada at **www.go.3M.com/covidfraud-en-ca** (English) or **www.go.3M.com/covidfraud-fr-ca** (French).

3M recommends purchasing our products only from a 3M authorized distributor or dealer, as that offers the greatest assurance that you will receive authentic 3M products.

If you need help identifying 3M authorized distributors and dealers in your area, please contact **3M Help Center** at **www.3m.com/3M/en_US/company-us/help-center** or **1 (888) 364-3577** in the United States. In Canada, please contact **3M Canada Customer Service at 1 (800) 364-3577.**

**With regard to 3M respirators specifically, we are providing the following additional information to help stop price gouging and sales of counterfeit products:**

- 3M has <u>not</u> changed the prices we charge for 3M respirators as a result of the COVID-19 outbreak.

- We are actively working to eliminate price gouging, including making referrals to law enforcement where appropriate.

- To help customers identify and avoid inflated prices, we are now publishing current single-case list prices for many of the most common 3M N95 respirator models sold in the U.S.

- List prices for these models sold in Canada are similar on a currency-adjusted basis.

| | Model # | List Price (USD) |
|---|---|---|
| **Surgical N95 Respirators** | 1804 | $0.68 |
| | 1804S | $0.68 |
| | 1860 | $1.27 |
| | 1860S | $1.27 |
| | 1870+ | $1.78 |
| **Standard N95 Respirators** | 8210 | $1.02 - $1.31 |
| | 8210Plus | $1.18 - $1.50 |
| | 8210V | $1.48 - $1.88 |
| | 8110S | $1.08 - $1.37 |
| | 8200 | $0.63 - $0.80 |
| | 8511 | $2.45 - $3.11 |
| | 9105 | $0.64 - $0.81 |
| | 9105S | $0.64 - $0.81 |
| | 9210+ | $1.40 - $1.78 |
| | 9211+ | $2.68 - $3.40 |

- These list prices are per respirator.

- Actual prices may be lower than these list prices, as negotiated between you and your chosen reseller.

- 3M has also worked to further accelerate delivery of respirators to critical end-users – both by utilizing our existing network of healthcare distributors and, where it makes sense to do so, shipping directly to end-user locations. Effective the week of March 23, the small volume of 3M filtering facepiece respirators being made available to critical industrial infrastructure is shipping directly to the specified end-user.

- 3M respirators should be sold only in 3M packaging, with model-specific user instructions accompanying the product.

- 3M respirators should not be sold individually or without packaging (including User Instructions).

- 3M has strict quality standards, and therefore products that have missing straps, strange odors, blocked valves, misspelled words, etc. are likely not authentic 3M respirators.

Finally, 3M personal protective equipment (PPE) is intended, labeled, packaged, and certified to meet the requirements of the countries in which 3M sells it. Those requirements differ around the world, including as it relates to, for example, respirator performance, local language, and local certification and approval for sale and use. As a result, 3M PPE imported from other countries may not meet local requirements. Please confirm such PPE meets all applicable requirements prior to use.

For technical assistance regarding the selection and use of 3M respirators, please contact your local 3M Technical Service team. In the U.S., you can call 1 (800) 243-4630. In Canada, you can call 1 (800) 364-3577.

**For more information, contact the 3M Help Center at 1 (888) 364-3577 in the United States. In Canada, please contact 3M Canada Customer Service at 1 (800) 364-3577.**

3M Company
3M Center
St. Paul, MN
55144-1000

© 3M 2020. All Rights Reserved.
3M is a trademark of 3M Company and affiliates.
Used under license in Canada.

# EXHIBIT 8





## 3M COVID-19 Anti-Fraud, Anti-Price Gouging, and Anti-Cou

### Have a concern to report related to Fraud, Price Gouging or Count

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and c
will not tolerate any such activity by 3M authorized channel partners and we will aggressively pur
enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, State

# COVID-19 Fraud

*Please complete as much of the information requested below as possible. Fields marked with an a*
*that 3M has received the report. We request that you reply to that email and attach any copies of i*
*can help us to investigate the situation.*

## Requestor Information

**First Name***

**Last Name***

**Company Name**

**Email/Business Email Address***

**Phone/Business Phone Number***

**Government Agency Name (if applicable)**

**Country/Region***

**United States**

**Account Type***

**Select One**

## Alleged Solicitor/Seller Information

*Please provide as much information as possible.*

**Seller First Name**

**Seller Last Name**

**Seller Company**

**Seller Email**

**Seller Phone**

**Seller's Website**

## Fraud Product Details

**Product 1***

**Select One**

**Product 1 Price**

**Product 1 3M SKU**

**Product 1 Quantity**

**Product 2**

Select One

**Product 2 Price**

**Product 2 3M SKU**

**Product 2 Quantity**

**Product 3**

Select One

**Product 3 Price**

**Product 3 3M SKU**

**Product 3 Quantity**

**How did the interaction take place?***

Select One

**Interaction URL**

**Product Fraud Details***

*Provide as much detail about the interaction as possible including how you first contacted the selle*

3M respects your right to privacy. 3M will collect, use, and disclose the personal information you
fraud, price gouging and fraudulent activity, 3M may voluntarily share information with law enfor
law enforcement agencies, 3M will have no control over that personal information.

