# EXHIBIT 8

FILED
4/10/2020 5:49 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Gay Lane DEPUTY

DC-20-05549

CAUSE NO. _____                    Gay Lane

| | | |
|---|---|---|
| **3M COMPANY,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | **DALLAS COUNTY,** |
| | § | |
| **JOHN DOE, claiming to be** | § | |
| **the "3M Company Trust Account"** | § | **___ JUDICIAL DISTRICT** |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION
## FOR TEMPORARY AND PERMANENT INJUNCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW PLAINTIFF 3M Company ("Plaintiff" or "3M"), and files this Original

Petition and Application for Temporary and Permanent Injunctions complaining of unknown

individual or entity JOHN DOE, claiming to be the "3M Company Trust Account" ("Defendant"),

hereby alleges as follows based on knowledge of its own actions, and on information and belief as

to all other matters:

## NATURE OF THE ACTION

1.      This lawsuit concerns Defendant's use of Plaintiff's famous "3M" trademarks to

perpetrate a false and deceptive price-gouging scheme on unwitting consumers, including agencies

of government, during the global COVID-19 pandemic.

2.      Throughout its history, 3M has been providing state-of-art, industry-leading

scientific and medical products to consumers throughout the world under its famous 3M marks.

Based on this longstanding, continuous use, consumers associate the 3M marks uniquely with 3M.

Now, more than ever, consumers are also relying on the famous 3M marks to indicate that the

products offered thereunder are of the same superior quality that consumers have come to expect

over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and personal protective equipment ("PPE"), including Plaintiff's 3M-brand N95 respirators.

3.       Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle against COVID-19, 3M is supplying healthcare workers and other first responders with 3M-brand N95 respirators.  For example, in the last week of March 2020, 3M supplied healthcare workers throughout the United States with 10 million of its 3M-brand N95 respirators.  3M also recently announced that it will import 166.5 million of its 3M-brand N95 respirators into the United States in the next three months to supplement its US production, and has invested the capital and resources necessary to double its current annual global production of 1.1 billion respirators.  In response to the COVID-19 outbreak and surge in need for N95 respirators, 3M has doubled its global output rate to nearly 100 million respirators per month, and it expects to produce around 50 million respirators per month in the United States by June 2020.

4.       The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly.  3M has <u>not</u> increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak.

5.       Unfortunately, any number of wrongdoers seek to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M N95 respirators and other products in high demand.  These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices – all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

6.      In response to fraudulent activity, price-gouging and counterfeiting related to N95 respirator masks that has spiked in the marketplace in response to the pandemic, 3M is taking an active role in combating these activities.  3M's actions include working with law enforcement authorities around the world, including the U.S. Attorney General, state Attorneys General and local authorities, and creating a "3M COVID-19 Fraud hotline" for the United States and Canada that end users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products.  3M is also publishing information on its website to help inform the purchasing public about 3M's prices and products so that they can avoid fraud.  Further information about 3M's efforts is set forth in the 3M press release and publication attached as hereto as **Exhibits 1 and 2**.  The filing of this Petition and Application for Injunction is another part of these efforts.

7.      Despite 3M's extensive efforts during COVID-19, unsavory characters continue their quests to take advantage of healthcare workers, first responders, and others in a time of need and trade off the fame of the 3M brand and marks.  Defendant is a prime example of this unlawful behavior.

8.      On or about March 30, 2020, Defendant communicated, by and through its representative, via phone and e-mail with New York City's Office of Citywide Procurement, offering to sell millions of Plaintiff's 3M-brand N95 respirator masks at a grossly inflated aggregate price of approximately $117,875,000.  Defendant is not an authorized distributor of any of Plaintiff's products and has no rights to use Plaintiff's famous 3M marks.  Nonetheless, to confuse and deceive New York City officials into believing that Defendant was an authorized distributor of Plaintiff's products, Defendant identified itself as the "3M Company Trust Account" and sought payment at its purported location in Irving, Texas. Indeed, Defendant's false

representations caused the New York City Procurement Office to prepare a Letter of Intent to the "3M Company Trust Account."  Compounding Defendant's bad acts, the prices at which it offered to sell 3M-brand N95 respirators to New York City's Procurement Office were 450%-600% *above* 3M's list price.  This offer constituted extreme price-gouging by any measure, including under Texas law (Tex. Bus. & Comm. Code § 17.46(b)(27)).  Not only does such price-gouging further strain the limited resources available to combat COVID-19, but such conduct justifiably has caused public outrage which threatens imminent and irreparable harm to 3M's brand as Defendant and similar pandemic profiteers promote an improper association between 3M's marks and exploitative pricing behavior.

9.      3M does not – and will not – tolerate individuals or entities deceptively trading off the fame and goodwill of the 3M brand and marks for personal gain.  This is particularly true against those who seek to exploit the surge in demand for 3M-brand products during the COVID-19 global pandemic, which already has claimed tens of thousands of lives worldwide and more than 5,000 lives in New York State alone.

10.     Accordingly, to further protect governmental actors and consumers from confusion and mistake, to reduce the amount of time and energy that government officials are forced to waste interacting with such schemes, as well as to forestall any further diminution to the 3M brand and marks' reputation, fame, and goodwill, Plaintiff brings this lawsuit against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and deceptive acts and practices.  Plaintiff also seeks preliminary and permanent injunctive relief.  As described below, any damages, costs, or fees recovered by Plaintiff will be donated to charitable COVID-19 relief efforts.

## DISCOVERY CONTROL PLAN

11.     Discovery in this case is intended to be conducted under Level 2 pursuant to Texas Rule of Civil Procedure 190.3.

## THE PARTIES

12.     Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.

13.     Defendant John Doe is an unknown person at this stage. On information and belief, Defendant, who is holding itself out to the public as the "3M Company Trust Account" is a Texas person or entity, claiming a principal place of business at 7750 N. MacArthur Blvd., Irving, Texas 75039.

## JURISDICTION AND VENUE

14.      Venue is proper in Dallas County, Texas pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 15.002.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.  3M**

15.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

**B.  The 3M Brand**

16.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more.  3M also uses

its famous "3M Science. Applied to Life" slogan in connection with the promotion of its goods and services.   Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

17.    The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and more.  As such, 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**C.  The Famous "3M" Marks**

18.    Over the past century, Plaintiff has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the inset 3M design mark (together, the "3M Marks"):



19.    For decades, products offered under Plaintiff's 3M Marks have enjoyed enormous commercial success (including, without limitation, its 3M-brand N95 respirator).  Indeed, in 2019, alone, sales of products offered under Plaintiff's 3M Marks exceeded several hundred million USD.

20.    Over the same period of time, products offered under Plaintiff's 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

21.     Based on the foregoing, consumers associate the 3M Marks uniquely with Plaintiff and recognize them as identifying Plaintiff as the exclusive source of goods and services offered under the 3M Marks.  Based on the foregoing, the 3M Marks have also become famous among consumers in the United States.

22.     To strengthen Plaintiff's common-law rights in and to its famous 3M Marks, Plaintiff has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"); and (iii) U.S. Trademark Reg. No. 5,469,903, which covers the "3M Science. Applied to Life" slogan in a number of Int. Classes, including Int. Class 9 for facial masks and respirators (the "'903 Registration").  *See* **Exhibits 3-5**.

23.     The '329, '534, and '903 Registrations are valid, in effect, and on the Principal Trademark Register.

24.     The '329 and '534 Registrations are "incontestable" within the meaning of 15 U.S.C. § 1065.  Accordingly, the '329 and '534 Registrations constitute conclusive evidence of: (i) Plaintiff's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) Plaintiff's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.  Relatedly, the '903 Registration constitutes *prima facie* evidence of: (i) Plaintiff's ownership of the "3M Science. Applied to Life" slogan; (ii) the validity of the "3M Science. Applied to Life" slogan; (iii) the validity of the registration of the "3M Science. Applied to Life" slogan; and (iv) Plaintiff's exclusive right to use the "3M Science. Applied to Life" slogan throughout the United States for, *inter alia*, respirators.

25.     Plaintiff's famous 3M Marks do more than identify Plaintiff as the exclusive source of goods and services offered thereunder.  Indeed, the famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards.  Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

**D.  Plaintiff's Extensive Efforts to Assist With the Battle Against COVID-19**

26.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19.  As Plaintiff states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":



27.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are Plaintiff's 3M-brand N95 respirators.

