UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

3M COMPANY,

                    Plaintiff,                                    20 Civ.  02949 (LAP)(KNF)

            -against-

PERFORMANCE SUPPLY, LLC,

                              Defendant.

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

LORETTA A. PRESKA, Senior United States District Judge:

Following the hearing on May 4, 2020, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.   Procedural History

1.      Plaintiff 3M Company ("3M") commenced this lawsuit against Defendant Performance Supply, LLC ("Defendant") on April 10, 2020.  *See* Dkt. No 1 (as re-filed at Dkt No. 9; hereinafter, the "Cplt.").  3M duly served the Defendant's President, Mr. Ronald Romano, with the Summons and Complaint on April 14, 2020.  *See* Dkt. No. 18.

2.      In the Cplt., 3M alleges that Defendant is using the "3M" trademarks to perpetrate a false and deceptive price-gouging scheme on unwitting consumers, including agencies of government, in connection with the attempted sale of 3M's N95 respirators during the global COVID-19 pandemic.  Cplt. at ¶ 1.

3.      In the Cplt., 3M seeks relief for: (i) federal trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (ii) federal unfair competition, false association, false endorsement, and false designation of origin under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (iii) federal trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (iv) federal false advertising under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (v) deceptive acts and practices under NEW YORK GENERAL BUSINESS LAW ("GBL") § 349; (vi) false advertising under GBL § 350; (vii) dilution and injury to business reputation under GBL § 360-*l*; (viii) trademark infringement under New York common law; and (ix) unfair competition under New York common law.  *See generally* Cplt.

4.     On April 24, 2020, 3M duly filed an application (the "Application") for a temporary restraining order ("TRO") and preliminary injunction ("PI") against Defendant.  *See* Dkt. No. 12.  In support of 3M's Application, it submitted: (i) a Memorandum of Law; (ii) the Declaration of Charles Stobbie (the "Stobbie Decl."); (iii) the Declaration of David A. Crist (the "Crist Decl."); and (iv) the Declaration of A. John P. Mancini, Esq. (the "Mancini Decl.").  *See* Dkt. No. 13-16.  3M also duly served all of the aforementioned documents on Mr. Romano on April 22, 2020 before filing them on April 24.  *See* Dkt Nos. 13-16

5.     In the Application, 3M sought an Order, pursuant to FED. R. CIV. P. 65(a), that directed Defendant to show cause (the "Order to Show Cause") as to why this Court should not preliminarily enjoin Defendant, its agents, servants, employees, officers, attorneys, and all persons and entities in active concert or  participation with any of them, from engaging in any of the following acts and conduct during the pendency of this lawsuit:

a.   using the "3M" trademarks (the "3M Marks," as defined in the Application), the slogan "3M. Science Applied to Life" (the "3M Slogan"), and any other word, name, symbol, device, or combination thereof that is confusingly similar to the 3M Marks and/or the 3M Slogan, for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, Plaintiff's 3M-brand N95 respirators, during the pendency of this action, and

b.   engaging in any false, misleading, and/or deceptive conduct in connection with 3M and its products, including, without limitation, representing itself as being an authorized distributor, vendor, agent, representative, retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators); falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of

3M's products; falsely representing that 3M has increased the price(s) of its 3M-brand N95 respirators; and offering to sell any of 3M's products at a price and/or in a manner that would constitute a violation of GBL § 369-R.  *See* Dkt. No. 12 at ¶ 1(a)-(b).

6.      In the Application, 3M also sought an Order, pursuant to FED. R. CIV. P. 65(b), that temporarily restrained Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from engaging in any of the acts and/or conduct described in Paragraph 5(a)-(b), *supra*, from the date of this Court's granting of 3M's Application, through and including the Date of the Show Cause Hearing.  *See* Dkt. No. 12 at ¶ 2.

7.      On April 24, 2020, this Court granted 3M's Application for the Order to Show Cause in its entirety.  *See* Dkt. No. 17.  This Court did not require 3M to post a bond.  *See* Order to Show Cause at ¶ 3.

8.      In the Order to Show Cause, the Court ordered 3M to serve the Order, together with 3M's Memorandum of Law, and the Stobbie, Crist, and Mancini Decls., respectively, on Mr. Romano by overnight courier or mail and/or personal service by April 25, 2020 at 5 pm.  *See* Order to Show Cause at ¶ 4.  Pursuant to the Order to Show Cause, 3M duly served Mr. Romano with the aforementioned documents via personal service on April 24, 2020 at 5:20 pm.  *See* Dkt. No. 19.

9.      In the Order to Show Cause, the Court ordered Defendant to file its opposition to 3M's Application by April 30, 2020 at Noon Eastern Daylight Time.  *See* Order to Show Cause at ¶ 6.  The Court ordered 3M to file its reply papers, if any, by May 2, 2020 at Noon Eastern Daylight Time.  *Id*.  Defendant did not oppose 3M's application.  Accordingly, 3M did not file a reply in further support of its Application.

10.     The Court scheduled a telephonic hearing on 3M's Application for May 4, 2020 at 11 am Eastern Daylight Time.  *See* Order to Show Cause at ¶ 1.

11.     The following Findings of Fact ("FOF") derive from 3M's Application (including its supporting Memorandum of Law, and the Stobbie, Crist, and Mancini Decls.), the record, and the proceedings held to date in this lawsuit.