Please be aware that the information you supply about yourself, or any aspect of 3M's operations
information that, to the best of your knowledge, is correct. You will not be sanctioned for submitti
knowingly provide false or misleading information, it may result in disciplinary or judicial action.

Submit

# EXHIBIT 9



Copy of COVID PPE Products-Price List (006).xlsx  [Protected View] - Excel

?

# Info

Info

New

Open

Save

Save As

Save As Kofax PDF


Save as new version

Print

Share

Export

Publish

Close

Account

## Copy of COVID PPE Products-Price List (006)

E-mail attachment:   C:\Users\jj054273\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\GVEIXDE8\Copy of COVID PPE Products-Price List (006).xlsx

### Protected View

**Enable Editing**

This file came from your email, so we opened it in a way that helps to keep your computer safe from viruses (just in case).

Don't worry—you can continue reading in this view. If you need to edit, and you trust this file, then enable editing.

Protected View Settings

Learn more about Protected View

### Properties ▾

| | |
|---|---|
| Size | 12.6KB |
| Title | None |
| Tags | None |
| Categories | None |

### Related Dates

| | |
|---|---|
| Last Modified | 3/26/2020 6:11 PM |
| Created | 3/26/2020 3:02 PM |
| Last Printed | |

### Related People

Author           M P P

Last Modified By          Alex Myers

Show All Properties

PPE Product List - pictures  3-26-20 (1).pptx - PowerPoint

# Info

## PPE Product List - pictures  3-26-20 (1)

Desktop » 3M



### Compatibility Mode
Converting this file will enable currently disabled features, which may result in layout changes.

Convert



### Protect Presentation
Control what types of changes people can make to this presentation.

Protect Presentation ▾



### Inspect Presentation
Before publishing this file, be aware that it contains:
- Document properties, author's name and cropped out image data
- Content that people with disabilities are unable to read

Check for Issues ▾



### Manage Presentation
Check in, check out, and recover unsaved changes.
- There are no unsaved changes.

Manage Presentation ▾



iManage Properties

## Properties ▾

| | |
|---|---|
| Size | 4.72MB |
| Slides | 21 |
| Hidden slides | 0 |
| Title | PowerPoint Presentation |
| Tags | Add a tag |
| Categories | Add a category |

### Related Dates

| | |
|---|---|
| Last Modified | 3/30/2020 3:36 PM |
| Created | 3/25/2020 10:10 AM |
| Last Printed | |

### Related People

Author  Kendel

Add an author

Last Modified By  Alex Myers

### Related Documents

📁 Open File Location

**Show All Properties**

---

Info

New

Open

Save

Save As

Save As Kofax PDF

Save as new version

Print

Share

Export

Close

Account

Options

JS 44   (Rev. 02/19)

Case 1:20-cv-02949-LAP   Document 16-7   Filed 04/24/20   Page 86 of 87
Case 1:20-cv-00523-NONE-SAB   Document 8-10   Filed 04/19/20   Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| 3M Company | RX2Live, LLC and RX2Live, Inc. |

**(b)**   County of Residence of First Listed Plaintiff _____
                                        *(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant     Utah County, Utah
                                            *(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
              THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
Carmine R. Zarlenga (pro hac vice); Dale Giali (SBN 150382); Keri E. Borders
(SBN 194015)
Mayer Brown LLP, 350 S. Grand Ave., 25th Floor, Los Angeles, CA 90071-1503
Telephone: 213-229-9500; Facsimile: 213-625-0248

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
          Plaintiff
- ☒ 3   Federal Question
          *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government
          Defendant
- ☐ 4   Diversity
          *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☒ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. 1114, 1124
Brief description of cause:
Trademark infringement; unfair competition; false endorsement; trademark dilution; false advertising

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
    UNDER RULE 23, F.R.Cv.P.

DEMAND $
TBD

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes    ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
04/19/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Carmine R. Zarlenga

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.    Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.