28.     Inset, below, is an image of Plaintiff's 3M-brand, Model 8210 respirator:



29.     Authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

30.     Based on the exponential increase in demand for 3M-brand N95 respirators, Plaintiff has invested the necessary capital and resources to double its global annual production of 1.1 billion 3M-brand N95 respirators.  *See* Exhs. 1,2  **What 3M has *not* done, though, is increase its prices**.  *See id.*

31.     Unfortunately, certain third parties do not share 3M's sense of civic responsibility during this time of crisis.  Indeed, opportunistic third parties are seeking to exploit the increased demand for Plaintiff's 3M-brand N95 respirators by offering to sell them for exorbitant prices, selling counterfeit versions of them, and accepting money for 3M-brand N95 respirators despite not having the product to sell and/or never intending to deliver the product to the unwitting buyer—in many instances, a public authority, such as the City of New York, which struggles to address the enormous financial and logistical challenges presented by COVID-19.

32.     Accordingly, to protect consumers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by governmental officials on scams, as well as to protect the widespread reputation and goodwill enjoyed by Plaintiff's carefully curated 3M brand, Plaintiff is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators.  For example, in

late-March 2019, 3M's Chief Executive Officer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

a. 3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify price-gouging (*See* **Exhibit 6**);

b. 3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*See* **Exhibit 7**); and

c. 3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting:



### I.    Defendant's Unlawful Conduct

33.    Despite Plaintiff's extensive measures to combat price-gouging and counterfeiting of its 3M-brand N95 respirators, these illicit activities continue.  Defendant is a prime example of this unlawful behavior, which is damaging to the 3M brand and public health.

34.    On or about March 30, 2020 – while New York City was reporting record numbers of COVID-19 positive tests and deaths – Defendant, by and through its representative, represented

to New York City's Head of Procurement that it had 35 million 3M respirators available for sale and that 20 million of the masks were in New York City.  *See* **Exhibit 8**.

35.     In its Email communication, Defendant, by and through its purported New York representative, offered to sell New York City's Procurement Office: (i) 20 million 3M-brand, N95 Model 8210 respirators for $5.75 each, and (ii) 500,000 3M-brand, N95 Model 1860 respirators for $5.75 each.  *See* Exh. 8.

36.     Defendant, by and through its representative, disclosed its name as the "3M Company Trust Account" and its address as 7750 N. MacArthur Blvd., Irving, Texas 75039. *See* Exh. 8.

37.     Defendant's use of the 3M standard-character mark in its communications caused New York City officials to mistakenly believe that Defendant was an authorized distributor of Plaintiff's products and/or otherwise had an association or affiliation with Plaintiff and its products.  To be sure, after Defendant sent the Email to Mr. Symon, New York City officials prepared a "Letter of Intent" directed to the "3M Company Trust Account.  *See* Exh. 8. However, the New York City officials were mistaken.  Defendant is not, and never has been, an authorized distributor or vendor of Plaintiff's products.  Defendant also does not have, and has never had, an association or affiliation with Plaintiff.

38.     Defendant's representations were likely to mislead and/or deceive a reasonable consumer into believing that Defendant is an authorized distributor of 3M products and/or has an association or affiliation with 3M.  Sadly, in this case, Defendant's Email actually misled and deceived experienced buyers in the Procurement Office of one of the world's largest cities into believing that Defendant was an authorized distributor of approximately 35 million 3M-brand N95 respirators.

39.     Another equally detestable element of Defendant's unlawful conduct is price-gouging.  Defendant's quote of $5.75 per 3M brand, N95 Model 8210 respirator is 560% over 3M's list price of $1.02-$1.31 per respirator.  *See* Exh. 3. Defendant's quote of $5.75 per 3M brand, N95 Model 1860 respirator is a 450% increase over 3M's list price of $1.27 per respirator. *See* Exh. 8.

40.     The mere association of 3M's valuable brand with such shameless price-gouging harms the brand, not to mention its more serious threat to public health agencies that are under strain in the midst of a worldwide pandemic.

41.     Based on the foregoing, Plaintiff seeks relief against Defendant for state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and deceptive acts and business practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*(Trademark Infringement Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))*
*(Infringement of the Federally Registered 3M Marks)*

42.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 – 43 of the Complaint as though set forth fully herein.

43.     Count I is a claim for trademark infringement under 15 U.S.C. § 1114.

44.     Plaintiff is the exclusive owner of each of the federally registered 3M Marks.

45.     Plaintiff has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling Plaintiff's 3M-brand N95 respirators.

46.     Plaintiff's exclusive rights in and to each of the 3M Marks predate any rights that Defendant could establish in and to any mark that consists of "3M" in whole and/or in part.

47.     Both of the 3M Marks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

48.     Both of the 3M Marks identify Plaintiff as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) and, therefore, the 3M Marks have acquired distinctiveness.

49.     Defendant is using 3M Marks in commerce to advertise, promote, offer for sale, and sell 3M-brand N95 respirators.

50.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether Defendant is 3M, and/or whether Defendant is a licensee, authorized distributor, and/or affiliate of 3M and/or products that Plaintiff offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

51.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products are affiliated, connected, and/or associated with 3M and/or products that Plaintiff offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

52.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue causing, consumer confusion, mistake, and/or deception about whether

Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M or vice versa.

53.     Plaintiff has not consented to the use of its famous 3M Marks by Defendant.

54.     Based on Plaintiff's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of Plaintiff's 3M Marks, Defendant had actual and constructive knowledge of Plaintiff's superior rights in and to the 3M Marks when Defendant began using the 3M Marks as part of its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

55.     Upon information and belief, Defendant adopted and uses the 3M Marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of exploiting the extensive consumer goodwill, reputation, fame, and commercial success of products that Plaintiff offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

56.     Upon information and belief, Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of Plaintiff's 3M Marks, to which Defendant is not entitled at law or in equity.

57.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(a).

58.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by Plaintiff is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirator masks at exorbitantly inflated prices during a global pandemic when Plaintiff's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which Plaintiff's respirator masks are being distributed and sold during

the COVID-19 pandemic and significant confusion about Plaintiff's role in the marketplace for masks that are essential to safeguarding public health.  Whereas Plaintiff's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms Plaintiff's 3M brand.

59.     Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
(*Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)*)
(*Use of the 3M Marks*)

60.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 - 61 of the Complaint as set forth fully herein.

61.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

62.     Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

63.     Upon information and belief, Defendant's use of Plaintiff's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

64.     Defendant has also falsely held itself out to be an agent of and/or authorized by Plaintiff to sell and/or distribute 3M-branded products, when this is not the case.

65.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

66.     Plaintiff has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
(*Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)*)
(*Dilution of the Famous 3M Marks*)

67.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 – 68 of the Complaint as though set forth fully herein.

68.     Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

69.     Plaintiff's 3M Marks were famous before and at the time Defendant began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators).

70.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that famous 3M Marks' established selling power and value will be whittled away.

71.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that famous 3M Marks' ability to identify Plaintiff as the exclusive source of products offered under the 3M Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators) will be whittled away.

72.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, is likely to dilute the reputation of the famous 3M Marks, such that famous 3M Marks' established ability to indicate the superior quality of Products

16

offered under such Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators), will be whittled away.

73.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

74.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by Plaintiff is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when Plaintiff's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which Plaintiff's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about Plaintiff's role in the marketplace for respirators that are essential to safeguarding public health.  Whereas Plaintiff's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms Plaintiff's 3M brand.

75.     Plaintiff has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
*(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*
*(Defendant's Formal Quote)*

76.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 - 77 of the Complaint as though set forth fully herein.

77.     Count IV is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

78.     The statements that Defendant made, by and through its purported representative, in its Email communications with New York City Chief Procurement Officer Don Symon constitute commercial advertising and/or commercial promotion.

17

79.     The statements that Defendant made in its E-mail contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendant and/or the products that Defendant allegedly had available for sale.

80.     The statements that Defendant made in its Email communications contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Plaintiff and Plaintiff's 3M-brand products, including, without limitation, Plaintiff's 3M-brand N95 respirators.

81.     The false, misleading, and/or deceptive statements in Defendant's E-mail were material to New York City's purchasing decisions, including, without limitation, its preparation of the aforementioned Letter of Intent to the "3M Company Trust Account."