## II.    COVID-19 and the Current National Emergency

12.     Over the last four months, the world has seen an outbreak of a highly contagious virus, known as COVID-19, creating an international state of emergency.  *See* Mancini Decl. at ¶ 5, Ex. 1.  According to the Center for Disease Control and Prevention, reported illnesses from COVID-19 "range[] from very mild (including some with no reported symptoms) to severe, including illness resulting in death."  *Id*. at Ex. 1, p. 4.

13.     The virus that causes COVID-19 (namely, the novel coronavirus) is believed to pass from person-to-person via airborne particles and liquids.  *See* Mancini Decl. at Ex. 1.  N95 respirators can prevent virus-carrying particles from reaching the wearer when appropriately selected, fitted, and worn over the mouth and nose.  *See* Stobbie Decl. at ¶ 5; *see also* Mancini Decl. at Ex. 4, p. 1.  Accordingly, current guidelines recommend that healthcare personnel wear respiratory protection, including N95 respirators, when interacting with infected patients in order to reduce the workers' risk of exposure to the virus.  *See* Mancini Decl. at Ex. 2, p. 5.

## III.   Plaintiff 3M

14.     3M (then, Minnesota Mining and Manufacturing company) began over 100 years ago as a small-scale mining venture in Northern Minnesota.  *See* Crist Decl. at ¶ 4.  3M has grown into an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  *Id*.  3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to medical devices and equipment.  *See id*. at Ex. 1.

### A.    The 3M Brand

15.    3M provides goods and services throughout the world under numerous brands, including well-known brands such as: ACE; POST-IT; SCOTCH; NEXCARE; and more.  *See* Crist Decl. at Ex. 2.

16.    However, 3M's most famous and widely recognized brand is its eponymous "3M" brand.  *See* Crist Decl. at ¶ 7.  The 3M brand encompasses products and materials for a wide array of medical devices, supplies, and personal protective equipment ("PPE"), including, for example: stethoscopes; medical tapes; surgical gowns; blankets; bandages and other wound-care products; and respirators.  *See id*. at Ex. 3.  3M-branded products are highly visible throughout numerous hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely on the high quality and integrity associated with the 3M brand.  *Id*. at ¶ 8.  3M employs strict quality-control standards in manufacturing all of its products, including its products used in the fields of healthcare and worker safety.  *Id*.  at ¶ 9.

### B.    The 3M Marks

17.    Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to customers throughout the world (including its 3M-brand N95 respirators) under the standard-character mark "3M" and the 3M design mark **3M** (together, the "3M Marks").  *See* Crist Decl. at ¶ 10.  3M also uses its famous "3M Science. Applied to Life" slogan (the "3M Slogan") in connection with the promotion of its goods and services.  *Id*.

18.    During this period, 3M's goods and services offered under its 3M Marks, in particular, have been the subject of widespread, unsolicited media coverage and critical acclaim.  *See* Crist Decl. at ¶ 11.  Products offered by 3M using its 3M Marks have also enjoyed enormous

commercial success (including, without limitation, its range of 3M-brand N95 respirators). *Id*. at ¶ 12.

19.     To strengthen 3M's common-law rights in and to its 3M Marks and 3M Slogan, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, inter alia, respirators (the "'534 Registration"); and (iii) U.S. Trademark Reg. No. 5,469,903, which covers the "3M Science. Applied to Life" slogan in a number of Int. Classes, including Int. Class 9 for facial masks and respirators (the "'903 Registration"). *See* Crist Decl. at ¶¶ 13-5, Exs. 4, 6, 8.

20.     Pursuant to Section 15 of the Lanham Act, namely, 15 U.S.C. § 1065, on April 2 2014, the United States Patent and Trademark Office (the "PTO") issued a Notice of Acknowledgement of 3M's Declaration of Incontestability of the '329 Registration. *See* Crist Decl. at Ex. 5.  On December 21, 2009, the PTO issued a Notice of Acknowledgement of 3M's Declaration of Incontestability of the '534 Registration. *See id*. at Ex. 7.

**C.    3M's N95 Respirators**

21.     3M is a leading manufacturer of N95 respirators. *See* Stobbie Decl. at ¶ 4.  In fact, "3M's N95 [respirators] are considered the gold standard by medical workers and public-health officials."  Mancini Decl. at Ex. 4, p. 3.  3M's N95-rated filtering facepiece respirators have a filtration efficiency of at least 95% against non-oily particles when tested using the U.S. National Institute for Occupational Safety and Health criteria. *Id*. at p. 1; *see also* Stobbie Decl. at ¶ 5.

22.     3M has sold N95 respirators in the United States under the 3M brand name and 3M Marks for decades.  *See* Crist Decl. at ¶ 10.  Since the COVID-19 outbreak began, the public has become even more familiar with 3M as a manufacturer of N95 respirators and other equipment essential to protecting healthcare personnel and workers from exposure to airborne particles.  *See id.* at ¶ 17; Stobbie Decl. at ¶ 13.  For example, in early March 2020, Vice President Pence and Dr. Deborah Birx, made a highly publicized visit to 3M's corporate headquarters in Minnesota, during which they discussed and "praise[d]" 3M and its N95 respirators.  *See* Mancini Decl. at Ex. 5.

**D.     3M's Production and Sale of N95 Respirators During COVID-19**

23.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are 3M-brand N95 respirators.  Stobbie Decl. at. ¶¶ 6, 7.