82.     Defendant placed its Email communications into interstate commerce by, *inter alia*, sending it to at least one New York City official's email account, namely, Mr. Symon.

83.     Defendant's Email communications directly and/or proximately caused and/or is likely to cause Plaintiff to suffer harm in the form of lost sales (including, without limitation, lost sales of Plaintiff's 3M-brand N95 respirators), as well as irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and goodwill.

84.     Upon information and belief, Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

85.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by Plaintiff is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirator masks at exorbitantly inflated prices during a global pandemic when Plaintiff's products are necessary to protect public health.  Such conduct has inspired intense public

criticism of the manner in which Plaintiff's respirator masks are being distributed and sold during the COVID-19 pandemic and significant confusion about Plaintiff's role in the marketplace for masks that are essential to safeguarding public health.  Whereas Plaintiff's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms Plaintiff's 3M brand.

86.     Plaintiff has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
(*Dilution and Injury to Business Reputation Under The Texas Trademark Act*)
(*Dilution of, Injury to the 3M Brand and Famous 3M Marks*)

87.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 – 88 of the Complaint as though set forth fully herein.

88.     Count VII is a claim for dilution under TEX. BUS. & COMM. CODE § 16.100 *et seq*.

89.     Upon information and belief, Defendant's acts and conduct complained of herein constitute dilution and injury to business reputation in violation of TEX. BUS. & COMM. CODE § 16.103.

90.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

91.     Plaintiff has no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF
(*Trademark Infringement Under The Texas Trademark Act*)
(*Infringement of the 3M Marks*)

92.     Plaintiffs repeat and incorporate by reference the statements and allegations in paragraphs 1 - 93 of the Complaint as though set forth fully herein.

93.     Count XIII is a claim for trademark infringement under TEX. BUS. & COMM. CODE § 16.100 *et seq*.

94.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of TEX. BUS. & COMM. CODE § 16.102.

95.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

96.     Plaintiff has no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
(*Unfair Competition and Passing Off Under Texas Common Law*)
(*Use of the 3M Marks*)

97.     Plaintiff repeats and incorporates by reference the statements and allegations in paragraphs 1 - 98 of the Complaint as though set forth fully herein.

98.     Count IX is a claim for unfair competition under Texas common law.

99.     The Texas common law tort of unfair competition covers situations where a defendant attempts to pass off its goods or services as those of someone else by simulating the trademark owner's product, name, advertising, or marks. It is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.

100.     Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition and passing off in violation of Texas common law.

101.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

102.     Plaintiff has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, based on Defendant's conduct complained of, herein, and upon Plaintiff asks that this Court:

20

A.       To enter an Order, finding in Plaintiff's favor on each Claim for Relief asserted herein;

B.       Pursuant to applicable Texas law and 15 U.S.C. § 1116:

1.   Preliminarily and permanently enjoining Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirator Marks;

2.   Preliminarily and permanently enjoining Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing itself as being a distributor, authorized retailer, and/or licensee of Plaintiff and/or any of Plaintiff's products (including, without limitation, Plaintiff's 3M-brand N95 respirator) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, Plaintiff and/or any of Plaintiff's products; and

3.   Order Defendant to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

C.       Pursuant to applicable Texas law and 15 U.S.C. § 1117:

1.   Order Defendant to provide Plaintiff with a full accounting of all manufacture, distribution and sale of products under the 3M Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators), as well as all profits derived therefrom;

2.   Order Defendant to pay to Plaintiff—so as to be donated charitably pursuant to subpart G, *infra*—all of Defendant's profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators);

3.   Award Plaintiff treble actual damages—so as to be donated charitably pursuant to subpart G, *infra*—in connection with Defendant's infringement of the 3M Marks;

4.   Find that Defendant's acts and conduct complained of herein render this case "exceptional"; and

5.   Award Plaintiff—so as to be donated charitably pursuant to subpart G, *infra*—its costs and reasonable attorneys' fees incurred in this matter;

D.      Pursuant to 15 U.S.C. § 1118, order the destruction of all unauthorized goods and materials within the possession, custody, and control of Defendant and Defendant's client that bear, feature, and/or contain any copy or colorable imitation of Plaintiff's 3M Marks;

E.      Award Plaintiff pre-judgment and post-judgment interest against Defendant; and

F.      Award Plaintiff such other relief that the Court deems just and equitable.

G.      Requiring that all monetary payments awarded to Plaintiff be donated to a COVID-19 charitable organization(s)/cause(s) of Plaintiff's choosing.

H.      Allow Plaintiff such other relief, at law or in equity, to which it may show itself justly entitled.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury for all issues so triable.


Dated: April 10, 2020

22

Respectfully submitted,


*/s/ Dimple D. Shah*
**DIMPLE D. SHAH**
State Bar No.  24012523
Dimple.shah@bowmanandbrooke.com

**BOWMAN AND BROOKE LLP**
5830 Granite Parkway
Suite 1000
Plano, Texas 75024
Telephone:  972.616.1700
Facsimile:  972.616.1701

**ATTORNEY FOR PLAINTIFF 3M COMPANY**

We use cookies on this site to enhance your user experience.

By clicking OK you are giving your consent for us to set cookies.

More info



PRODUCTS FOR BUSINESS ▷       PRODUCTS FOR CONSUMERS ▷       ABOUT US ▷

United States  >  3M News Center  >  Press Releases  >  Company  >

3M and the Trump Administration Announce Plan to Import 166.5 Million Additional Respirators into the United States ov

## 3M News Center

PRESS RELEASES ▷     3M STORIES ▷     RESOURCES ▷     ABOUT 3M ▷     MEDIA CONTACT

## 3M and the Trump Administration Announce Plan to Import 16 United States over the Next Three Months

Imports to supplement the 35 million N95 respirators 3M currently produces in U.S. per month

Monday, April 6, 2020 5:58 pm CDT

**Dateline:** ST. PAUL, Minn.

**Public Company Information:**
NYSE: MMM

**Exhibit 1**

ST. PAUL, Minn.--(BUSINESS WIRE)--Today 3M and the Trump Administration are announcing a plan to
over the next three months to support healthcare workers in the United States. 3M and the Administratio
that this plan does not create further humanitarian implications for countries currently fighting the COVI
to further collaborate to fight price gouging and counterfeiting.

"I want to thank President Trump and the Administration for their leadership and collaboration," said 3M
Roman. "We share the same goals of providing much-needed respirators to Americans across our count
seek to take advantage of the current crisis. These imports will supplement the 35 million N95 respirato
month in the United States."

"Given the reality that demand for respirators outpaces supply, we are working around the clock to furth
the most critical areas," Roman continued. "We'll continue to do all we can to protect our heroic healthc
your tireless efforts – including those in our plants and distribution centers around the world."

3M will import 166.5 million respirators over the next three months primarily from its manufacturing faci
address and remove export and regulatory restrictions to enable this plan. The plan will also enable 3M
where 3M is the primary source of supply.

As a global company, 3M has manufacturing operations around the world to serve local and regional ma
continue to work with governments to direct respirators and other supplies to serve areas most in need.

Beginning in January, 3M ramped up production of N95 respirators and doubled its global output to 1.1 b
already put into motion additional investments and actions that will enable it to double its capacity again
online in the next 60 to 90 days. In the United States, for example, 3M expects to be producing N95 res
current levels.

Last week 3M announced additional actions to address price gouging and counterfeit activity related to
take decisive action against those seeking to take illegal and unethical advantage of the COVID-19 outbr

**Forward-Looking Statements**
This news release contains forward-looking information about 3M's financial results and estimates and b
identify these statements by the use of words such as "anticipate," "estimate," "expect," "aim," "project,"
other words and terms of similar meaning in connection with any discussion of future operating or finan
cause actual results to differ materially are the following: (1) worldwide economic, political, regulatory, c
Company's control, including natural and other disasters or climate change affecting the operations of th
crises such as the global pandemic associated with the coronavirus (COVID-19); (3) liabilities related to
products and chemistries, and claims and governmental regulatory proceedings and inquiries related to
developments that could occur in the legal and regulatory proceedings described in the Company's Ann
quarterly reports on Form 10-Q (the "Reports"); (5) competitive conditions and customer preferences; (6
and market acceptance of new product offerings; (8) the availability and cost of purchased components
derivatives) due to shortages, increased demand or supply interruptions (including those caused by natu
with the phased implementation of a global enterprise resource planning (ERP) system, or security brea
infrastructure; (10) the impact of acquisitions, strategic alliances, divestitures, and other unusual events
strategies, and possible organizational restructuring; (11) operational execution, including scenarios whe
(12) financial market risks that may affect the Company's funding obligations under defined benefit pens
of capital. Changes in such assumptions or factors could produce significantly different results. A furthe
Concerning Factors That May Affect Future Results" and "Risk Factors" in Part I, Items 1 and 1A (Annual
by applicable Current Reports on Form 8-K. The information contained in this news release is as of the d
looking statements contained in this news release as a result of new information or future events or deve

**Exhibit 1**

About 3M

At 3M, we apply science in collaborative ways to improve lives daily. With $32 billion in sales, our 96,00
3M's creative solutions to the world's problems at www.3M.com or on Twitter @3M or @3MNews.