24.     Since the outbreak of COVID-19 in early 2020, 3M has doubled its global output rate of filtering facepiece respirators, such as N95 respirators, to 1.1 billion per year, to seek to ensure that adequate supply is available to governments and healthcare personnel, as well as to workers in other critical industries, including food, energy and pharmaceutical.  *See* Stobbie Decl. at Ex. 1.  3M is currently producing 35 million of its 3M-brand N95 respirators each month in the United States.  *Id.* at Exs. 1, 2.  Approximately 90% of these respirators are now distributed for use by healthcare workers.  *Id.* at Exs. 1, 3.

25.     Notwithstanding the surging demand and public need for PPE during COVID-19, 3M has confirmed publicly that it will not increase the prices of its 3M-brand N95 respirators as a result of the COVID-19 crisis.  *See* Stobbie Decl. at ¶ 12, Ex. 3.

**E.     3M's Efforts to Help Curtail Unlawful Conduct During COVID-19**

26.     Opportunistic third parties in the United States are seeking to exploit the increased demand for 3M-brand N95 respirators by offering to sell them for exorbitant prices, associating

3M with those exorbitant prices, falsely claiming that their exorbitant prices are a result of 3M price increases, selling counterfeit versions of 3M-brand N95 respirators, and seeking and accepting money for purported quantities of 3M-brand N95 respirators that they do not possess or are not authorized to sell.  *See* Stobbie Decl. at ¶ 17.

27.     3M is working with law enforcement, retail partners, and others to help thwart third-party price-gouging, counterfeiting, and fraud in relation to 3M-brand N95 respirators during COVID-19.  *See* Stobbie Decl. at ¶ 14.  For example, on March 24, 2020, 3M's Chief Executive Officer, Mike Roman, sent a letter to U.S. Attorney General William Barr, and the President of the National Governors' Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  *See id*. at Ex. 4.  Additional examples of 3M's efforts to thwart price-gouging, counterfeiting, and fraud during COVID-19 include:

a.   3M posted the single-case U.S. list price for several of its 3M-brand N95 respirators on its website so that customers can more readily identify and avoid inflated prices (*see id*. at Ex. 5);

b.   3M created a form on its website through which customers can report suspected incidents of price-gouging and counterfeiting (*see id*. at Ex. 6); and

c.   3M established a fraud "hotline" that customers can call to verify the authenticity of purported 3M authorized distributors and to report suspect incidents of price-gouging and counterfeiting.  *See id*. at Ex. 3. p. 3.

28.     3M also actively investigates and acts on complaints in order to protect the goodwill and reputation of the 3M brand, as well as to protect customers and healthcare workers who rely upon the availability and proven quality of authentic 3M-brand N95 respirators.  *See* Stobbie Decl. at ¶ 16.

29.     Additionally, 3M has taken legal action against third parties who use the 3M Marks and/or 3M Slogan to confuse and deceive consumers into believing that they are authorized 3M distributors, vendors, or representatives, as well as third parties who offer to sell purported 3M-brand N95 respirators for exorbitant prices.  Examples of this legal action include:

a.     *3M Company v. Rx2Live, LLC*, Case No. 1:20-cv-00523, presently pending in the United States District Court for the Eastern District of California (*see* Mancini Decl. at Ex. 7);

b.     *3M Company v. John Doe, claiming to be the "3M Company Trust Account,"* Cause No. DC-20-05549, presently pending in Dallas County, Texas District Court (*id*. at Ex. 8);

c.     *3M Company v. Geftiko, LLC*, Case No. 6:20-cv-00648, presently pending in the United States District Court for the Middle District of Florida, Orlando Division (*id*. at Ex. 9);

d.     *3M Company v. King Law Center, Chartered*, Case No. 6:20-cv-00760, presently pending in the United States District Court for the Middle District of Florida, Orlando Division;

e.     *3M Company v. TAC2 Global LLC*, Case No. 8:20-cv-01003, presently pending in the United States District Court for the Middle District of Florida, Tampa Division;

f.     *3M Company v. 1 Ignite Capital, LLC*, *et al.*, Case No. 4:20-cv-00225, presently pending in the United States District Court for the Northern District of Florida, Tallahassee Division;

g.     *3M Company v. Zachary Puznak*, *et al*, Case No. 1:20-cv-01287, presently pending in the United States District Court for the Southern District of Indiana, Indianapolis Division; and

h.     *3M Company v. Hulomil LLC*, Case No. 3:20-cv-00394, presently pending in the United States District Court for the Western District of Wisconsin.

IV.     **Defendant Performance Supply, LLC**

30.     Defendant purportedly operates out of Englishtown, New Jersey.  *See* Stobbie Decl. at ¶ 19, Ex. 7; *see also* Crist Decl. at ¶ 19, Ex. 9.  Defendant does not appear to have any website or social media.  *See* Mancini Decl. at ¶¶ 14, 15.  Defendant's president, Mr. Ronald Romano, appears to sell vehicles as his primary business.  *Id*. at ¶ 16, Exs. 10-12.