**Contact:**
Jennifer Ehrlich
651-733-8805

**Related Materials**

Download press release as a PDF

**Multimedia Files:**

Download All Files



Download:

Download Thumbnail (33.12 KB)

Download Preview (34.23 KB)

Download Small (35.65 KB)

Download Square (34.4 KB)

## 3M United States

| **PRESS RELEASES** | **3M NEWS CENTER** | **RELATED LINKS** | **HELP** |
|---|---|---|---|
| Company | Media Contacts | Investor Relations | Help Center |
| Earnings and Dividends | 3M Stories | History | Site Map |
| | | | **NEWS** |

**Exhibit 1**

Mergers and Acquisitions

Product and Brand

Sustainability

View All Releases

Resources

About 3M

About 3M

Factsheet

Research & Development

Press Releases

**REGULATORY**

SDS Search

Transport Information Search

RoHS & REACH Information Search

CPSIA Certification Search

California Supply Chains Act Disclosure (PDF, 84KB)

UK Modern Slavery Act Statement (PDF, 169KB)

More Regulatory & Compliance Information

**ABOUT US**

About 3M

3M Careers

Investor Relations

Partners & Suppliers

Government Customers

Sustainability

3Mgives

**Exhibit 1**

## FOLLOW US

    

**Change Location**

United States - English

 Legal | Privacy

© 3M 2020 . All Rights Reserved.

The brands listed above are trademarks of 3M.

Business Wire NewsHQ<sup>sm</sup>

**Exhibit 1**



PRODUCTS FOR       ▼          PRODUCTS FOR        ▷          ABOUT US  ▷
BUSINESS                       CONSUMERS

3M United States > Coronavirus

Alert: 3M is committed to the fight against COVID-19. |



# Helping the world respond to COVID-19

## 3M is committed to doing everything we can to fight COVID-19 and support healthcare workers globally

The COVID-19 pandemic continues to affect all of us, and 3M is working around-the-clock to help provide critical tools for the fight. Our current focus: supporting healthcare and front-line workers around the world by manufacturing products they need to help protect their lives as they treat others.

**Exhibit 2**

   

## Increasing output of N95 respirators

Doubled our global output rate to nearly 100 million respirators per month; expect to produce about 50 million respirators per month in the U.S. by June 2020.

Anticipate doubling our global capacity to almost 2 billion respirators in the next 12 months.

We have not increased the **prices we charge for 3M respirators** in this crisis.

## Partnering with others to supply more

Working with governments to investigate alternate manufacturing scenarios and exploring coalitions with other companies to increase capacity further.

Partnering with Ford Motor Company to increase production of 3M Powered Air Purifying Respirators.

Secured authorization from the Chinese government to import about 10 million masks to the US from our manufacturing facility in China.

## Getting product to those who need it most

In the last seven days of March 2020, we sent 10 million N95 respirators to healthcare facilities across the U.S.

In the US, 90% of our N95 respirators designated for healthcare workers; remainder for critical industries including: food, energy and pharmaceutical.

Maximizing production of other important products, including hand sanitizers and disinfectants.

## Combatting price-gouging, fraud and counterfeiting

Working with law enforcement, retail partners and others to identify unethical, illegal counterfeiters and price-gougers related to 3M's respirators, remove them from e-commerce partner sites, and refer them to the appropriate law enforcement authorities.

Inviting those with concerns of potentially fraudulent activity, price gouging, or counterfeit 3M products to **to report their concerns at 3M's website** so we can take action.

**Exhibit 2**

## WARNING: Fraud and Counterfeit Activity

We have created a new 3M hotline for the U.S. and Canada that end-users and purchasers of 3M products can call for information on how to identify authentic 3M products and to ensure products are from 3M authorized distributors.



1 (800) 426-8688
Call the fraud hotline.



Report a concern



STATEMENT: Fraudulent Activity, Price Gouging, and Counterfeit Products
(PDF, 1.6 MB)

3M recommends purchasing our products from a 3M authorized distributor or dealer only. This offers the greatest assurance that you will receive authentic 3M product.

If you need help identifying 3M authorized distributors and dealers in your area, please contact 3M Help Center or 1 (888) 364-3577 in the United States. In Canada, please contact 3M Canada Customer Service at 1 (800) 364-3577.

**Exhibit 2**

Learn about critical 3M products and access helpful resources







### Personal Protective Equipment (PPE)

Proper selection and use are key to utilizing respirators to help reduce exposure to airborne contaminants. Find Technical Bulletins, How to Videos, Fit Testing Resources and more information to help you protect your employees and yourself.

**Learn more about personal protective equipment**

### Commercial Cleaning Solutions

Get information and application tips on 3M cleaning and disinfectant products for use by facility managers, building service contractors and all who clean public spaces.

**Learn more about commercial cleaning solutions**

### Supporting Health Care Providers

Every day, health care workers on the front lines put themselves at risk to ensure others are cared for. 3M Medical offers resources and information to help protect providers and patients, especially during this challenging time.

**Learn more about health care provider resources**

Stay up to date with 3M's response to COVID-19

**Exhibit 2**





April 01, 2020

## Putting healthcare workers first during the coronavirus outbreak

Exhibit 2





March 31, 2020

**3M introduces hotline, releases price lists to help combat counterfeits, price gouging during COVID-19**

Exhibit 2

**Exhibit 2**

READ MORE IN THE 3M NEWS CENTER

Exhibit 2

## Stay up-to-date on the science of COVID-19

If you have questions about the virus and how to best protect yourself, please consult the sources below for the most current guidelines and recommended precautions.





### Center for Disease Control and Prevention

- **2020 Situation Summary**
- **What You Need to Know**
- **Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings**

### World Health Organization

- **Coronavirus**
- **Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected**

## Contact Media Relations

Media inquiries regarding 3M's response to the coronavirus situation should be referred to 3M Media Relations.