31.     Defendant is not, and has never been, a licensed or authorized distributor, agent, or representative of 3M-brand N95 respirators.  *See* Stobbie Decl. at ¶¶ 21, 23; Crist Decl. at ¶¶ 21, 23.  Yet, on or about March 30, 2020, Defendant sent Ms. Ebony P. Roberson, a Purchasing Agent at New York City's Office of Citywide Procurement, a detailed Formal Quote, offering to sell seven million 3M N95 respirators.  *See id*. at ¶ 19, Ex. 17; ¶ 19, Ex. 9.  Defendant stated that it would sell the respirators for $6.05 per mask for 2 million 3M 8210 masks and for $6.35 per mask for 5 million 3M 1860 masks.  *See id*.  As shown in the table below, Defendant's mark-up over 3M's listed single-case prices is more than five times as much:

| 3M Model | 3M's Per-Respirator List Price | Defendant's Per-Respirator Price | Markup |
|---|---|---|---|
| 1860 | $1.27 | $6.35 | 500% |
| 8210 | $1.02-$1.31 | $6.05 | 460-590% |

32.     In its one-page Formal Quote, Defendant reproduced 3M's marks *nine times* and referenced 3M's headquarters in St. Paul, Minnesota, seeking to imply a connection with 3M that does not exist.  *See* Stobbie Decl. at ¶ 20; Crist Decl. at ¶ 20.  Defendant also attached to the Formal Quote a 3M Technical Specification Sheet for both Models of 3M-brand N95 respirators that Defendant offered for sale.  *See id*.  The 3M design mark and 3M Slogan prominently appeared on both Technical Specification Sheets.  *Id*.  The 3M design mark also appeared on

10

both Technical Specification Sheets.  *Id*.  The standard-character 3M mark also appeared in the

Technical Specification Sheets.  *Id*.

33.     Based on Defendant's Formal Quote, Ms. Roberson prepared an "Evaluation

Request – Bid Document Review" as part of the City's quality-assurance measures.  *See* Stobbie

Decl. at ¶ 21; Crist Decl. at ¶ 21.  In the Evaluation Request, New York City officials twice

identified Defendant as a "vendor" of 3M-brand, N95 Model 8210 and 1860 respirators.  *See id*.

However, the New York City officials were mistaken.  As stated, *supra*, Defendant is not, and

never has been, an authorized distributor, vendor, or representative of 3M's products.  Defendant

also does not have, and has never had, an association or affiliation with 3M.  *See* Stobbie Decl.

at ¶¶ 21, 23; Crist Decl. at ¶¶ 21, 23.

34.     In the Formal Quote, Defendant also stated:

Due to the national emergency, ***acceptance of the purchase order is at the full
discretion of 3M*** and supplies are based upon availability.  The N95 masks 3M
can begin shipping in 2-4 weeks CIF at any of 3M [sic] plants in the USA or 3M
Plants Overseas according to their manufacturing schedule.  ***3M chooses the
plant***.  Order may be shipped in whole or in part.

*See* Stobbie Decl. at ¶ 22; Crist Decl. at ¶ 22.  (emphasis added).

35.     However, as stated, *supra*, Defendant is not authorized to solicit purchase orders

from customers for submission to 3M for approval.  *See* Stobbie Decl. at ¶ 22; Crist Decl. at ¶

23.

Nor is Defendant authorized to state how, where, or in what quantity such orders would be filled.

*Id*.

36.     Defendant's Formal Quote also does not accurately describe how 3M fills N95

orders.  *See* Stobbie Decl. at ¶ 23; Crist Decl. at ¶ 23.  3M fills orders for its N95 respirators by

accepting purchase orders from 3M's authorized distributors and wholesalers, or directly from

the government.  *Id*.  3M does not accept purchase orders from unauthorized resellers, like Defendant.  *Id*.

37.    The same day that Ms. Roberson received the Formal Quote, she contacted Eileen Simmons, a 3M Business Development Manager for government markets, for verification of Defendant's claim.  *See* Stobbie Decl. at ¶ 24; Crist Decl. at ¶ 24.  Ms. Simmons informed Ms. Roberson that Defendant is not associated with 3M, and so that potential sale was averted.  *Id*. Absent injunctive relief, however, there is nothing to prevent Defendant from making similar offers to other government or healthcare entities around the United States.  *Id*.

## CONCLUSIONS OF LAW

1.    "In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]."  *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018).  To obtain either, 3M must show: "(1) a likelihood of success on the merits […]; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

2.    3M is entitled to a PI because: (i) 3M faces irreparable harm in the absence of a PI; (ii) 3M is likely to succeed on the merits of its claims; (iii) the balance of equities favors issuing a PI; and (iv) entering a PI against Defendant would serve the public's interest in avoiding confusion about the source and quality of goods and services during the COVID-19 global pandemic.  *See discussion infra*.

## I.  3M Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

3.    Irreparable harm exists when "remedies available at law, such as monetary damages, are inadequate to compensate the plaintiff."  *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (granting preliminary-injunction motion).  Of particular significance

here and now, harm both to parties within a lawsuit *and to the public* may be considered when determining if failure to issue a preliminary injunction will result in irreparable harm. *Long Island R .Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901 (2d Cir. 1989) (preliminary injunction prohibiting union from striking was appropriate where the general public would sustain irreparable harm).

4.      Here, Defendant's conduct is likely to irreparably harm 3M in two respects, namely: (i) quality and (ii) reputation.