Contact Us

**Exhibit 2**

Int. Cls.: **9 and 10**

Prior U.S. Cls.: **21, 23, 26, 36, 38, 39 and 44**

United States Patent and Trademark Office

Reg. No. **3,398,329**

Registered Mar. 18, 2008

## TRADEMARK
### PRINCIPAL REGISTER

# 3M

3M COMPANY (DELAWARE CORPORATION)
3M CENTER, 220-9E-01
2501 HUDSON ROAD
ST. PAUL, MN 55144

FOR: FULL LINE OF PARTICULATE, OZONE, GAS, VAPOR, CHEMICAL, BIOHAZARD AND OTHER RESPIRATORS, INCLUDING FILTERING FACE-PIECE RESPIRATORS AND ELASTOMERIC FACE-PIECE RESPIRATORS, OTHER THAN FOR ARTIFICIAL RESPIRATION; FULL LINE OF SELF-RESCUE AND PROTECTION APPARATUS, NAMELY, OXYGEN BREATHING UNITS, SUPPLIED-AIR RESPIRATORS, AND POWERED AIR-PURIFYING SYSTEMS (PAPRS) RESPIRATORS; CARTRIDGES, FILTERS, AIR TANKS AND OTHER COMPONENT PARTS FOR RESPIRATORS AND BREATHING UNITS; DUST MASKS; FULL LINE OF PROTEC-TIVE EYEWEAR, NAMELY, SAFETY GOGGLES, EYEGLASSES AND EYE SHIELDS; FACE-PROTEC-TION SHIELDS; EAR PLUGS AND EAR MUFFS TO ATTENUATE SOUND AND PROTECT HEARING; HARD HATS AND OTHER PROTECTIVE HEL-METS; WELDING HELMETS; AIR MONITORING DEVICES AND SENSORS FOR MEASURING GASES AND VAPOR CONCENTRATION LEVELS; GAS DETECTORS FOR DETECTING THE PRESENCE OF CARBON MONOXIDE AND OTHER GASES; THERMAL-IMAGING CAMERAS FOR USE BY FIREFIGHTERS AND FOR SEARCH AND RESCUE; ENVIRONMENTAL SAMPLING AND TESTING IN-STRUMENTS AND EQUIPMENT, NAMELY, ELEC-TRONIC LUMINOMETERS, AND RELATED SOFTWARE, DOCKING STATIONS AND BATTER-IES, FOR DETECTING, MEASURING AND ANA-LYZING CHEMICALS, BIOLOGICAL SUBSTANCES, FOOD RESIDUES AND MICROBES; MICROBIOLOGICAL AND CONTAMINANT-TEST-ING INSTRUMENTS AND EQUIPMENT, AND SOFTWARE RELATED THERETO, FOR DETECT-ING, MEASURING AND ANALYZING BACTERIA, INCLUDING PATHOGENS SUCH SALMONELLA AND LISTERIA, ALLERGENS, TOXINS, VITAMINS,

ANTIBIOTICS, AND OTHER ORGANISMS AND SUBSTANCES; DIAGNOSTIC APPARATUS FOR TESTING FOOD; LABORATORY EQUIPMENT AND SUPPLIES, NAMELY, TEST TUBES, TEST TUBE CAPS, DIP STICKS, RACKS, MICROTITRE PLATES AND TRAYS; SECURITY SCANNERS AND READERS FOR USE IN READING PASSPORTS AND OTHER FORMS OF IDENTIFICATION; ANTI-THEFT AND LIBRARY MATERIAL CHECK-OUT SECURITY SYSTEMS; RADIO FREQUENCY IDENTIFICATION (RFID) TAGS AND READERS; COMPUTER SOFTWARE FOR SUPPLY CHAIN MANAGEMENT FROM SOURCE TO CONSUMP-TION, NAMELY, FOR COLLECTING, STORING AND MANAGING DATA, AND REPORTING, EX-ECUTING AND TRACKING, IN CONNECTION WITH ENTERPRISE RESOURCE PLANNING, SUP-PLIER ENABLEMENT, MANUFACTURING, IN-VENTORY CONTROL AND WAREHOUSING, ORDER FULFILLMENT, SHIPPING, TRANSPOR-TATION AND DELIVERY; COMPUTER SOFT-WARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT AND MEDICAL RECORDS, CODING AND GROUP-ING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND MEDICAL IMAGING SCANNERS AND RE-LATED SOFTWARE FOR CAPTURING IMAGES OF THE MOUTH AND TEETH FOR USE IN DENTIS-TRY, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

FOR: FULL LINE OF SURGICAL AND MEDICAL MASKS, RESPIRATORS AND FACE AND EYE SHIELDS FOR MEDICAL AND HEALTH-CARE RELATED PERSONNEL; FULL LINE OF ORTHO-PEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COM-POSITE FABRICS CONTAINING FIBERGLASS

Exhibit 3

AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTRO-ENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS; AUTOCLAVES FOR MEDICAL USE; ORTHODONTIC APPLIANCES; DENTAL APPARATUS, NAMELY, INTRA-ORAL LIGHT SYSTEMS FOR CURING DENTAL MATERIALS, CERAMIC USED IN MAKING DENTAL CROWNS, BRIDGES AND OTHER RESTORATIVES; DENTAL INSTRUMENTS AND KITS COMPRISED OF SUCH INSTRUMENTS, NAMELY, MANDRELS, BURS, DISCS, CUPS, WHEELS, POINTS, BRUSHES AND ABRASIVE STRIPS USED TO GRIND, POLISH OR FINISH DENTAL RESTORATIVES; DENTAL INSTRUMENTS, NAMELY, SCISSORS, CRIMPING PLIERS, CONTOURING PLIERS AND IMPRESSION TRAYS; ELECTRONIC MIXERS FOR DENTAL COMPOUNDS; APPLICATORS AND DISPENSERS FOR DENTAL PRIMERS, CEMENTS, ADHESIVES, IMPRESSION MATERIALS AND RESTORATIVE MATERIALS; GLASS-FIBER POSTS USED IN DENTAL RESTORATIVE PROCEDURES; AND DENTAL PROPHYLAXIS ANGLES AND DENTAL PROPHYLAXIS CUPS FOR USE IN CLEANING TEETH AND DENTAL HYGIENE PROCEDURES, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 0-0-1960; IN COMMERCE 0-0-1960.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,237,168, 2,793,534 AND OTHERS.

SER. NO. 77-257,496, FILED 8-16-2007.

TARAH HARDY, EXAMINING ATTORNEY

**Exhibit 3**

Int. Cls.: **1, 3, 5, 9, 10 and 28**

Prior U.S. Cls.: **1, 4, 5, 6, 10, 18, 21, 22, 23, 26, 36, 38, 39, 44, 46, 50, 51 and 52**

## United States Patent and Trademark Office

**Reg. No. 2,793,534**

Registered Dec. 16, 2003

## TRADEMARK
### PRINCIPAL REGISTER



3M COMPANY (DELAWARE CORPORATION)
2501 HUDSON ROAD
3M CENTER
ST. PAUL, MN 55144 , BY MERGER, BY CHANGE OF NAME MINNESOTA MINING AND MANUFACTURING COMPANY (DELAWARE CORPORATION) ST. PAUL, MN 55144

FOR: ETHYLENE OXIDE FOR USE IN THE STERILIZATION OF MEDICAL, LABORATORY AND FOOD HANDLING INSTRUMENTS AND EQUIPMENT; CHEMICAL AND STEAM INDICATOR STRIPS AND TAPE FOR USE WITH AUTOCLAVES AND FOR TESTING THE STERILITY OF MEDICAL INSTRUMENTS AND EQUIPMENT; INDICATOR STRIPS FOR TESTING GLUTARALDEHYDE, ETHYLENE OXIDE AND OTHER CHEMICAL SOLUTIONS AND GASES; INDICATOR STRIPS FOR TESTING FOR BIOLOGICAL CONDITIONS FOR USE IN SAFETY-MONITORING; INDICATOR STRIPS FOR INDICATING TEMPERATURES FOR USE IN THE STERILIZATION AND SAFETY-MONITORING; ASSAY AND REAGENT TEST KITS AND COUNT PLATES FOR FIELD AND LABORATORY TESTING FOR E COLI, COLIFORM, AND OTHER BACTERIA OR CONTAMINANTS IN MEAT, DAIRY PRODUCTS AND OTHER TYPES OF FOOD, AND FOR TESTING TO DETECT YEAST AND MOLD; AND STERILIZATION MONITOR TESTING KITS CONTAINING INDICATOR STRIPS OR TAPE, REAGENTS AND RECORD KEEPING CARDS OR BINDERS FOR TESTING THE STERILITY OF SURGICAL AND MEDICAL INSTRUMENTS, EQUIPMENT, AND SUPPLIES , IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FIRST USE 11-0-1990; IN COMMERCE 11-0-1990.

FOR: NON-MEDICATED SKIN CARE PRODUCTS, NAMELY, CLEANSERS, CREAMS, LOTIONS, MOISTURIZERS, BARRIER CREAMS AND EMOLLIENTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 1-0-1996; IN COMMERCE 1-0-1996.

FOR: FULL LINE OF BANDAGES, DRESSINGS AND MEDICAL TAPES, NAMELY, ADHESIVE BANDAGES, BANDAGES FOR SKIN WOUNDS, SURGICAL BANDAGES, WOUND DRESSINGS, NON-STICK PADS FOR USE AS MEDICAL DRESSINGS, MEDICATED COMPRESSES, TRANSPARENT MEDICAL DRESSINGS, HYDROCOLLOID DRESSINGS, COLOSTOMY DRESSINGS, ULCER DRESSINGS, MEDICAL ADHESIVE TAPES, SURGICAL TAPES, AND WOUND AND SKIN CLOSURE ADHESIVE STRIPS WITH OR WITHOUT ANTIMICROBIAL SOLUTIONS; GAUZE; WOUND HEALING FILLERS WITH OR WITHOUT GAUZE; MEDICATED SKIN CARE PREPARATIONS; SURGICAL DISINFECTANTS AND PREPPING SOLUTIONS; MEDICATED ANTISEPTIC HAND WASHES; AND CULTURE MEDIA, BACTERIOLOGICAL MEDIA AND DIAGNOSTIC PREPARATIONS FOR CLINICAL OR MEDICAL LABORATORY USE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 2-0-1991; IN COMMERCE 2-0-1991.