5.      The 3M brand and Marks are synonymous with superior quality.  This is not a coincidence.  For more than a century, 3M has invested hundreds of millions of dollars in advertising and marketing products under its 3M Marks and 3M Slogan. FOF at ¶¶ 17, 21.  3M also implements rigorous quality-control standards to ensure that all products offered under its famous 3M Marks and 3M Slogan are consistent and of the highest quality.  *Id*. at ¶ 16.

6.      However, 3M cannot control whether the products that Defendant is offering for sale and/or selling outside of its authorized trade channels adhere to 3M's rigorous quality-control standards.  *See* Crist Decl. at ¶¶ 28-9.  This constitutes irreparable harm.  *See El Greco Leather Prods. Co., Inc. v. Shoe World*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark"); *Mister Softee, Inc. v. Tsirkos*, No. 14-cv-1975-LTS-RLE, 2015 WL 7458619, *5 (S.D.N.Y. Nov. 23, 2015) (Finding irreparable harm because "Plaintiffs have no actual control over the quality of Defendant's products or services").

7.      Defendant also is using the 3M Marks to create the false impression that it is authorized to solicit large orders for N95 respirators at inflated prices on 3M's behalf during the

13

COVID-19 global pandemic.  No amount of money could repair the damage to 3M's brand and reputation if it is associated with the crime of price-gouging at the expense of healthcare workers and other first responders in the midst of the COVID-19 crisis.  *See* Crist Decl. at ¶¶ 25-7.  This too constitutes irreparable harm.  *See*, *e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) ("It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard").

8.      In short, 3M should not have its carefully curated brand and reputation left to the devices of Defendant's scheme to profit from a pandemic.  Yet, that is precisely what will happen in the absence of PI.  Accordingly, 3M has established irreparable harm.

## II.   3M Has Established a Likelihood of Success on the Merits of its Claims

9.      To obtain a PI, 3M must establish a likelihood of success on the merits of only one of its claims.  *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019).  However, because 3M is likely to succeed on the merits of its claims for trademark infringement, unfair competition, false endorsement, false association, and false designation of origin under Section 32 and 43(a)(1)(a) of the Lanham Act, and New York common law (collectively, the "Claims"), 3M seeks a PI on all of these Claims.

10.     For 3M to prevail on its Claims, it must satisfy two elements, namely: (i) that its 3M Marks and 3M Slogan are valid and entitled to protection, and (ii) Defendant is using the famous 3M Marks and/or 3M Slogan in a manner that is likely to create consumer confusion. *See Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998) (The same standard governs Section 32 and 43(a)(1)(A) claims; granting preliminary

injunction); *Avela, Inc. v. Estate of Marilyn Monroe, LLC,* 131 F. Supp. 3d 196, 209 (S.D.N.Y. 2015).

      **A.**     **3M is Likely to Establish the Validity of its 3M Marks and 3M Slogan**

      11.     The '329 and '534 Registrations for the 3M Marks are "incontestable" within the meaning of 15 U.S.C. § 1065.  FOF at ¶¶ 19, 20.  Accordingly, the 3M Marks are conclusively valid and entitled to protection.  *See* 15 U.S.C. § 1115(b); *accord Lexington Mgmt. Corp.,* 10 F. Supp. 2d at 277-78.  The '903 Registration for the 3M Slogan is on the Principal Trademark Register.  FOF at ¶¶ 19, 20.  Accordingly, the 3M Slogan is *prima facie* valid and entitled to protection.  *See* 15 U.S.C. § 1115(a).

      12.     Based on the foregoing, 3M is likely to establish the validity and protectability of its 3M Marks and 3M Slogan.

      **B.**     **3M is Likely to Establish that Defendant's Use of the 3M Marks and 3M Slogan is Likely to Cause Confusion as to Source and/or Quality**

      13.     "The likelihood-of-confusion prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark."  *Guthrie Healthcare System v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

      14.     To determine whether a likelihood of confusion exists, courts in this Circuit use the eight "*Polaroid*" factors, namely: "1) the strength of the plaintiff's mark; 2) the degree of similarity between marks; 3) the proximity of the products or services; 4) the likelihood that the senior user will 'bridge the gap' into the junior user's product or service line; 5) evidence of actual confusion between the marks; 6) whether the defendant adopted the mark in good faith; 7) the quality of defendant's products or services; and 8) the sophistication of the parties'

customers." *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 278 (referencing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.))

15.     Here, 3M is likely to establish that the balance of relevant *Polaroid* factors weighs overwhelmingly in its favor.

### i.     The First *Polaroid* Factor: the 3M Marks and Slogan are Strong

16.     "The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). Courts measure a mark's distinctiveness in two ways, namely: (i) conceptual strength (*i.e.,* "inherent distinctiveness"), and (ii) commercial strength (*i.e.,* "acquired distinctiveness"). *See Streetwise Maps, Inc.,* 159 F.3d at 743-44.

### a.     The 3M Marks are Conceptually Strong

17.     To determine a mark's conceptual strength, courts use "Judge Friendly's familiar test for the inherent distinctiveness of trademarks in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir. 1976)." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 377 (2d Cir. 1997). "The Abercrombie test classifies verbal marks into four categories which run in a continuum: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Landscape Forms, Inc.,* 113 F.3d at 377.