**Exhibit 4**

FOR: COMPUTER SOFTWARE FOR USE IN THE MEDICAL AND HEALTH CARE FIELDS FOR PROCESSING CLAIMS FOR REIMBURSEMENT, MAINTAINING PATIENT RECORDS, CODING AND GROUPING DATA USED FOR MEDICAL AND HEALTH CARE RESEARCH, AND FOR REPORTING HEALTH TRENDS AND OTHER MEDICAL DATA; AND FULL LINE OF RESPIRATORY FACE MASKS FOR FILTERING OUT GERMS, DUST AND POLLEN, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5-0-1992; IN COMMERCE 5-0-1992.

FOR: FULL LINE OF ORTHOPEDIC CASTINGS TAPES, SPLINTS, REINFORCING STRIPS, ELASTIC BANDAGES, AND SUPPORT BANDAGES AND COMPRESSION WRAPS; COMPOSITE FABRICS CONTAINING FIBERGLASS AND RESINS FOR USE IN MAKING CASTS; PADDING FOR ORTHOPEDIC CASTS; ORTHOPEDIC CASTING TOOLS; FULL LINE OF STETHOSCOPES; FULL LINE OF SURGICAL MASKS, FACE SHIELDS, AND RESPIRATORY MASKS FOR MEDICAL PURPOSES; FULL LINE OF SURGICAL AND MEDICAL PROCEDURE DRAPES AND SHEETS; PATIENT ISOLATION DRAPES; MEDICAL-EQUIPMENT ISOLATION DRAPES; NON-ADHERENT SHEETING FOR BEDS, STRETCHERS AND EXAM TABLES; SURGICAL GOWNS; COMPRESSION BANDAGES; SURGICAL COMPRESSES; MEDICAL THERMOMETERS; FULL LINE OF MEDICAL ELECTRODES WITH OR WITHOUT CHEMICAL CONDUCTORS AND WET GELS FOR USE IN CARDIAC, ELECTROCARDIOGRAPH, ELECTROENCEPHALOGRAPH AND OTHER TYPES OF PATIENT MONITORING; LEADS AND CONNECTORS FOR USE WITH MEDICAL ELECTRODES; DEFIBRILLATION PADS; ELECTROSURGICAL PADS, PLATES AND ADAPTERS TO REMOVE RF CURRENT FROM A PATIENT'S BODY DURING ELECTROSURGERY'; THERMAL COLD AND HOT PACKS FOR FIRST AID AND THERAPEUTIC PURPOSES; EYE PATCHES FOR MEDICAL USE; PADDING FOR USE BETWEEN MEDICAL EQUIPMENT AND PATIENTS OR FOR ELEVATING OR POSITIONING LIMBS; POUCHES FOR HOLDING SURGICAL AND MEDICAL INSTRUMENTS; ISOLATION POUCHES AND BAGS FOR STORING ORGANS, TISSUE AND OTHER BODY PARTS FOR TRANSPLANTS AND LABORATORY TESTING; AND FULL LINE OF STERILIZED AND NON-STERILIZED FASTENING AND COMPRESSION SURGICAL WRAPS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 6-0-1990; IN COMMERCE 6-0-1990.

FOR: ATHLETIC TAPE AND ATHLETIC SUPPORT AND COMPRESSION WRAPS FOR KNEES, WRISTS, ANKLES, ELBOWS, LEGS AND ARMS, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

FIRST USE 0-0-1993; IN COMMERCE 0-0-1993.

OWNER OF U.S. REG. NOS. 1,181,981, 1,234,260 AND OTHERS.

THE MATTER SHOWN IN BROKEN LINES INDICATES THE RELATIVE PLACEMENT OF THE MARK ON A TYPICAL PACKAGE FOR THE GOODS AND IS NOT CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 76-138,263, FILED 9-29-2000.

ALICIA COLLINS, EXAMINING ATTORNEY

**Exhibit 4**

# United States of America

## United States Patent and Trademark Office

## 3M SCIENCE. APPLIED TO LIFE.

**Reg. No. 5,469,903**

**Registered May 15, 2018**

**Int. Cl.: 1, 2, 3, 4, 7, 8, 9, 11, 16, 17, 21**

**Trademark**

**Principal Register**

3M Company (DELAWARE CORPORATION)
220-9e-01
3m Center, 2501 Hudson Road
St. Paul, MINNESOTA 55144

CLASS 1: Adhesives for industrial use; body fillers for autobody use

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 2: Coatings for protecting surfaces against moisture, corrosion, contaminants and other conditions

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 3: Cleaning, polishing, scouring and abrasive preparations and substances; abrasives for industrial and domestic use; preparations for cleaning, polishing, glazing, waxing, restoring or preserving finished surfaces of motorized vehicles

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 4: Industrial lubricants

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 7: Abrasive belts, discs, pads, sheets and wheels for power-operated sanders and grinders

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 8: Sanding blocks

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 9: protective safety facial masks, respirators other than for artificial respiration for domestic and industrial use

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 11: Filtering devices, namely, filters for commercial use for use in the purification of air

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 16: Stationery notes containing adhesive on one side for attachment to surfaces; tape flags; adhesive tape dispensers for household, office or stationery use



Director of the United States
Patent and Trademark Office

**Exhibit 5**

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 17: Adhesives tapes and adhesive tape dispensers for industrial or commercial use; duct tapes; electrical tapes; masking tapes; mounting tapes for household and commercial use; adhesive foam tapes, double sided adhesive tapes, all for industrial purposes; adhesive backed plastic films for industrial and commercial use

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

CLASS 21: Scouring, cleaning and scrubbing sponges, and pads

FIRST USE 2-23-2018; IN COMMERCE 2-23-2018

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 3241340, 0561157, 0405413

SER. NO. 86-344,821, FILED 07-22-2014

**Exhibit 5**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten  Years\***
**What and When to File:**

- ***First Filing Deadline:***  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years  after  the  registration  date.   See  15  U.S.C.  §§1058,  1141k.   If  the  declaration  is  accepted,  the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- ***Second Filing Deadline:***  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You  must  file  a  Declaration  of  Use  (or  Excusable  Nonuse)  and  an  Application  for  Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** h ttp://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders  who  authorize  e-mail  communication  and  maintain  a  current  e-mail  address  with  the USPTO.  To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**Exhibit 5**

 Science.
Applied to Life.™

March 31, 2020

## Fraudulent Activity, Price Gouging, and Counterfeit Products

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. Examples include people fraudulently representing themselves as being affiliated with 3M and having authentic 3M product to sell, selling (or offering to sell) 3M products at grossly inflated prices, selling counterfeit products falsely claimed to be from 3M, and falsely claiming to manufacture 3M products. In many cases, these scammers will try and secure funds in advance and then disappear once the money is received.

3M will not tolerate any such activity by 3M authorized channel partners and we will aggressively pursue third-parties that seek to take advantage of this crisis. We are working with law enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, state Attorneys General, and local authorities.

We have also created a new **3M COVID-19 Fraud hotline** for the U.S. and Canada that end-users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products. **You can reach this hotline by calling: 1 (800) 426-8688.**

In addition to the hotline, you can report a concern at **www.go.3m.com/covidfraud**.

3M recommends purchasing our products only from a 3M authorized distributor or dealer, as that offers the greatest assurance that you will receive authentic 3M products.

If you need help identifying 3M authorized distributors and dealers in your area, please contact **3M Help Center** at **www.3m.com/3M/en_US/company-us/help-center** or **1 (888) 364-3577** in the United States. In Canada, please contact **3M Canada Customer Service** at **1 (800) 364-3577**.

**With regard to 3M respirators specifically, we are providing the following additional information to help stop price gouging and sales of counterfeit products:**

- 3M has <u>not</u> changed the prices we charge for 3M respirators as a result of the COVID-19 outbreak.