18.     Here, "3M" is not a word, and has no inherent relationship to the goods or services for which the marks are used, namely, N95 respirators. Accordingly, the 3M Marks are fanciful and, thus, inherently distinctive when used for respirators. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) ("[A] fanciful mark is not a real word at all, but is invented for its use as a mark"); *Landscape Forms, Inc.*, 113 F.3d at 377 ("[F]anciful trademarks are inherently distinctive [...]").

16

### b.     The 3M Marks are Commercially Strong and Famous

19.     A mark is commercially strong if it has acquired "secondary meaning," *i.e.*: "in the minds of the public, the primary significance of [the mark] […] is to identify the source of the product rather than the product itself." *Christian Louboutin, S.A. v. Yves Saint Laurent America Holdings, Inc.,* 696 F.3d 206, 216 (2d Cir. 2012).

20.     As discussed, *supra*, the 3M Marks are incontestable.  Accordingly, the 3M Marks have acquired secondary meaning as a matter of law.  *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 391 (2d Cir. 2002) ("Because FSLC continually maintained its registration of the mark, FSLC's mark is incontestable and, as a matter of law, it has acquired secondary meaning").

21.     Even in the absence of 3M's incontestable registrations, it is likely to establish that its 3M Marks and 3M Slogan have acquired secondary meaning.  As discussed, *supra*, 3M has invested hundreds of millions of dollars in advertising, marketing, and promoting goods and services under the 3M Marks and 3M Slogan; goods sold under the 3M Marks and 3M Slogan, including 3M's N95 respirators, enjoy enormous commercial success; the 3M Marks and 3M Slogan are recognized and well-known in households around the U.S.; and 3M has been the exclusive source of goods and services offered under the 3M Marks and 3M Slogan for several decades.  FOF at ¶¶ 17-8, 21-22; *accord 3M Co. v. Christian Investments LLC*, No. 1:11CV0627 TSE/JFA, 2012 WL 6561732, at *8 (E.D. Va. July 12, 2012) (Holding 3M Marks were distinctive and famous; "Plaintiff has used the 3M mark since 1906, it offers more than 50,000 products and services in a wide variety of fields and markets under the 3M mark, the 3M mark is distinctive and distinguishes the source of plaintiff's products and services […]").

22.     Based on the foregoing, the first *Polaroid* factor favors 3M.

ii.     **The Second *Polaroid* Factor: Defendant Reproduced the 3M Marks and Slogan in Their Entirety**

23.     Defendant reproduced the 3M Marks and Slogan in their entirety in the Formal Quote and Technical Specification Sheets.  FOF at ¶¶ 32, 33.  Accordingly, the second *Polaroid* factor favors 3M.  *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) ("For the purpose of considering the question of the similarity of the marks, the district court correctly determined that as a matter of law these marks [*i.e.*, "COTT" v. "COTT"] are identical").

iii.    **The Third *Polaroid* Factor: Defendant Purported to Sell the Same Products that 3M is Widely Known for Selling**

24.     It has become commonplace knowledge that 3M manufactures and sells N95 respirators under its 3M Marks.  FOF at ¶¶ 21-2.  Accordingly, Defendant's offering of N95 respirators under the 3M Marks heightens the likelihood of consumers confusing the source of products from Defendant as originating from 3M.  *See Guthrie Healthcare Sys.,* 826 F.3d at 39 (Under the third *Polaroid* factor, courts consider "the subject matter of the commerce in which the two parties engage [...]"; finding a likelihood of confusion because, among other things, both parties provides healthcare-related goods and services); *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2005) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.").  Accordingly, the third *Polaroid* factor favors 3M.

iv.     **The Fourth *Polaroid* Factor: There is No "Gap" to Bridge**

25.     The fourth *Polaroid* "factor addresses the question of whether the two companies are likely to compete directly in the same market." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 239-40 (S.D.N.Y. 2012). When, as here, the parties' goods are the same, this *Polaroid* factor is irrelevant because there is no gap to bridge.  *See, e.g., Mister Softee, Inc.*

*Tsirkos,* 2014 WL 2535114, \*5 (S.D.N.Y. June 5, 2014) (issuing preliminary injunction; fourth *Polaroid* factor irrelevant where both parties sold ice cream).

> **v.**     **The Fifth *Polaroid* Factor: Defendant Actually Confused New York City Officials into Identifying Him as a 3M "Vendor"**

26.     Here, evidence of actual confusion is demonstrated by Ms. Roberson's March 30 Evaluation Request, wherein New York City officials mistakenly identified Defendant as a "vendor"—*twice*—of 3M-brand N95 respirators.   FOF at ¶¶ 32-34.   Accordingly, the fifth *Polaroid* factor favors 3M.  *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) ("The existence of some evidence of actual confusion, the fifth *Polaroid* factor, further buttresses the finding of a likelihood of confusion").

> **vi.**    **The Sixth *Polaroid* Factor: Defendant is Using the 3M Marks in Bad Faith**

27.     "A defendant's good faith—or lack thereof—in adopting its mark is highly consequential among the *Polaroid* factors." *Louis Vuitton Malletier v. Sunny Merchandise*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015).  To be sure, "where the second-comer has adopted its mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement. Courts have found a presumption of likelihood of confusion in such circumstances." *Louis Vuitton Malletier*, 97 F. Supp. 3d at 496.