- We are actively working to eliminate price gouging, including making referrals to law enforcement where appropriate.

- To help customers identify and avoid inflated prices, we are now publishing current single-case list prices for many of the most common 3M N95 respirator models sold in the U.S.

- List prices for these models sold in Canada are similar on a currency-adjusted basis.

| | Model # | List Price (USD) |
|---|---|---|
| **Surgical N95 Respirators** | 1804 | $0.68 |
| | 1804S | $0.68 |
| | 1860 | $1.27 |
| | 1860S | $1.27 |
| | 1870+ | $1.78 |
| **Standard N95 Respirators** | 8210 | $1.02 - $1.31 |
| | 8210Plus | $1.18 - $1.50 |
| | 8210V | $1.48 - $1.88 |
| | 8110S | $1.08 - $1.37 |
| | 8200 | $0.63 - $0.80 |
| | 8511 | $2.45 - $3.11 |
| | 9105 | $0.64 - $0.81 |
| | 9105S | $0.64 - $0.81 |
| | 9210+ | $1.40 - $1.78 |
| | 9211+ | $2.68 - $3.40 |

**Exhibit 6**

- These list prices are per respirator.

- Actual prices may be lower than these list prices, as negotiated between you and your chosen reseller.

- 3M has also worked to further accelerate delivery of respirators to critical end-users – both by utilizing our existing network of healthcare distributors and, where it makes sense to do so, shipping directly to end-user locations. Effective the week of March 23, the small volume of 3M filtering facepiece respirators being made available to critical industrial infrastructure is shipping directly to the specified end-user.

- 3M respirators should be sold only in 3M packaging, with model-specific user instructions accompanying the product.

- 3M respirators should not be sold individually or without packaging (including User Instructions).

- 3M has strict quality standards, and therefore products that have missing straps, strange odors, blocked valves, misspelled words, etc. are likely not authentic 3M respirators.

Finally, 3M personal protective equipment (PPE) is intended, labeled, packaged, and certified to meet the requirements of the countries in which 3M sells it. Those requirements differ around the world, including as it relates to, for example, respirator performance, local language, and local certification and approval for sale and use. As a result, 3M PPE imported from other countries may not meet local requirements. Please confirm such PPE meets all applicable requirements prior to use.

For technical assistance regarding the selection and use of 3M respirators, please contact your local 3M Technical Service team. In the U.S., you can call 1 (800) 243-4630. In Canada, you can call 1 (800) 364-3577.

**For more information, contact the 3M Help Center at 1 (888) 364-3577 in the United States. In Canada, please contact 3M Canada Customer Service at 1 (800) 364-3577.**

3M Company
3M Center
St. Paul, MN
55144-1000

© 3M 2020. All Rights Reserved.
3M is a trademark of 3M Company and affiliates.
Used under license in Canada.

**Exhibit 6**





## 3M COVID-19 Anti-Fraud, Anti-Price Gouging, and Anti-Cou

### Have a concern to report related to Fraud, Price Gouging or Count

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and c
will not tolerate any such activity by 3M authorized channel partners and we will aggressively pur
enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, State

**Exhibit 7**

## COVID-19 Fraud

*Please complete as much of the information requested below as possible. Fields marked with an as*
*that 3M has received the report. We request that you reply to that email and attach any copies of i*
*can help us to investigate the situation.*

## Requestor Information

**First Name***

**Last Name***

**Company Name**

**Email/Business Email Address***

**Phone/Business Phone Number***

**Government Agency Name (if applicable)**

**Country/Region***

United States

**Account Type***

Select One

**Exhibit 7**

## Alleged Solicitor/Seller Information

*Please provide as much information as possible.*

**Seller First Name**

**Seller Last Name**

**Seller Company**

**Seller Email**

**Seller Phone**

**Seller's Website**

## Fraud Product Details

**Product 1***

Select One

**Product 1 Price**

**Product 1 3M SKU**

**Product 1 Quantity**

**Exhibit 7**

**Product 2**

Select One

**Product 2 Price**

**Product 2 3M SKU**

**Product 2 Quantity**

**Product 3**

Select One

**Product 3 Price**

**Product 3 3M SKU**

**Product 3 Quantity**

**How did the interaction take place?***

Select One

**Interaction URL**

**Product Fraud Details***

*Provide as much detail about the interaction as possible including how you first contacted the selle*

**Exhibit 7**



3M respects your right to privacy. 3M will collect, use, and disclose the personal information you fraud, price gouging and fraudulent activity, 3M may voluntarily share information with law enfor law enforcement agencies, 3M will have no control over that personal information.

Please be aware that the information you supply about yourself, or any aspect of 3M's operations information that, to the best of your knowledge, is correct. You will not be sanctioned for submitti knowingly provide false or misleading information, it may result in disciplinary or judicial action.

Submit

**Exhibit 7**

CAUSE NO. _____

| | | |
|---|---|---|
| **3M COMPANY,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | **DALLAS COUNTY,** |
| | § | |
| **JOHN DOE, claiming to be the** | § | |
| **"3M Company Trust Account"** | § | |
| | § | **___ JUDICIAL DISTRICT** |
| *Defendant.* | § | |
| | § | |

## <u>AFFIDAVIT OF WILLIAM GORDON CHILDS</u>

BEFORE ME, the undersigned authority, on this day personally appeared William Gordon Childs, and upon his oath stated as follows:

1.  My name is William Gordon Childs.  I am over 18 years of age and have never been convicted of a crime involving moral turpitude. I am of sound mind and suffer no legal disabilities. I am competent and qualified to make this Affidavit. I have personal knowledge of the factual matters set forth herein and they are true and correct.

2.  I am Senior Counsel for the Applicant, 3M Company ("3M"), and am authorized to submit this affidavit in support of its Original Petition and Application for Temporary and Permanent Injunctions.

3.  In response to COVID-19, respirators have been in high demand.  3M has identified retailers offering 3M™ brand respirator products at exorbitant prices.  In many cases, these retailers wrongfully claim to be affiliated with 3M or use 3M marks without authorization.

4.  3M is committed to helping combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. On March 31, 2020, 3M published a notice (attached as **Exhibit "A"**) confirming 3M will be aggressively pursuing third parties seeking to take advantage of this crisis. 3M also created a COVID-19 Fraud Hotline and has confirmed it has not changed its respirator pricing. 3M is working with law enforcement to eliminate price gouging.

5.  3M was alerted of one such entity, offering purported 3M™ brand respirators by the New York City Mayor's Office of Contract Services on March 30, 2020. See 03/30/20 E-mail String attached as **Exhibit "B"**.

6.  3M was advised that Defendant John Doe, by and through its representative, represented itself as the "3M Company Trust Account" and represented to the Chief

Procurement Officer of New York City that it had 35,000,000 3M respirators available for sale. *See* **Exhibit "B".**

7.   We also learned that John Doe, representing itself as the "3M Company Trust Account" by and through his representative, offered to sell the City of New York 20 Million 3M 8210 respirators and 500,000 3M 1860 respirators are excessive and exorbitant prices. *Id.*

8.   In its email communications, Defendant, by and through its representative, offered to sell New York City's Procurement Office: (i) 20 million 3M-brand, N95 Model 8210 respirators for $5.75 each, and (ii) 500,000 3M-brand, N95 Model 1860 respirators for $5.75 each. *Id.*

9.   The attached email string, provided to 3M by the City of New York Procurement Office, reflects that the prices Defendant offered to sell 3M-brand N95 respirators to New York City's Procurement Office were approximately 450%-600% *above* 3M's list prices. *Id.*

10.  The "3M Company Trust Account" purportedly located at 7750 N. MacArthur Blvd., Irving, Texas 75039 is not an entity that is in any way associated or affiliated with Plaintiff 3M Company and I did not locate any authorized 3M distributor with that address.

11.  3M seeks the Court's expedited assistance in preventing the John Doe defendant from representing itself to State Governments or the public as having any relationship to 3M, or else 3M will suffer immediate, irreparable harm.

12.  I make this affidavit in good faith and for no improper purpose.

Further, affiant sayeth not.

SUBSCRIBED AND SWORN this __10__ day of April, 2020.

_____

William Gordon Childs

STATE OF TEXAS

COUNTY OF ___Arlington, State of Virginia___

This affidavit was sworn to and subscribed before me by William Childs, on this __10__ day of April 2020, to certify which witness my hand and seal of office.