28.     Prior to the rise of COVID-19, 3M's federal trademark registrations placed Defendant on constructive notice of 3M's superior rights in and to, among other things, the 3M Marks.  *See* 15 U.S.C. § 1072 ("Registration of a mark on the principal register [...] [constitutes] constructive notice of the registrant's claim of ownership thereof"). Subsequent to COVID-19, 3M's manufacture and sale of N95 respirators has become common, household knowledge, with government officials like President Donald Trump and Vice President Mike Pence drawing

extensive attention to 3M and its respirator masks over the last month.  *See* Stobbie Decl. at ¶ 13, Ex. 4.

29.     Accordingly, there is no question that Defendant also adopted the 3M Marks with actual knowledge of 3M's rights therein.  There is likewise no question that Defendant uses the 3M Marks to exploit the Marks' widespread fame and goodwill.  Indeed, Defendant's primary line of business is selling vans and other vehicles, and it did not begin attempting to sell purported 3M-brand N95 respirators until after the COVID-19 global pandemic began.  FOF at ¶ 31.  This is textbook bad faith.  *See Louis Vuitton Malletier v. Sunny Merchandise*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015) (explaining that the sixth *Polaroid* factor "is an equitable inquiry which seeks to answer the overarching question of whether defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill").

30.     Based on the foregoing, the sixth *Polaroid* factor favors 3M.  *See Paddington Corp. v. Attiki Importers & Distrib.*, 996 F.2d 577, 586-87 (2d Cir. 1993) (when actual or constructive knowledge "is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith").

### vii.     The Seventh *Polaroid* Factor: Defendant's Use of the 3M Marks Jeopardizes – Irreparably – the Reputation of the 3M Brand and Marks

31.     The seventh *Polaroid* factor concerns "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Louis Vuitton Malletier*, 97 F. Supp. 3d at 497-98.  As discussed, *supra*, that is precisely what will happen to carefully curated 3M brand if Defendant continues using the 3M Marks to create the false impression that it is an authorized representative of 3M products and/or in connection with unlawful price-gouging.  Accordingly, the seventh *Polaroid* factor favors 3M.  *See Henegan Const. Co., Inc.* v. *Heneghan Contracting Corp.*, No. 00 CIV.9077 JGK, 2002 WL 1300252, at

*8 (S.D.N.Y. June 12, 2002) ("The fact that the plaintiff has maintained high-quality services for so many years makes it more likely that it would be damaged if its reputation were placed beyond its control").

> **viii.**      **The Eighth *Polaroid* Factor: In the Era of COVID-19, Normally Prudent Purchasers Must Make Rash Purchasing Decisions**

32.    The eighth and final *Polaroid* factor concerns "the sophistication of the consumers and the degree of care likely to be exercised in purchasing the product." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 456 (S.D.N.Y. 2017). In the current pandemic, purchasers of N95 respirators are government entities and hospitals and healthcare providers. *See*, *e.g.*, Stobbie Decl. at ¶ 25. These customers are sophisticated and prone to exercise high degrees of care; however, the current state of emergency has stymied the ability of customers to take the time and conduct the diligence necessary to show extensive care. For example, to obtain purported 3M-brand N95 respirators as quickly as possible, one New York City procurement official offered to drive an unknown distance, late at night, to inspect the respirators. *See* Stobbie Decl. at ¶ 25. Accordingly, in this unique environment, the eighth *Polaroid* factor favors 3M.

> **ix.**      **All of the *Polaroid* Factors Strongly Favor 3M**

33.    In sum, each of the relevant *Polaroid* factors strongly favor 3M. This "powerful showing of a likelihood of confusion" (*Guthrie Healthcare Sys.*, 826 F.3d at 46), combined with the overwhelming strength and validity of the 3M Marks, and Defendant's bad faith, establish that 3M is likely to succeed on the merits of its Claims.

> **C.**      **3M is Likely to Succeed on its Claim for False Advertising Under Section 43(a)(1)(B)**

34.    3M also is likely to succeed on the merits of its claim for false advertising under Section 43(a)(1)(B) of the Lanham Act.

35.     In the Formal Quote, Defendant made detailed factual representations concerning the nature of 3M's business operations.  *See* FOF at ¶ 34.  For example, Defendant represented that, "[d]ue to the national emergency, acceptance of the purchase order is at the full discretion of 3M."  *Id*.   Defendant further represented in the Formal Quote that 3M allegedly ships its products CIF, and that 3M will determine the production site for the order.  *Id*.  However, these representations are false on their face.  *See* FOF at ¶ 36.  Given the level of specificity in these representations, they also are likely to – and, in fact, *did* – deceive a reasonable consumer into believing that Defendant is an authorized distributor of 3M products and/or has an association or affiliation with 3M.  Sadly, in this case, Defendant's Formal Quote actually misled and deceived experienced buyers in the Procurement Office of one of the world's largest cities into believing that Defendant was an authorized "vendor" of approximately $45 million-worth of 3M-brand N95 respirators.  *See* FOF at ¶¶ 31-37.

36.     Based on the foregoing, 3M also is likely to succeed on its claim under Section 43(a)(1)(B) of the Lanham Act for false advertising.  *Accord Church & Dwigh v. SPD Swiss Precision Diagnostics*, 843 F.3d 48, 65 (2d Cir. 2016).