_____

Notary Public Signature

**CHIRAG PATEL**
ELECTRONIC NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
REGISTRATION # 7679556
MY COMMISION EXPIRES JUNE 30, 2020

Notary Stamp Placed at 2020/04/10 15:53:34 EST                                    w51lg

Chirag Patel
_____
Notary's Printed Name

My Commission Expires: June 30, 2020

**Exhibit 8**



**March 31, 2020**

## Fraudulent Activity, Price Gouging, and Counterfeit Products

At 3M, we are committed to doing all we can to help combat the fraudulent, price gouging, and counterfeit activity that is unfortunately occurring in connection with COVID-19. Examples include people fraudulently representing themselves as being affiliated with 3M and having authentic 3M product to sell, selling (or offering to sell) 3M products at grossly inflated prices, selling counterfeit products falsely claimed to be from 3M, and falsely claiming to manufacture 3M products. In many cases, these scammers will try and secure funds in advance and then disappear once the money is received.

3M will not tolerate any such activity by 3M authorized channel partners and we will aggressively pursue third-parties that seek to take advantage of this crisis. We are working with law enforcement authorities around the world – including, in the U.S., the U.S. Attorney General, state Attorneys General, and local authorities.

We have also created a new **3M COVID-19 Fraud hotline** for the U.S. and Canada that end-users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products. **You can reach this hotline by calling: 1 (800) 426-8688.**

In addition to the hotline, you can report a concern at **www.go.3m.com/covidfraud**.

3M recommends purchasing our products only from a 3M authorized distributor or dealer, as that offers the greatest assurance that you will receive authentic 3M products.

If you need help identifying 3M authorized distributors and dealers in your area, please contact **3M Help Center** at **www.3m.com/3M/en_US/company-us/help-center** or **1 (888) 364-3577** in the United States. In Canada, please contact **3M Canada Customer Service** at **1 (800) 364-3577**.

**With regard to 3M respirators specifically, we are providing the following additional information to help stop price gouging and sales of counterfeit products:**

- 3M has not changed the prices we charge for 3M respirators as a result of the COVID-19 outbreak.

- We are actively working to eliminate price gouging, including making referrals to law enforcement where appropriate.

- To help customers identify and avoid inflated prices, we are now publishing current single-case list prices for many of the most common 3M N95 respirator models sold in the U.S.

- List prices for these models sold in Canada are similar on a currency-adjusted basis.

|  | Model # | List Price (USD) |
|---|---|---|
| **Surgical N95 Respirators** | 1804 | $0.68 |
|  | 1804S | $0.68 |
|  | 1860 | $1.27 |
|  | 1860S | $1.27 |
|  | 1870+ | $1.78 |
| **Standard N95 Respirators** | 8210 | $1.02 - $1.31 |
|  | 8210Plus | $1.18 - $1.50 |
|  | 8210V | $1.48 - $1.88 |
|  | 8110S | $1.08 - $1.37 |
|  | 8200 | $0.63 - $0.80 |
|  | 8511 | $2.45 - $3.11 |
|  | 9105 | $0.64 - $0.81 |
|  | 9105S | $0.64 - $0.81 |
|  | 9210+ | $1.40 - $1.78 |
|  | 9211+ | $2.68 - $3.40 |

**Exhibit 8, attachment A**

- These list prices are per respirator.

- Actual prices may be lower than these list prices, as negotiated between you and your chosen reseller.

- 3M has also worked to further accelerate delivery of respirators to critical end-users – both by utilizing our existing network of healthcare distributors and, where it makes sense to do so, shipping directly to end-user locations. Effective the week of March 23, the small volume of 3M filtering facepiece respirators being made available to critical industrial infrastructure is shipping directly to the specified end-user.

- 3M respirators should be sold only in 3M packaging, with model-specific user instructions accompanying the product.

- 3M respirators should not be sold individually or without packaging (including User Instructions).

- 3M has strict quality standards, and therefore products that have missing straps, strange odors, blocked valves, misspelled words, etc. are likely not authentic 3M respirators.

Finally, 3M personal protective equipment (PPE) is intended, labeled, packaged, and certified to meet the requirements of the countries in which 3M sells it. Those requirements differ around the world, including as it relates to, for example, respirator performance, local language, and local certification and approval for sale and use. As a result, 3M PPE imported from other countries may not meet local requirements. Please confirm such PPE meets all applicable requirements prior to use.

For technical assistance regarding the selection and use of 3M respirators, please contact your local 3M Technical Service team. In the U.S., you can call 1 (800) 243-4630. In Canada, you can call 1 (800) 364-3577.

**For more information, contact the 3M Help Center at 1 (888) 364-3577 in the United States. In Canada, please contact 3M Canada Customer Service at 1 (800) 364-3577.**

3M Company
3M Center
St. Paul, MN
55144-1000

© 3M 2020. All Rights Reserved.
3M is a trademark of 3M Company and affiliates.
Used under license in Canada.

**Exhibit 8, attachment A**

REDACTED

On Mar 30, 2020, at 7:36 PM, ████████████████████████ wrote:

████████,

I just took a phone call from Dan Symon, NYC Chief Procurement Officer – Director, Mayor's Office of Contract Services, who wanted me to vet this source claiming they have 35 million 3M respirators in NYC.

**Exhibit 8, attachment B**

I know your team had a meeting with Gov Cuomo's AG's office today.  Dan provided me the correspondence that came through this entity along with their Letter of Intent.  I told him not to trust this person and that they are not associated with 3M.

**Please see attached.**



From: Symon, Daniel (MOCS) <dan.symon@mocs.nyc.gov>
Sent: Monday, March 30, 2020 8:25 PM

2

**Exhibit 8, attachment B**

**To:** Lawrence Siegel (DCAS) <LSiegel@dcas.nyc.gov>
**Subject:** Fwd: Masks/attestation of funds letter.


Dan Symon
NYC Chief Procurement Officer
Director, Mayor's Office of Contract Services

**From:** Symon, Daniel (MOCS)
**Sent:** Monday, March 30, 2020 7:56:28 PM
**To:** ███████████████████
**Subject:** RE: Masks/attestation of funds letter.

Attached.

**From:** ███████████████████ >
**Sent:** Monday, March 30, 2020 7:28 PM
**To:** Symon, Daniel (MOCS) <dan.symon@mocs.nyc.gov>
**Subject:** RE: Masks/attestation of funds letter.

Dan,

This is addressee:

3M Company Trust Account
7750 N MacArthur Blvd
Irving Texas 75039

Upon receipt of proof of funds/letter of attestation we will provide proof of life and address of goods so you can inspect.


Thanks.

███

Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Symon, Daniel (MOCS)" <dan.symon@mocs.nyc.gov>
Date: 3/30/20 7:05 PM (GMT-05:00)
To: ███████████████████
Subject: RE: Masks/attestation of funds letter.

Hi ██████ .  Nothing attached here.  But we also need to see proof of life.  If there's 20 million masks in nyc, where can I see them?  I'll drive there tonight.  What payment terms are being suggested?  Can you send a quote?  What is the name of the company?

Dan Symon
NYC Chief Procurement Officer
Director, Mayor's Office of Contract Services

3

**Exhibit 8, attachment B**

Visit **nyc.gov/coronavirus** to learn how to protect yourself and others from COVID-19.

---

**From:** ██████████████████ >
**Sent:** Monday, March 30, 2020 7:02 PM
**To:** Symon, Daniel (MOCS) <dan.symon@mocs.nyc.gov>
**Subject:** Masks/attestation of funds letter.

Dan,

Nice meeting you on the phone. As per our conversation I spoke to the seller of The Masks. He asks in place of a proof of funds that we provide an attestation of funds letter from an attorney.

I'm attaching a copy sample for your review.

I'm assuming you could get from the Comptroller's office or Corp counsel.

It would be in the amount for these particular masks, which would be $5.75 a mask  for the 20 million 3M 8210 and $5.75 a mask for 500,000 3M 1860.

Thank you.

Best,

██████████████████

Sent from my Verizon, Samsung Galaxy smartphone

---

Sent from the Department of Citywide Administrative Services. This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. This footnote also confirms that this email message has been swept for the presence of computer viruses.

<Letter of Intent 3.30.pdf>

**Exhibit 8, attachment B**