   **D.     3M is Likely to Succeed on its Claims for Deceptive Acts and Practices, and False Advertising, Under GBL §§ 349, 350**

37.     In addition to creating confusion about the source and quality of the purported 3M-brand N95 respirators that Defendant attempted to sell, Defendant's conduct results in a diversion of critical public resources, which places lives at risk.  *See* Crist Decl. at ¶ 29.  These resources include the time spent by public officials to pursue false/fraudulent leads and the money spent to purchase products at inflated prices.  *Id*.  This waste of resources further diminishes the ability of public officials and procurement officers to investigate and identify

other counterfeit and inferior quality supplies as buyers are pressured to place large orders swiftly for essential PPE. *Id.*

38.    Accordingly, because Defendant's trademark infringement, unfair competition, and false advertising presents a substantial threat to public health and safety, 3M also is likely to prevail on the merits of claims for deceptive acts and practices, and false advertising, under GBL §§ 349, 350. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265-22 (2d Cir. 1995) (§ 349 claim stated where defendant provided false information to regulatory agency tasked with protecting public health and safety); *In re Houbigant Inc.*, 914 F. Supp. 964, 983-84 (S.D.N.Y. 1995) (§§ 349, 350 claims stated where defendants were part "of an unlawful scheme" to, *inter alia*, "deceive customers as to the source and origin of the products" at issue).

### III.    The Balance of Hardships Tips Decidedly in 3M's Favor

39.    It would not be a "hardship" for Defendant to refrain from engaging in unlawful activities related to 3M's brand (which constitute, *inter alia*, trademark infringement, false association, and price-gouging).  This is especially true given that Defendant sells products unrelated to 3M's brand (*e.g.*, vehicles and automobiles), and could continue doing so under a PI. FOF at ¶ 31; *see also WpIX, Inc. v. lvl, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer […] cannot complain about the loss of ability to offer its infringing products"; "[t]he balance of hardships, therefore, clearly tips in plaintiffs' favor"); *see also New York City Triathlon Club, LLC*, 704 F. Supp. 2d at 344 (Entering preliminary injunction that did "not prohibit Defendant from operating a training club [in general].  It only prohib[ited] Defendant from operating a training club using the name that infringes upon Plaintiff's Marks").

40.    Unlike Defendant, 3M would suffer substantial hardship in the absence of a TRO and PI.  Indeed, as discussed, *supra*, Defendant's unlawful conduct is likely to irreparably harm the 3M brand, 3M Marks and 3M Slogan.  Accordingly, the balance of hardships tips decidedly

in 3M's favor.  *See New York City Triathlon Club, LLC*, 704 F. Supp. 2d at 345 ("The balance of hardships in this case clearly favors Plaintiff.  As explained above, Plaintiff faces the threat of irreparable harm absent injunctive relief").

**IV.   Issuing a Preliminary Injunction Would Serve the Public Interest of Avoiding Confusion and Protecting Healthcare Workers, First Responders, and Critical Infrastructure Operations from the Risk of Receiving Protective Equipment of Unknown Quality and Inflated Prices**

41.    During the current COVID-19 pandemic, consumers and government officials, including those here in New York City, understandably lack the time and resources they would have in normal purchasing environments to ensure that sellers are who they purport to be (*e.g*, authorized distributors of 3M-brand products), and that products are what sellers claim they are (*e.g.*, genuine 3M-brand products).  Accordingly, when the public sees purported 3M-brand N95 respirators available for sale, they are relying on the 3M Marks and 3M Slogan and standards associated with the 3M brand now, more than ever, to indicate that the respirators offered for sale are, in fact, genuine and adhere to the 3M brand's rigorous standards.

42.    Sellers, such as Defendant, are seeking to exploit the fact that consumers are making rapid purchasing decisions during COVID-19 by falsely representing themselves as authorized distributors of 3M-brand products, as well as offering to sell those products at exorbitantly high prices.  Not only is this unlawful conduct likely to confuse and deceive the public about the source and quality of purported 3M-brand products offered under the 3M Marks and 3M Slogan, but also it creates an overall purchasing environment that is materially different from, and irreparably harms, the carefully curated 3M brand and customer experience.

43.    Accordingly, unless this Court enjoins Defendant's unlawful conduct, the public will continue suffering harm in the form of confusion and deception about the source and quality of the purported 3M-brand N95 respirators that Defendant is offering to sell for exorbitantly high

prices.  *See New York City Triathlon, LLC*, 704 F. Supp. 2d at 344 (consumers have an "interest in not being deceived—in being assured that the mark [they] associate [] with a product is not attached to goods of unknown origin and quality"); *see also NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328, 342 (S.D.N.Y. 2014) (consumers have a "protectable interest in being free from confusion, deception and mistake").

44.     Unquestionably, the protection of healthcare professionals who are putting their lives on the line in the fight against COVID 19 is in the public interest.  Those brave and selfless professionals deserve trustworthy supply lines of authentic PPE, including N95 respirators, that are free of misrepresentations, false designations of origin, and unscrupulous profiteering.

45.     Likewise, precious public resources should not be squandered on needless inquiries and investigations into the truth and the legality of basic commercial terms and representations made in the procurement process.  If the market (and the participants in the market) cannot be trusted, procurement will grind to a halt.  When lives are at stake and time is of the essence, as is clearly the case in this crisis, the public interest demands accountability.

Accordingly, the preliminary injunction shall issue.

**SO ORDERED.**

Dated:  May 4, 2020
            New York, New York

_____

LORETTA A. PRESKA, U.S.D.J.